**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **MARK JAY KRUM**<br>**Plaintiff,**<br>**v.**<br><br>**CHUBB LIMITED;**<br><br>**AND**<br><br>**GREAT NORTHERN INSURANCE COMPANY;**<br><br>**AND**<br><br>**CELIA SANTANA;**<br><br>**AND**<br><br>**DALE KRUPOWICZ;**<br><br>**AND**<br><br>**PERSONAL RISK MANAGEMENT SOLUTIONS, LLC,**<br><br>**Defendants.** | **CASE NO.: 1:20-cv-03616-RM-GPG**<br><br>**PLAINTIFF'S REPLY OPPOSITION EXHIBITS IN SUPPORT OF HIS MOTION FOR PARTIAL SJ** |

**PLAINTIFF'S REPLY IN SUPPORT OF HIS AMENDED MOTION FOR PARITAL SUMMARY JUDGMENT AGAINST DEFENDANT GREAT NORTHERN INSURANCE COMPANY REGARDING THE AMOUNT AND CAUSE OF THE THAS LOSS**

**REPLY EXHIBIT NO. 8**

A P P E A R A N C E S:

Representing the Plaintiff:

Mark Jay Krum, Esq.
500 East 83rd Street, Suite 8K
New York, NY 10028
212.371.2300 (Fax) 609.822.7400
MarkJayKrum@aol.com

Representing the Deponent:
Paul S. Weinberg, Esq.
Weinberg & Garber, P.C.
One Roundhouse Plaza, Suite 304
Northampton, MA 01060
413.582.6886 (Fax) 413.582.6881
pweinberg@w-g-law.com

Representing the Defendants Chubb Group Holdings, Inc.; Chubb INA Holdings, Inc.; Federal Insurance Company; Great Northern Insurance Company; Steve W. Mortensen and Matthew Witcher:

Amy M. Samberg, Esq.
Clyde & Co.
2301 Baker Street, Suite 100
Denver, CO 80205
Amy.Samberg@clydeco.us

Representing the Defendants Celia Santana and Dale Krupowicz:

Paul W. Jordan, Esq.
Gordon Rees Scully & Mansukhani LLP
555 Seventeenth Street, Suite 3400
Denver, CO 80202
pwjordan@grsm.com

Also present:
Priscilla "Cricket" Dye
Brian Capouch, Videographer



I N D E X


| EXAMINATION | PAGE |
|---|---|
| By Mr. Krum | 10 |

| EXHIBITS: | | PAGE: |
|---|---|---|
| Ex 154: | Plaintiff's Deposition Notice to Tom Kirkpatrick | 10 |
| Ex 26: | Notice Demanding Appraisals | 14 |
| Ex 53: | Email dated 7/1/20 from Mark Krum to Steven Magnotta; 6/17/20 email | 18 |
| Ex 54: | Email dated 7/8/20 to Mike Pavluk from Tom Kirkpatrick | 22 |
| Ex 57: | Email dated 7/26/20 to Steven Magnotta from Tom Kirkpatrick (Contents Consulting_011140) | 59 |
| Ex 56A: | Email dated 7/9/20 to Tom Kirkpatrick from Steven Magnotta (Chubb_040638) | 74 |
| Ex 56B: | Email dated 7/9/20 to Tom Kirkpatrick from Steven Magnotta (Contents Consulting_010982 and 010983) | 74 |
| Ex 55: | Email dated 7/23/20 to Steven Magnotta from Mark Krum with attached email chain | 82 |
| Ex 129: | Email dated 9/29/20 to Tom Kirkpatrick from Mike Pavluk, with attached email chain | 86 |
| Ex 139: | email chain dated 4/22/21 between Tom Kirkpatrick and Steven Magnotta (Contents Consulting_012091 and 012092) | 105 |





| EXHIBITS (Cont'd): | | PAGE: |
|---|---|---|
| Ex 21: | Appraisal award made 5/13/21 | 114 |
| Ex 60: | Email dated 7/7/20 to Tom Kirkpatrick from Arash Hajjam (Contents Consulting_010955) | 143 |
| Ex 160: | Email dated 8/20/2020 to Mike Pavluk from Tom Kirkpatrick with attached email chain, (Contents Consulting_011350-0113531) | 148 |
| Ex 22: | Supplemental Appraisal Award for Clarification Purposes Only, made May 17, 2021 | 150 |
| Ex 19A: | Photograph (Contents Consulting_008721) | 153 |
| Ex 19B: | Photograph (Contents Consulting_008732) | 157 |
| Ex 19C: | Photograph (Contents Consulting_000024) | 157 |
| Ex 19D: | Photograph (Contents Consulting_000025) | 159 |
| Ex 19E: | Photograph (Contents Consulting_000049) | 160 |
| Ex 2N: | Photograph (RETAINED) | 161 |
| Ex 25: | Email dated 6/12/20 to Mark Krum from Steven Magnotta | 163 |
| Ex 24: | Email dated 4/17/20 to Mark Krum from Steven Magnotta | 170 |
| Ex 24A: | J.S. Held report dated 4/15/20 to Steve Magnotta from Anthony Danza with Attachment 1 | 177 |
| Ex 24B: | J.S. Held report dated 4/16/20 to Steve Magnotta from Anthony Danza | 179 |
| Ex 24C: | Claimed Equipment Submitted on Frankentek list | 180 |
| Ex 31: | Frankentek report | 183 |
| Ex 32A: | Email dated 1/27/20 to Tommy Le from Mark Krum | 184 |





| EXHIBITS (Cont'd): | | PAGE: |
|---|---|---|
| Ex 32A-1: | Attachment 1 to Frankentek report (Frankentek Agreement) | 187 |
| Ex 32A-2: | Attachment 2 to Frankentek report (engineer drawings) | 188 |
| Ex 32A-3: | Attachment 3 to Frankentek report (CAT drawings) | 189 |
| Ex 32A-4: | Attachment 4 to Frankentek report (photographs) | 190 |
| Ex 32A-5: | Attachment 5 to Frankentek report (equipment price comparison sheet) | 191 |
| Ex 32B: | Email dated 1/27/20 to Tommy Le from Mark Krum | 192 |
| Ex 32B-1: | Attachment 6 to Frankentek report (fabric replacement estimate) | 193 |
| Ex 32B-2: | Attachment 7 to Frankentek report (acoustical treatment replacement) | 201 |
| Ex 32B-3: | Attachment 8 to Frankentek report (CAT Proposal 1-Summary) | 202 |
| Ex 32B-4: | Attachment 9 to Frankentek report | 220 |
| Ex 32B-5: | Attachment 10 to Frankentek report (AV equipment price comparison) | 221 |
| Ex 32B-6: | Attachment 11 to Frankentek report (Krum wiring schedule) | 221 |
| Ex 32B-7: | Attachment to Frankentek report (Audio/Video plans, Rack elevation) (Exhibit marked but not referenced) | |
| Ex 32B-8 | Attachment to Frankentek report (Owner's suite and upper level lighting) (Exhibit marked but not referenced) | |
| Ex 161: | Letter dated 5/21/21 to Mark Krum from Steven Magnotta | 227 |

Page 22

marked as Exhibit 54 in this deposition.
MR. KRUM: Sharon, Madam Court Reporter, would you mind putting a "54" on here, one of your exhibit tags? Thank you very much.
(Exhibit 54, email dated 7/8/20 to Mike Pavluk from Tom Kirkpatrick, marked)
BY MR. KRUM:
Q. I'm going to show this to your lawyer and to Ms. Samberg. While they're looking at it, I'm going to represent to you, Mr. Kirkpatrick, that this is an email dated July 8, 2020 sent from you to Mike Pavluk. Now, I did not see this in your -- your lawyer sent a whole bunch of documents to Ms. Samberg pursuant to a subpoena. Do you recall that they served on Contents Consulting, "they" being Chubb?
A. Yes.
Q. And I received 13,938 pages of whatever you produced to them, that's what Ms. Samberg produced to me. And I didn't see this document in any of the 13,938 pages. But I'm going to show it to you now and I believe it's an email, I represent to you based upon the document that I have in front of me, it was an email that you sent to Mr. Pavluk,

Page 23

Exhibit 54?
MS. SAMBERG: Object to the form.
BY MR. KRUM:
Q. And it's two pages. If you look at that, is that an email that you sent to Mr. Pavluk on July 8, 2020?
A. It is.
Q. Do you know why that wasn't produced in the 13,938 pages?
MS. SAMBERG: Form and foundation.
A. No.
MR. KRUM: Sharon, I just want to make sure, since we haven't had the pleasure of working together before, that you make sure that you get everything taken down. So, if the lawyers, just because they're quick to the draw, object while I'm still asking the question, I want to make sure that you complete my question on the transcript. And I'll make sure that I pause as much as I can to help out my colleagues on the other side, and you, too. If you can just make sure that occurs, okay?
BY MR. KRUM:
Q. Now, tell us what this email, what you

Page 24

were the -- the purpose of this email. Instead of me reading it, just tell us, if you could, characterize the purpose of it. You've had a chance to look at it again, right?
A. Yes.
Q. It refreshes your recollection of what you did on July 8, 2020?
A. Yes.
Q. Just tell us what the purpose was of sending Mr. Pavluk this email.
A. Twofold. It clarified that the umpires that Mr. Pavluk nominated, two were firms, not individuals, which certainly it is to be an individual, not a firm, that is, the umpire, asking if he had names that he wished me to consider. And I nominated Craig Rice as a possible umpire.
Q. And am I correct that I say the most important thing, but you'll tell us whether you agree or not, is that, Hey, Mr. Pavluk, I'm the one who's nominated by Chubb on its behalf to be the appraiser, one of the three appraisers on behalf of Chubb?
MS. SAMBERG: Object to form.
A. Again, you asked me what I thought it

Page 25

represented, I responded as the appraiser for Chubb.
Q. Right. It says right in the second sentence, "I have been selected by Chubb to act as the appraiser on their behalf."
A. I certainly didn't think that was the most important point or anything in dispute. Again, I was sending it to clarify who he was suggesting to be umpire and provide him with my suggestion.
Q. Nonetheless, this email, written by you, confirms that you are selected by Chubb to be their -- to be the appraiser on my THAS on Chubb's behalf?
A. Yes.
Q. And it does list one of the individuals, Mr. Daniel Stern, right, that Mr. Pavluk suggested or recommended as one of the -- as the third appraiser: Himself, Mike Pavluk on behalf of Krum --
A. Yes.
Q. -- Mr. Kirkpatrick on behalf of Chubb. And Pavluk says, I think we should use Mr. Daniel Stern as the so-called neutral.
A. Could you repeat that question?

Page 26

BY MR. KRUM:
Q. I'll withdraw the question and I'll state it again.
Mr. Pavluk had informed Chubb, which Mr. Magnotta, for which Mr. Magnotta informed you, that Pavluk's saying Mr. Daniel Stern could be one of the three appraisers?
MS. SAMBERG: Form and foundation.
A. He was suggested to be a possible umpire among three provided by Pavluk.
Q. Okay. You're saying umpire, I'm saying appraiser. I don't want to get into any type of disagreement on that, but tell us what you mean when you say umpire.
A. The appraisal process consists of three parties: One nominated by the insured, one nominated by the insurer, and then an impartial third party is added to the board to become the three- member appraisal panel.
Q. And one of the three people Mr. Pavluk had recommended was Daniel Stern.
A. He did.
Q. And you did not approve on behalf of Chubb of Mr. Stern being a -- one of the three

Page 27

appraisers.
A. That's not accurate. I didn't know who the other two individuals were that he was suggesting, and I wanted to give all three reasonable consideration. So, I wasn't refusing to include him, I simply was clarifying. He didn't tell me who the other two he was suggesting were.
Q. Well, you're looking still at the document, and that may be causing the confusion. I'm not asking you based upon what the document says; I'm just saying you. Why don't you put the document down for a second. If you need to look at it again, you can pick it up. Do you mind putting it down? Thank you.
My question to you, sir, I believe if it was read back, would be, you, Tom Kirkpatrick, did not ultimately, on behalf of Chubb, approve Mr. Stern to be the third appraiser; you rejected him.
MS. SAMBERG: Object to form.
A. That's a misrepresentation of what I did.
Q. Tell us what you did.
A. I thought --
Q. First of all, I'm asking -- that's a

Page 28

question.
A. So the answer's no.
Q. Okay. Tell us why the question is no.
A. I believe there were better qualified individuals to be the umpire.
Q. Well, I said -- so, in other words, you're telling us that you accepted Mr. Stern?
A. No.
Q. Okay. I said you rejected him. You don't agree that you rejected him?
A. No, rejecting and not selecting are two very different things.
Q. What's the difference between rejecting and not selecting?
A. I never made an affirmative statement that he was not to be considered. I simply didn't select him. He wasn't my choice.
Q. Well, if you don't agree, then it has to go to a court, correct? Just like if Mr. Pavluk doesn't agree with who you recommend, it goes to the court to decide.
MS. SAMBERG: Objection.
A. Yes.
Q. So, you're telling us that you wouldn't

Page 29

agree to select Mr. Stern; is that what your testimony is?
A. I did not agree to select Mr. Stern.
Q. The court ultimately approves Mr. Stern?
A. Yes.
Q. Now, you did ask Mr. Pavluk and you recommended, requested on behalf of Chubb, that the third appraiser be Craig Rice, Linda McGowan, and/or the Honorable James S. Miller?
A. That's true.
Q. Now, as of July 8, 2020 -- I don't mean that exact day, in or about, around July 8, July of 2020 is my question. Can you tell us, please, what experience you've had with theater -- luxury high-end theater home automation systems as of July of 2020?
A. The clientele that we serviced routinely have high-end audio home theater. We deal with it on a regular basis.
Q. Who's "we"?
A. Contents Consulting.
Q. I apologize, I interrupted you, but I just wanted to know who, when you said "we," who that was. Okay, you can finish, please.

A. It wasn't if I could get him work. It was if his involvement would benefit our clients on an engagement.
Q. Were you sincere when you did that?
A. I answered that. Yes.
Q. And why would you think Mr. Stern could benefit your clients, when you made that representation to him that you said, yes, I'll get you in the Rolodex? I'm paraphrasing that, but you know what I mean.
A. He had industry connections that might be of assistance in researching some of the high-end home audio we deal with.
Q. Do you respect Mr. Stern professionally?
MS. SAMBERG: Object to form.
A. My only involvement was through the appraisal, I had no other contact. I thought he was a person of character.
Q. Is that the same thing, integrity?
MS. SAMBERG: Form.
A. Yes.
Q. I'm going to mark this as Exhibit 57. I think, he asked, the Bates stamp number is Contents Consulting_011140, which would be 11,140.



MS. SAMBERG: I'm sorry, Mark, what exhibit are you marking?
MR. WEINBERG: 57.
MR. KRUM: Sharon, would you kindly write "57."
(Exhibit 57, email dated 7/26/20 to Steven Magnotta from Tom Kirkpatrick, marked)
BY MR. KRUM:
Q. Now, have you worked with Mr. Magnotta since my -- I believe you characterized it as a file. I'm not suggesting anything by that, I'm just saying you characterized a claim as a file, right?
A. Yes.
Q. Have you worked with Mr. Magnotta in anything other than my file?
A. Our firm has.
Q. Since you were retained as the THAS appraiser for Chubb on my case?
A. Yes.
Q. And how many other matters have you worked with Mr. Magnotta at Chubb on?
A. One.
Q. And what is that matter?
A. There was the damage to an assisted



living facility in either Kentucky or Tennessee, somewhere in that region, and he requested our assistance in inventorying and valuating the contents at that facility.
Q. Go back to Exhibit 54, which is right next to you. That's the email that you wrote to Mr. Pavluk. Do you see that?
A. Yes.
Q. Do you see the last sentence there, which is, you know, the last paragraph before it goes to the next page, page 2 of Exhibit 54. It says, "I" -- that's meaning you, right, Tom Kirkpatrick?
A. Yes.
Q. "I nominate Craig Rice to be the umpire. He is an electrical engineer who is the CEO and principal" -- and the next page says "Engineer of Golden Forensics, LLC, in" -- I'm not going to pronounce this right. It's A-r-v-a-d-a -- "Colorado."
A. Yes.
Q. Did you know Mr. Rice?
A. Did I -- I'm sorry, the question?
Q. Did you know Mr. Rice on July 8 when you nominated him?



A. Only by reputation, not personally.
Q. How did you know him by reputation?
A. He was recommended by an engineer, a Colorado engineer, as being a capable third party.
Q. Right. Well, anyone else? Anyone else other than this person that you say is a Colorado engineer, as being a capable third party?
A. No.
Q. So when you say you knew him by reputation, you're telling me that some engineer that you knew recommended Mr. Rice to you?
A. I described the criteria and this person indicated that Mr. Rice fit the bill.
Q. Well, why aren't you telling me who this person is, why are you saying "this person"? We both know who that person is.
A. You haven't asked me his name.
Q. Well, you agree we both know who the person is.
MS. SAMBERG: Form.
A. Yes, it's -- his name, his first name is Abrash or ...
Q. It's Dr. Hajjam, right? H-A-J-J-A-M. Who is also another expert that Chubb -- so-called

Page 150

(Exhibit 22, Supplemental Appraisal Award for Clarification Purposes Only, made May 17, 2021, marked)
BY MR. KRUM:
Q. And I'm going to now show you what's been marked as Exhibit 22. I represent to everyone in the room, on the phone, and to you, Mr. Kirkpatrick, that it's the supplemental appraisal award made on May 17, 2021, which would have been four days after the appraisal award. And it's -- everybody has it, but it's also been filed with the court as ECF Document 89 in this case, 20-cv-03616. And I represent to you it's signed by you and Mr. Pavluk. Exhibit 22. So I'm characterizing it as a supplemental appraisal award. Do you agree with that?
A. Yes.
Q. And this would be, in your opinion, right, another binding appraisal award issued by two members of the appraisal panel for my THAS?
A. Yes.
Q. And is that your signature?
A. Yes. Electronic signature, yes.
Q. And it's Mike Pavluk's signature, right,

Page 151

and his initials?
A. Yes.
Q. And that's the supplemental appraisal award, right, that the appraisal panel issued, signed by you and Pavluk, telling the reader that the panel, when it issued its previous award on May 13th, Exhibit 21 in this deposition, that we knew already that Mr. Krum had received reimbursement for the theater seats, so there shouldn't be some deduction for that out of our appraisal award. Did I characterize that correctly?
A. Yes.
Q. So, Exhibit 22 isn't giving me, the insured, anything more, it's just making sure that nobody's deducting anything, meaning the insurer, from your previous appraisal award because you had already taken it into consideration and deducted it amongst yourselves.
A. This was known during our proceedings and this was clarification confirming that, yes.
Q. And another way of saying that would be if, if you were going to give me that money in the award, you would have made your award 53,000, or whatever that amount was, higher because you knew I

Page 152

had already been reimbursed for it.
A. Yes.
Q. I want to go back to January of 2010. 2010. I don't want to go back there. I probably do want to go back there but not for this deposition. I meant January of 2020, when you came to my home, January 10, I believe, to Colorado. Does that sound right?
A. Yes.
Q. You were there for, I'm saying, two full days. You spent a substantial amount of time the first day, which I believe was Friday, January 10. Do you recall that?
A. I remember, yes, I was there two days.
Q. And the second day -- the first day, if I'm correct, was a Friday, the second day would have been a Saturday?
A. Yes.
Q. And you spent those two full days looking at contents in my house and you also looked at my theater?
A. Yes.
Q. And you did that on behalf of Chubb?
A. Yes.

Page 153

Q. When I say "Chubb," what does that mean to you? When I say "Chubb," who is Chubb to you?
A. An insurance carrier.
Q. Now, when -- I withdraw that.
Now I want to show you what I believe we marked as, for this deposition as 19A, B, C, D and E. 19A, B, C, D and E. And they're just photographs, I represent to you. And I'm going to mark them now with the court reporter's sticker.
MR. KRUM: Ms. Court Reporter Sharon, do I have your permission to do that?
THE COURT REPORTER: Yes.
(Exhibit 19A, photograph, marked)
MR. KRUM: 19A. I'm going to give a copy to Ms. Samberg and Mr. Weinberg can see Ms. Samberg's copy.
BY MR. KRUM:
Q. I'm going to hand you 19A and you can tell us what that is if you know what it is.
A. They're two CAT amplifiers, they're 250-watt per channel units. You had four of them; two at the bottom left of the rack and two at the bottom right.
Q. And you took that photograph, right?

Page 174

Q. Well, why did you issue an award for hundreds of thousands of dollars in damage I sustained from the insured event for my home automation system on May 13, 2021, this year?
MS. SAMBERG: Form and foundation.
A. You asked me a question about June 12, 2020 --
Q. Hold on for a second. I apologize. You're going to get to answer my question in a second.
MR. KRUM: But I keep having this objection to form and foundation. My question was why, as in who, what, where, when and why, which happens to be a non-leading question, though I'm entitled to ask leading questions, what is the objection to form, Counsel?
MS. SAMBERG: Your argumentative and sort of in-your-face demeanor is objectionable on its face, Mark. And so he's answered these questions, now for the third time you're asking him the same question.
And as to foundation, you're asking --
MR. KRUM: Whoa, whoa, whoa, whoa. That's your objection to form? That's improper.

Page 175

MS. SAMBERG: You can have your opinion --
MR. KRUM: What's your objection to foundation?
MS. SAMBERG: You are asking him why Chubb did certain things, and so, he can't answer why Chubb did certain things.
MR. KRUM: Sure, he can; it's a deposition. You've explained your objection --
MS. SAMBERG: And I can make my objection for the record --
MR. KRUM: You certainly can. But they're baseless.
MS. SAMBERG: And that's all I'm doing --
MR. KRUM: They're baseless.
MS. SAMBERG: -- I am politely making my objections to the form and foundation and I'm entitled to do it and I'm going to keep on doing it so long as your questions are objectionable.
MR. KRUM: They're not objectionable.
Read the question back and the witness will answer. I just wanted to understand what Ms. Samberg meant when she says, "Objection, form" under 611.

Page 176

What's the question, please, pending?
THE COURT REPORTER: "Well, did you issue an award for hundreds of thousands of dollars in damages from the insured event for my home automation system on May 13, 2021? This year?"
A. I don't know what question's in front of me.
Q. The one the court reporter just read back. On May 13, 2021 you issued an award to me as the THAS appraiser on behalf of Chubb for hundreds of thousands of dollars that I sustained in damage to my home automation system?
A. Yes.
Q. I'm going to hand you what was marked at a previous deposition as 24A, 24B and 24C. We'll take one at a time; they're multi-page exhibits. And I want you to keep in front of you Exhibit 24. You have that? Exhibit 24 is that April --
A. 24's in front of me.
Q. And that's the April 17 letter, email, 2020, from Mr. Magnotta to me saying that my loss assessment for, as you said, "the equipment," is $39,093.22, right?
A. Yes.

Page 177

Q. So, it's like a bookmark I'm asking you to keep there as Exhibit 24. Now I'm going to hand you 24A, 24B, and 24C. 24A, let's do that first.
(Exhibit 24A, J.S. Held report dated 4/15/20 to Steve Magnotta from Anthony Danza with Attachment 1, marked)
24A, I represent to you, Mr. Kirkpatrick, is a three-page letter and then a two-page attachment. Do you see that?
A. Yes.
Q. And it's dated April 15, 2020, right?
Right?
A. I'm sorry, I was reading. I didn't quite hear your question.
Q. Exhibit 24 is dated April 15, 2020. Exhibit 24A.
A. 24A is April 15.
Q. I'm mistaken. I meant to say "24A" and I forgot to say that, I apologize.
24A is dated April 15, 2020?
A. Yes.
Q. And 24 is the 39,000 number that's dated -- Magnotta's email to me on April 17, two days later.

I don't -- we defined it for purposes of this deposition. Let's throw that out, whatever we defined it in right now. Okay?
You told Magnotta, "Give Krum 128,165," correct?
A. For the items listed on that report with the scope defined by the engineers.
Q. Okay. I didn't define that scope, did I?
A. No, but your definition of THAS is different than the scope of that report.
Q. Sir, you gave me, Krum, $1,205,000 for damage to my theater and home automation system. Is there anything I'm saying in there that's not correct?
A. No.
Q. You agree it's correct?
A. Yes.
Q. Now you're saying that you didn't want the blow something up. So my question to you is, sir, okay, because you're saying, hey, Mr. Krum, there's this additional scope that I didn't include in the 128.
A. Correct.
Q. Okay. Well, what was that additional



scope that you didn't include in the 128 that you did include in the 1,205,000, sir?
A. The home automation, for number one.
Q. Okay. So how much did you give me for home automation?
A. I don't have a breakdown.
Q. Well, sir, you issued award for 1,205,000. You issued the award. Not me. What basis -- what was the amount for which you came to 1,205,000 on?
A. Again, there was --
MS. SAMBERG: Object to the form. Go ahead.
A. All the parties expressed their opinion and there were certain compromises involved and I do not have anything that memorializes the exact amount for the different components. But I can tell you that it was a different scope than the 128.
Q. Well, how much more? Was it a million dollars more?
A. That ultimately was awarded, for those areas?
Q. No, I know what was awarded. I know you issued an award for 1,205,000, we just saw it in



writing, Exhibit 21. My question to you, sir, again, is, the 128,165, and then you have the 1,205,000. You're saying to me, Mr. Krum, I only gave you 1,205,00 because I didn't want to blow it up. So I want to follow up with a question that I think is reasonable, is that, you're hired by Chubb, you're paid by Chubb, you're retained by Chubb to be its appraiser. Were you willing to give me an extra million dollars that was going to come out of Chubb's pockets because you didn't want to blow up a hundred -- what was already given at $128,000? That just sounds utterly ridiculous to me.
MR. WEINBERG: Misstates the testimony.
MS. SAMBERG: Object to the form.
BY MR. KRUM:
Q. How did I misstate your testimony, sir? Tell me, how did I misstate it? You've got your lawyer over here saying I misstate your testimony. Tell me, please tell me, how did I misstate it in any way?
A. I believed that the appropriate amount was significantly higher than the 128 when all the areas involved in the THAS were added. I didn't believe it was over a million dollars, but it was



close.
Q. Okay. So let's go with that. You're saying that, Mr. Krum -- forget what you signed off on for a second. Can we do that? Can we just put that aside?
A. Yes.
Q. Because I keep saying to you that you signed this. Let's just put that aside. Would you agree with that for a second?
A. I'd love to.
Q. Thank you. So we put the million 205 aside, and we just say to you, on June 12, 2020, when Magnotta sent me the letter for 1 million -- I apologize, $128,165 was the loss assessment as of June 12, 2020, we can agree on that, right, with what we're having -- what we're having a -- I don't want to say -- we're not having a disagreement. What you're telling me is that, Mr. Krum, that 128,165 -- can we just call it 128 so we make it simple for purposes of the question?
A. Sure.
Q. Mr. Krum, the 128,000, that's one scope, and the scope that I was looking at on May 13 is another scope. Is that what you're telling me?

A. Yes.
Q. And the scope on May 13 is much greater than what the scope is that I gave Magnotta the 128,165 number for?
A. Yes.
Q. My damages on June 12, 2020 were the same for my theater and home automation system as they were on May 13, 2021, when you issued the award ten months later. You have to agree with that, right?
A. Yes.
Q. Whatever my damages were on June 12, 2020, they're the exact same damages, whatever they were, that you were considering on May 3, 2021.
MS. SAMBERG: Object to form.
A. They were the same damage.
Q. So the answer's yes to my question.
So then, I ask you, then why wasn't I given that amount of money, whatever it was that you, Tom Kirkpatrick, thought, whether you thought it was $500,000, $300,000, $800,000, whatever it was, you were telling me it was close to a million, you would agree that's the number that should have been the loss assessment as of June 12, 2020.
MS. SAMBERG: Form and foundation.



A. What I'm saying is that my 128 was for a subset of the entire THAS claim defined by the engineers on an item per item basis. In regards to your speakers, the engineers identified two speakers that had contact with glycol that they recommended repair.
At the time of the proceedings, it was clear Mr. Stern believed that all of the speakers needed to be refurbished. He made it clear that the refurbishment was available at a percentage of replacement. Did I necessarily agree? No. Not if I'm to believe what my engineers said. But I do believe Mr. Stern was an honorable person, trying to find an equitable resolution, and it was clear to me that's exactly what he wanted. He did not agree with Mike to replace the speakers, he didn't agree with the engineers, Arash Hajjam's approach. He offered a different approach. And sitting in that chair and saying, is this what I would want to see happen? No. Is it a reasonable approach that's a much better resolution than what Michael kept pounding on? Yes. So there were certain things that I agreed to that changed the position to what seemed to be a workable compromise within the panel.



So, when I say it became closer to a million dollars, taking into account what Mr. Stern was suggesting, what he thought and what he would agree to, and trying to be reasonable in my approach and recognizing it was in no one's best interest to have to go back eight months and appeal to the court to appoint a different umpire, I thought it was a reasonable resolution.
So, the fact that you're saying I agreed with, I did sign; I didn't necessarily agree with the position, but found positions that I could live with within the framework of what Mr. Stern was directing.
So, I don't know if that answers -- and, again, I'll just go back. The THAS claim, having building elements and content elements, things you could take if you moved, they fall under different coverages, and different people were consulting on the different coverages. I had a limited role of doing the content items, and I did consult and help with some of the structural measures such as the fabrics, because I had a better understanding of Cricket's design work, her fees, proper amount for -- on a yardage basis for the fabrics, so I was



asked to assist sometimes outside of my lane. But there are different lanes, and for me to not know what every lane was doing and what you were paid at what time, that's the way the consulting was broken out. If I was involved in every aspect, I would have known what was happening all over. But, again, when I say the THAS is being defined differently in different places, my definition originally was very, very limited to certain components that you would take with you.
So, the 128 was based on a subset. When we expand the scope at the time of the proceeding --
Q. Who's "we"? Who's "we expand the scope"? Who's "we"?
A. You filed for an appraisal based upon THAS defining it the way you did. Chubb responded to -- I guess you expanded it to include both structural and contents beyond what I was involved with.
Q. You know that's not correct, sir. You know that I filed an appraisal demand because Chubb didn't pay me for these items that I'm saying I should be paid for. That's Exhibit 26; it's all in black and white, multiple pages, line item by line

item. That's what I said I'm entitled to.
I have no idea what Magnotta did. All I know is that I wasn't paid for damage that I had incurred as of June 12, 2020 until you signed the award ten months later in May of 2021. So my question to you, sir, is, I believe you've already answered it. I believe you've already agreed, but I want to make sure. Okay?
What you awarded on May 13, 2020 is what I should have been entitled to on June 12, 2020. What you awarded on May 13, 2021; I may have said '20. What you award on May 13, 2021, I was clearly, unequivocally entitled, right, sir, on June 12, 2020?
MR. WEINBERG: Objection. Asked and answered.
MS. SAMBERG: Object to the form.
A. I agree.
Q. You agree?
MR. WEINBERG: He agrees with me.
BY MR. KRUM:
Q. Okay. Well, he doesn't have a basis to go "Asked and answered." If he wants to instruct you not to answer, we can all come back and get the



answer another time at your cost, in my opinion. I'm asking you to answer the question.
MR. KRUM: Do you want to instruct him not to answer it? Instruct him not to answer it and I'll move on.
MR. WEINBERG: I'm objecting to the fifth time you've asked. You're not getting the answer you want, he's not going to give you the answer you want, so you should just stop beating a dead horse.
MR. KRUM: Are you instructing him not to answer?
MR. WEINBERG: I'm not instructing him not to answer.
BY MR. KRUM:
Q. Then answer the question.
A. What was your question?
MR. KRUM: Read it back, please, just the question.
MS. SAMBERG: Without the testimony that led into the question.
MR. KRUM: Read the question back. The question.
THE COURT REPORTER: "Question: You know



that's not correct, sir. You know that I filed an appraisal demand because Chubb didn't pay for my fees, items that I'm saying" -- hold on a moment.
MR. KRUM: Let me ask the question. Let's proceed.
BY MR. KRUM:
Q. Sir, whatever you decided and thought that I should be paid for the damages from the insured event on May 13, 2021, whatever that number is, 900, 800, one million, 1.1, or the 1,205,000 that you signed off on, whatever that number is, there wasn't anything that made it grow from June 12, 2020, to May 13, 2021, correct?
A. Correct.
Q. So, I gave you 32B-3. I'm going to now give you 32B-4.
(Exhibit 32B-4, Attachment 9 to Frankentek report, marked)
And 32B-4 is the eighth -- excuse me, is the ninth attachment, I represent to you, to the Frankentek report on January 26, 2020.
A. I saw this.
Q. Did you see it before June 12, 2020?



A. I believe so.
Q. And now I'm going to give you what's been marked as 32B-5, is the tenth attachment to the Frankentek January 26, 2020 report. It's two pages. 32B-5.
(Exhibit 32B-5, Attachment 10 to Frankentek report, AV equipment price comparison, marked)
32B-5. I call it Attachment No. 10, and it's the equipment price comparison, AV, audio visual equipment.
A. These damages are very similar in nature. One's larger. And I'm trying to remember exactly if I saw both.
Q. You saw before June 12, 2020 the Attachment No. 10, 32B-5?
A. Yes.
Q. I'm going to show you now what's been marked as 32B-6. It's Attachment 11 to the Frankentek report. It's Attachment 11 of the 14 attachments. It's six pages. 32B-6.
(Exhibit 32B-6, Attachment 11 to Frankentek report, Krum wiring schedule, marked)
32B-6, have you seen that before June 12, 2020? I call it the wire schedule or a cable list.

Page 234

Again, I didn't want it to blow up, I didn't want to have to come back, I wanted it to be a final, done deal while we were all there and we could work on it. So that's what we did.
Q. And the 14th attachment to Frankentek's January 26, 2020 report, Attachment No. 14, is marked as 32B-9. And it's three pages, 32B-9.
(Exhibit 32B-9, Attachment 14 to Frankentek report regarding game room, marked)
Had you seen 32B-9 before, sir?
A. I don't believe so.
Q. So if it was an attachment, as I represent, to the Frankentek report, the 14th attachment, then you weren't provided that attachment by Chubb.
And I represent that to be game room drawings. You don't disagree with that, do you?
A. It's marked "Game Room Plan View" and I don't recall seeing this.
Q. Now I'm going to give you Exhibit 25, 25A, 25B, and 25C. And 25 you already have because 25 is the ... 25 is the ...
A. I have 25.
Q. Is the June 12th email from Magnotta to

Page 235

me saying the loss assessment's 128,165, correct?
A. Yes.
Q. So I'm going to give you now 25A, 25B, 25C. Can I see Exhibit 25? And Exhibit 25 has one, two, three, four .pdf attachments to it that Magnotta is sending to me, correct?
A. Yes.
Q. And I'm representing to you that those are all your documents and they're going -- they're marked 25A, 25B, 25C and 25D. Three of them are yours and one's the Envista report. And I'm going to give you those now: 25A, B, C and D.
(Exhibit 25A, Inventory ACV/Variance report, marked; 25B Contents Consulting, LLC Inventory ACV/Variance Report; 25C Equipment Damage Investigation report, marked)
They were already marked at Mr. Magnotta's deposition. Here's 25A. And I represent to you that it's a long document, numerous pages, and it's Contents Consulting, your company, called an Inventory ACV/Variance Report. And we marked that as 25A. Do you see that?
A. Yes.
Q. And let me ask you my question first,

Page 236

then you can spend as much time as you want looking at the document. It's over 58 pages. Because the first three pages, and then it starts again at page 58. So, I believe it would be 61 pages. But, sitting here, I just didn't count them just now. But it looks like it's 61 pages. And tell us what Exhibit 25A is.
A. It's a report issued on 6/10/20 that compared contents and labor valuation of the items that we addressed. It shows that the claimed amount for the items in the scope of our report was $784,416.01. And it showed that our evaluation, based upon the damage determination by the engineers on those specific items, was 128,165.
Q. And that document was prepared by you and your -- I'm saying team, but the people that work for you?
A. Yes.
Q. Would you agree that it's your team?
A. Yes.
Q. Exhibit 25A. And you used Exhibit 25A in reaching your 128,165 number?
A. This is where that number came from.
Q. I'm going to hand you Exhibit 25B, as in

Page 237

boy. And 25B is another large document that I represent to you; it may be 51 pages because you have the first three pages and then you have pages 1 of 48. So that would equal 51, but I didn't just count it.
Exhibit 25B is what they call, or what you called is an Inventory ACV/Variance Report. If you can look at 25B and tell me if you recognize it.
A. Yes. I recognize it.
Q. And what is it, 25B?
A. It's a report that focused on -- I'll read it exactly. "Draft of items contained in Frankentek proposals which are either duplication of items addressed in the Contents Consulting inventory report, or which are not related to the 'THAS' and thought to be structure items to be addressed by others as of 6/10/20."
Q. Would you agree with me that you are ultimately able to determine that there were many mistakes, inaccuracies, however you want to characterize it, in this report?
MS. SAMBERG: Form.
BY MR. KRUM:
Q. It wasn't accurate.

Page 238

A. I don't know on what basis you're making that statement but is there a question in front of me?
Q. Yeah. Are you telling me 25B is accurate, sitting here today?
A. At the time that it was issued, it was thought to be accurate.
Q. Okay. How about sitting here today?
A. And these are structure items that ended up getting rolled into the THAS appraisal that weren't being considered at this point in time by our office.
Q. Were not being considered by Contents Consulting?
A. Right.
Q. 25C. I represent to you that's another large document, which is -- I'll characterize it as the Envista report by Dr. Hajjam. 25C as in cat.
Do you recognize -- sorry.
A. You know, the report that you gave me and said is inaccurate, and again I disagree with that characterization, but I'm looking at it, Lutron wall plates, telephone jacks, these -- you don't take wall plates with you when you leave a home. That's

Page 239

why it wasn't considered as a content item. It was a structural item to be addressed by others.
So, again, you're lumping this all in as THAS, where the coverages are specifically building or contents, and that's why this report was generated to say these are being claimed but we're not dealing with it, somebody else needs to.
Q. Well, it turns out that you did deal with it in your appraisal award because no one else dealt with it and I was never paid for the damage I sustained 18 months earlier.
MS. SAMBERG: Objection to form.
MR. WEINBERG: Objection.
BY MR. KRUM:
Q. You agree with that, right?
A. Again, at the end of the day, we did consider the low voltage system as part of the THAS proceedings.
Q. And I got paid as part of the 1,205,000. And the reason I got paid is because it was damage from the insured event and I never had been paid before.
A. Again, and nothing in this report says it wasn't damaged or you shouldn't be paid. It simply

Page 240

says we weren't addressing these.
Q. You understand that Magnotta's saying that you were addressing them. You understand that, right?
MS. SAMBERG: Object to the form. And foundation.
A. I have no idea what Mr. Magnotta said.
Q. Okay. Exhibit 25D. I don't need to give you 25D. We won't mark that at this deposition.
So you have before you 24, 24A, 24B, 24C. You have the Frankentek report and its 14 attachments, Exhibit 31, Exhibit 32A, Exhibit 32A-1 through and including 32A-5. You have Exhibit 32B which is the email 2 of 2 from Frankentek to me, which I then sent to Tommy Le. And 32B attaches 32B-1 through and including 32B-9, which are Frankentek's attachments 6 through 14.
You have all that before you. We just went through it all, correct?
A. Yes.
Q. And, on top of that, you have Exhibit 25, which is the email from Mr. Magnotta to me on June 12, 2020 for 128,165, right?
A. Yes.

Page 241

Q. And then you have the three reports that were -- Mr. Magnotta attached to that email, 25A and 25B, which were the two Contents Consulting reports that you said you prepared with your team, and also 25C, which is the Envista report. You have that before you, right?
A. Yes.
Q. My question is this, sir: Can you give me one document, one sheet of paper, that you had after you had all these things -- well, first of all, I withdraw that.
As of June 12, 2020, everything we just went through you had access to?
A. The ones that I acknowledged that I saw.
Q. And if you didn't see it, then it wouldn't have been given -- and it was an attachment to the Frankentek report, then Chubb didn't give it to you, right?
A. Again, it relies on drawing a conclusion but, as I said, some of them I didn't see.
Q. Well --
A. And I'm not contesting that they were or were not an attachment.
Q. Well, you know what was an attachment

Page 246

A. So which numbers, please?
Q. I have given you what I called was the Envista report. I have given you the J.S. Held report. Those are the only reports that I know exist. Okay? I'm trying to find out from you, this is my opportunity, you're the one who said 128,165 to Magnotta. I'm trying to find out, is there something else that you had that I'm not aware of?
MS. SAMBERG: Form and foundation.
A. You're referring to these by exhibit numbers and I am not familiar of the exhibit numbers. Let me go through, and we'll spend the next half hour, I'll look through, and I'll tell you if there's anything I recall. But I am telling you that the scope was defined by the Held and Envista report, and if they're in here, if you gave them to me, then the answer to that question is, that's what I relied on. Was there any other report that I relied on to define scope? No.
Q. Okay. Well, you know I gave it to you. Look at 25C. That's the --
A. Well, again --
Q. -- Envista report. Look, 25C. Just look at it. Is that the Envista report?

Page 247

A. Yes.
Q. Okay. Do you think -- I'm asking you, is there something else that you would call the Envista report other than what I've identified as 25C?
A. No.
Q. Okay. Now let's look at 24; 24A and B, right? And C. Those are all the J.S. Held reports, right?
A. Wait. Let me find those so I can --
Q. Take your time. Take your time. Take your time. No rush.
MS. SAMBERG: Speaking of rush, what's the time on the record, please, Mr. Videographer?
MR. WEINBERG: It's over five and a half hours, closer to six.
THE VIDEOGRAPHER: 5:34.
MS. SAMBERG: Thank you.
That's ridiculous.
MR. KRUM: I'm sorry, what did you say? You said it's ridiculous, is that what you said?
Court Reporter, please make sure you took it down.
MS. SAMBERG: By all means.

Page 248

A. So the reports from the damage experts that I relied on appear to have exhibit numbers 24C, B, A, and 25C.
Q. And you had the Frankentek report, too.
A. Yes.
Q. And whatever attachments Mr. Le gave you, based upon the 14 that are mentioned in the report, correct?
A. Yes.
Q. Okay. Am I correct that that's the universe of documents that you relied upon in making your recommendation to Mr. Magnotta, based upon what you're telling me was the scope that someone told you was your scope to report on, that's the 128,165; there are no other documents out there?
A. Not from third parties, but we did do independent research on replacement values.
Q. But there was nothing else that -- that you relied upon?
A. Other than the independent research we did to establish replacement values.
Q. Okay.
Now I want to fast forward from that June 12, 2020 date, with all those documents before you

Page 249

and what you're saying also is your independent research that you did, and now we go to the appraisal award, May 13, 2021. Okay? Eleven months later. Eleven months and one day, to be exact, right? June 12, 2020 to May 13, 2021. Eleven months and one day, right?
A. Yes.
Q. What additional documents did you rely upon, in addition to everything we just went through and this independent research that you did back in -- before June 12, 2020, to issue or sign off on your award of 1,205,000 on May 13, 2021?
A. No additional specific documents, but input from Mr. Stern and what he -- his position on various elements of the claim.
Q. Now, at Magnotta's deposition, we marked Exhibit 28.
(Exhibit 28, Statement of Loss, marked)
Exhibit 28, I represent to you, is a statement of loss, what we talked about a little earlier, an SOL. And at Magnotta's deposition, he agreed with me that that was the statement of loss for on or about July 30, 2021. I call it the July 30, 2021 SOL. It's marked Exhibit 28.

Page 246

A. So which numbers, please?
Q. I have given you what I called was the Envista report. I have given you the J.S. Held report. Those are the only reports that I know exist. Okay? I'm trying to find out from you, this is my opportunity, you're the one who said 128,165 to Magnotta. I'm trying to find out, is there something else that you had that I'm not aware of?
MS. SAMBERG: Form and foundation.
A. You're referring to these by exhibit numbers and I am not familiar of the exhibit numbers. Let me go through, and we'll spend the next half hour, I'll look through, and I'll tell you if there's anything I recall. But I am telling you that the scope was defined by the Held and Envista report, and if they're in here, if you gave them to me, then the answer to that question is, that's what I relied on. Was there any other report that I relied on to define scope? No.
Q. Okay. Well, you know I gave it to you. Look at 25C. That's the --
A. Well, again --
Q. -- Envista report. Look, 25C. Just look at it. Is that the Envista report?

Page 247

A. Yes.
Q. Okay. Do you think -- I'm asking you, is there something else that you would call the Envista report other than what I've identified as 25C?
A. No.
Q. Okay. Now let's look at 24; 24A and B, right? And C. Those are all the J.S. Held reports, right?
A. Wait. Let me find those so I can --
Q. Take your time. Take your time. Take your time. No rush.
MS. SAMBERG: Speaking of rush, what's the time on the record, please, Mr. Videographer?
MR. WEINBERG: It's over five and a half hours, closer to six.
THE VIDEOGRAPHER: 5:34.
MS. SAMBERG: Thank you.
That's ridiculous.
MR. KRUM: I'm sorry, what did you say? You said it's ridiculous, is that what you said?
Court Reporter, please make sure you took it down.
MS. SAMBERG: By all means.

Page 248

A. So the reports from the damage experts that I relied on appear to have exhibit numbers 24C, B, A, and 25C.
Q. And you had the Frankentek report, too.
A. Yes.
Q. And whatever attachments Mr. Le gave you, based upon the 14 that are mentioned in the report, correct?
A. Yes.
Q. Okay. Am I correct that that's the universe of documents that you relied upon in making your recommendation to Mr. Magnotta, based upon what you're telling me was the scope that someone told you was your scope to report on, that's the 128,165; there are no other documents out there?
A. Not from third parties, but we did do independent research on replacement values.
Q. But there was nothing else that -- that you relied upon?
A. Other than the independent research we did to establish replacement values.
Q. Okay.
Now I want to fast forward from that June 12, 2020 date, with all those documents before you

Page 249

and what you're saying also is your independent research that you did, and now we go to the appraisal award, May 13, 2021. Okay? Eleven months later. Eleven months and one day, to be exact, right? June 12, 2020 to May 13, 2021. Eleven months and one day, right?
A. Yes.
Q. What additional documents did you rely upon, in addition to everything we just went through and this independent research that you did back in -- before June 12, 2020, to issue or sign off on your award of 1,205,000 on May 13, 2021?
A. No additional specific documents, but input from Mr. Stern and what he -- his position on various elements of the claim.
Q. Now, at Magnotta's deposition, we marked Exhibit 28.
(Exhibit 28, Statement of Loss, marked)
Exhibit 28, I represent to you, is a statement of loss, what we talked about a little earlier, an SOL. And at Magnotta's deposition, he agreed with me that that was the statement of loss for on or about July 30, 2021. I call it the July 30, 2021 SOL. It's marked Exhibit 28.

Now, whether it was prepared on July 29th or July 30th in the morning, or the 27th, I -- Magnotta and I agreed I was given this on or about July 30, 2021. Okay. So I'm asking you to accept that as true with regard to my questions. Okay?

You're looking through the document now. It's multiple pages. Have you ever seen the document before, does it --

A. No.

Q. Okay. Obviously you didn't look at every line and every page, but based upon what you did look at, it doesn't appear to be something you looked at before, correct?

A. I'm sorry, what was the question?

Q. Exhibit 28 does not appear to be a document you saw before today?

A. I've never seen this before.

Q. So now, let's go -- you see how it says "Statement of Loss Summary Sheet" at the top, on page 1, Mark J. Krum, and it gives the BC Property address. Do you see that?

A. Yes.

Q. And then it talks about claimed amount, Chubb loss assessment, paid amount, and current



payments, right?

A. Yes.

Q. And then it gives line items on all the next pages, right?

A. Yes.

Q. And then on page 3, it gives -- if you go down to the bottom, it says that 128,165 number; do you see it, "Frankentek Theaters Contents Consultant Report," 128,165. Do you see that?

A. Yes.

Q. And next to that number, to the left of it, is the claimed amount, 851,121, right?

A. Yes.

Q. So, you didn't prepare the document, right?

A. No.

Q. But you've seen statement of losses regarding your profession of being with Contents Consulting many times before, right?

MS. SAMBERG: Form and foundation.

A. I'm familiar with statement of losses.

Q. Okay. So, right, am I right, if you look at the first column, it says Krum's claiming $851,121, and Chubb is agreeing to pay, as of this



date, if I'm telling you it's correct, July 30, 2020, 128,165. You see that, right?

A. I do.

Q. And then right above it, for the home automation, it has Krum's claiming 234,030, right?

A. Yes.

Q. Now, you know those numbers that I'm reading to you and that are on this when I represent to you to be a July 30, 2020 -- July 30, 2020 statement of loss; if I ever said July 30, 2021, I was mistaken, it's July 30, 2020 is what I mean every time I refer to Exhibit 28. You know those numbers -- I withdraw that.

You would agree that those numbers are the exact numbers out of that Frankentek Exhibit 26 report, Mike Pavluk saying Krum had damages to his theater, in the January 26, 2020 report of Exhibit 26 that you looked at, of $851,121, right; that's a number right out of Frankentek's report?

MS. SAMBERG: Form and foundation.

A. Again --

Q. You can pull the report, it's Exhibit 26; it's right to your right.

A. I have no reason to believe that's not



accurate, but I can't state it is.

Q. Okay. If I'm telling you it's in that report, you don't think I'm making that up, do you?

A. No.

Q. So, 851,121 is what Frankentek says in it's January 26, report, 2020. And Frankentek says in that same report, Krum had 234,030 in damages of home automation system in that same January 26, 2020 report, Exhibit 26, that, you believe that's likely correct, too, right?

A. Yes.

Q. And it shows that Chubb's not paying anything as of July 30, 2020 for the home automation but they paid 128,165 as of July 30, 2020 for the theater, right?

A. It is blank.

Q. And the 128,165 matches up to Magnotta's email of June 12, 2020 which I believe was Exhibit 25, right?

A. Yes.

Q. Now, underneath that, okay, not exactly underneath it, because underneath it to the right it has a number of 221,000, that's just referring to some amount that was paid as of June 25, 2020. But

REPORTER'S CERTIFICATE

I, SHARON R. ROY, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was properly identified and put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 6th day of December, 2020.

______________________________
SHARON R. ROY, RPR
Notary Public
My commission expires: July 18, 2025

PLEASE NOTE:
THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.



WITNESS: Tom Kirkpatrick
CASE: Krum v. Chubb Limited, et al.

SIGNATURE PAGE/ERRATA SHEET

PAGE LINE CHANGE OR CORRECTION AND REASON

---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------
---- --- --------------------------------------

I have read the transcript of my deposition taken November 18, 2020. Except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed under the pains and penalties of perjury:

______________________________ Date________________

Deponent, Tom Kirkpatrick



DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the Deposition Errata Sheet hereof, with the understanding that I offer these changes as if still under oath.

Signed on the __________ day of _____________________, 2021.

__________________________________
Tom Kirkpatrick



***************************************************

INSTRUCTIONS TO DEPONENT

***************************************************

After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you, and sign it.

DO NOT MAKE MARKS OR NOTATIONS ON THE TRANSCRIPT VOLUME ITSELF!

***************************************************

ERRATA SHEET HANDLING/DISTRIBUTION

***************************************************

The original of the Errata Sheet has been delivered to Paul Weinberg, Esq. When the Errata Sheet has been completed by the deponent and signed, please provide a copy to Amy Samberg, Esq, Paul Jordan, Esq., and the original to Mark Krum, Esq., to whom the original deposition transcript was delivered.

***************************************************

ATTYS:
PLEASE REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE COMPLETED AND SIGNED ERRATA SHEET WHEN YOU RECEIVE IT.

***************************************************