**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **MARK JAY KRUM**<br>**Plaintiff,**<br>**v.**<br><br>**CHUBB LIMITED;**<br><br>**AND**<br><br>**GREAT NORTHERN INSURANCE COMPANY;**<br><br>**AND**<br><br>**CELIA SANTANA;**<br><br>**AND**<br><br>**DALE KRUPOWICZ;**<br><br>**AND**<br><br>**PERSONAL RISK MANAGEMENT SOLUTIONS, LLC,**<br><br>**Defendants.** | **CASE NO.: 1:20-cv-03616-RM-NRN**<br><br>**PLAINTIFF'S RESPONSE AND OPPOSITION EXHIBITS TO DEFENDANT GNIC's MOTION FOR SJ** |

**PLAINTIFF'S RESPONSE AND OPPOSITOIN TO DEFENDANT GREAT NORTHERN INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

## OPPOSITION EXHIBIT NO. 31
## KRUM JANUARY 27 2020 REPLY TO RESERVATION OF RIGHTS LETTER

**Mark Jay Krum**
Attorney-at-Law

500 East 83rd Street, Suite 8K
New York, New York 10028
Tel: (212) 371-2300
Fax: (609) 822-7400

www.krumlaw.com
E-mail: markjaykrum@aol.com

Admitted in
PA, NY, DC, TX & WY

January 27, 2020

***Via Facsimile*: 877-817-5699** **[Twenty-One Pages]**
***Via E-Mail*: TVLE@CHUBB.COM**

Mr. Tommy V. Le
General Adjuster, Property
Chubb North American Claims
Western Claim Service Center
2155 W. Pinnacle Peak Road
Phoenix, AZ 85027

**Re: Insured: Mark Jay Krum**
**Date of Loss: December 24, 2019**
**Property: 373 Strawberry Park Road, Beaver Creek, CO**
**Policy No.: 0013787210-02**
**Claim No. : 047519042569**

Dear Mr. Le:

This correspondence is in direct response to your correspondence dated January 17, 2020 (received by email Friday evening at 8:44 p.m. EST) titled Reservation of Rights Letter (Your "ROR Letter"); your email correspondence of Tuesday evening, January 21, 2020 (received at 8:14 p.m. EST) (Your "Jan. 21 Email"); your email correspondence of Wednesday evening, January 22, 2020 (received at 8:06 p.m. EST) (Your "Jan. 22 Email"); and your email correspondence of Sunday evening, January 26, 2020 attaching 72 pages (received at 9:28 p.m. EST) (Your "Jan 26 Email").

This correspondence will also directly address my Masterpiece Home and Contents Policy No. 13787210-02 (the "Policy") with Chubb and Great Northern Insurance Company ("Chubb"); the Fair Rental Value (the "FRV") provision of the Policy; and the Extra Living Expense/Alternative Living Expense (the "ELE" and/or "ALE") provisions of the Policy.

Please be advised that I, as the insured, reserve all of my rights and remedies pursuant to law and the Policy with regard to the bad faith actions which Chubb has exhibited to date.

Mr. Tommy Le
General Adjuster, Property
Chubb North American Claims
*Re: Claim 047519042569*
January 27, 2020

**THE INSURED EVENT AND SUBSEQUENT INSPECTIONS BY CHUBB**

During the morning of Tuesday, December 24, 2019, a single failed actuated sprinkler head at my dream home at 373 Strawberry Park Road, Beaver Creek, Colorado 81620 (the "Insured Property" or "Property") released hundreds of gallons of liquid contaminant (the "Event"). Chubb's Environmental Scientist and Industrial Hygienist has confirmed that the contaminant from the Event is a mixture of glycol and water "also known as glycerin" and that this contamination is classified as a category three water loss. *See* January 9, 2020 MJK Email to Andrew Fredericks attached hereto, incorporated herein, as Exhibit "A".

On December 24, 2019, Western States Fire Protection Co. of Centennial, Colorado ("Western") investigated and started to repair the sprinkler system at the Insured Property. Western found and subsequently determined that the Sprinkler Head had no visible damage or corrosion and that no heat source or fire appears to have caused actuation. *See* Western Report dated December 30, 2019 attached hereto, incorporated herein, as Exhibit "B"; *see also* January 1, 2020 MJK Email to Tommy Lee ("TL"). Western was referred to my daughter Erika Krum by ServPro on December 24, 2019, shortly after the Event.

On December 26, 2019, you and your building consultant, Brian D. Beatty, Vice President of J.S. Held LLC ("J.S. Held"), inspected the damage at the Property and were given full and unlimited access to the Property. While reviewing the Property at that time (specifically the damage in my Game Room) both you and Mr. Beatty requested that on the following day (Friday, December 27) I promptly provide access to the Insured Property to J.S. Held's Environmental Scientist and Industrial Hygienist. Accordingly, and at your direct request, I allowed complete access to the Insured Property on Friday, December 27, 2019, to your Environmental Scientist and Industrial Hygienist, Andrew D. Fredericks (the "Dec. 27 Scientific Inspection"). I was advised and personally observed that Scientist Fredericks spent a few hours inspecting the entire Property and the damage caused by the contaminant released by the failed sprinkler during the Event. Scientist Fredericks performed a visual assessment and used an infrared imaging and contact moisture meter at the Insured Property to confirm the damage directly and indirectly caused by the Event.

During and following the Dec. 27 Scientific Inspection, your Scientist Fredericks confirmed both verbally and in writing: (i) that both full bathrooms as well the two bedrooms on the lower level were identified as sustaining contaminant damage from the Event; (ii) that my daughter's bedroom on the Second Floor was also substantially impacted both in the bedroom and her bathroom; (iii) the Game Room bathroom as well as the fabric ceiling and stone and wood flooring in the Game Room, and the Game Room crawl space, were also substantially damaged from the contaminant; (iv) first floor hardwood floors in the Great Room, Kitchen, Dining Room, Main Hallway, Foyer, Theatre Room and Study were all affected and damaged from the Event; (v) Plaster Walls in each of the aforementioned areas were impacted including the Entry Room Bathroom and Entry Closet (which contained stored fabric, drapery, carpet, antiques and antique books – most of which were ruined); (vi) Entry Wood Columns, Great Room and Kitchen and house chandeliers were all affected and damaged from the Event; (vii) Fabric Walls and furniture in Theatre Room were affected; (viii)

Wood Panel Walls and hardwood flooring in Study were affected; (viii) Stone Floors in Entry, Entry Bathroom and Entry Coat Closet were all impacted; (ix) "Due to the design of the house and the point of origin, numerous areas of the subgrade were identified as being subjected to water damage, including[] ceilings, wall and ceiling cavities, hardwood floors, fabric walls, carpeted flooring, and plaster walls"; (x) first floor Gym plaster walls and carpet were affected; (xi) Maintenance Room flooring was affected; (xii) Second Floor bridge, column illumination, bookshelves and hardwood flooring were all ruined; (xiii) Owner's Suite Kitchen and Study were affected; and (xiv) "Upon evaluation of staining and drip marks, it appears that water from the sprinkler head was able to infiltrate the first-floor sub-floor and traveled along certain electrical and HVAC conduits before being deposited in the subgrade areas."

Scientist Fredericks also stated that it was the opinion of JS Held "that professional remediation activities should commence immediately [and that i]t is likely that materials within the wall, floor, and ceiling cavities of the subject areas are holding moisture [and that i]f left in place without removal or drying, these pockets of moisture could potentially support microbial growth over time." *See* Preliminary Status Report, dated December 30, 2019 of Chubb Scientist Andrew Fredericks.

This again confirms that you stated on multiple occasions in the presence of Mr. Beatty, my designer (Ms. Cricket Dye from South Carolina) and myself that all of the damage identified above falls directly under the dwelling and contents coverage under my Policy.

Your Jan. 22 Email statement that you and/or any Chubb representative "have been provided with almost no substantive response" from me post Event is factually incorrect and cannot be reasonably, factually, and/or demonstrably supported. I have answered every question posed to me by you, Brian D. Beatty (of J.S. Held), Andrew Fredericks (of J.S. Held), Nathan Roberts (of J.S. Held), Thomas Kirkpatrick (of Contents Consulting LLC), Tony Pierce (of ServPro) and Carl Finocchiaro (of Spectrum Forensics). I am also quite upset by your inference that I have (in any way) deliberately failed to provide you and/or Chubb with any document(s) for which you have asked. That is just not true. I have promptly provided and will continue to provide all documents and information on a timely basis. The fact that you continually ask for documentation that I have repeatedly told you never existed (*i.e*, was never created), can not be considered, under any industry or professional standard, to be a failure to cooperate.

I have spent dozens of hours personally meeting with you and the others named above at the Property as follows:

(1) For approximately 14 hours with Tony Pierce and his ServPro crew on Tuesday, December 24, 2019, and well over an additional 20 hours since;
(2) For well over two hours with you and Brian Beatty on Thursday, December 26, 2019;
(3) For well over four hours with Scientist Andrew Fredericks on Friday, December 27, 2019;

(4) For well over two hours with Scientist Andrew Fredericks, Tony Pierce and James Landers on Wednesday, January 8, 2020;
(5) For well over three hours with you on Friday, January 10, 2020;
(6) For well over two hours with Brian Beatty and Nathan Roberts on Friday, January 10, 2020;
(7) For well over 12 hours with your contents consultant Thomas Kirkpatrick on Friday, January 10 and Saturday, January 11, 2020;
(8) For well over 25 hours with Cricket Dye between Monday, January 6 and Wednesday, January 15, 2020;
(9) For well over 15 hours with Mike Pavluk (of Frankentek) between Monday, January 6 and Friday, January 10, 2020; and,
(10) For approximately 35 minutes with Carl Finocchiaro, Friday morning, January 24, 2020.

The above does not include the countless hours on the phone with Chubb, its representatives, including Carl Finocchiaro, or the dozens of hours responding to your emails. *See* January 23, 2020 Email from MJK to TL attached hereto, incorporated herein, as Exhibit "C".

**THE INSURED PROPERTY**

In 2008 my daughter Erika and I decided that we would embark upon finding the perfect location in a prestigious gated community to build the world's greatest ski house (the "Goal"). It took me over two years to find the Property and acquire it. After finalizing the legal documents, I spent a full year with highly skilled and esteemed local Colorado architects, structural and electrical engineers, general contractors, designers and technicians preparing conceptual designs to achieve the Goal. Only then did work begin, and no expense was spared. I personally have spent thousands of hours to make this happen. An important part of the Goal was to provide all visitors and guests with an unparalleled experience. Some of our guests have been artists, scientists, musicians, professional athletes, university professors, world leaders, and celebrities from all parts of the globe. In addition to a spectacular location, the home was to contain the finest American and European furniture, carefully chosen antiques, museum quality art, books and accessories, all of the highest quality, from the world over. With considerable blood, sweat and tears (not to mention my life savings) and after several years, we reached our objective - - the world's greatest ski house.[1]

The Insured Property is approximately 11,000 square feet; at 2.8 acres it is the second largest lot in the exclusive gated community of Strawberry Park; it sleeps 21 comfortably, has eight full bathrooms (five full bathrooms with both a jacuzzi tub and a large shower); three half bathrooms; a

[1] Seeing it Christmas morning after the calamity, was heartbreaking especially when I think about all the hard work everyone invested to accomplish the Goal. My daughter summed it up on Christmas Eve just a few hours after the Event, when she said to me crying, "Dad it's all gone." Words cannot begin to describe the kick-in-the-gut feeling. Obviously, I have strong emotional attachment to the Property.

spectacular game room with six 55 inch flat screen tvs; three full wet bars; eight fire places and one outdoor fire pit; a 26 foot climbing wall; a world class movie theatre (the "Krum Theatre"); a 25 foot climbing rope; an indoor basketball court; and spectacular ski-in and ski-out to Beaver Creek and Bachelor Gulch Mountains.

**FRE AND ELE/ALE POLICY PROVISIONS**

While I use the Property personally throughout the year and also allow friends, family and colleagues to use the Property, for financial reasons I was certainly intending to rent the Property for additional and substantial income during the month of March of 2020. That is why my rental website (MJProperties LLC.com) was active and had been recently updated at the time of the Event.

From the beginning (the summer of 2010), there are countless individuals who can and will affirm that this was always to be an investment property, to generate both substantial rental income and to serve as a unique meeting location for high end clients and business associates to assist me financially in my professional endeavors. Your insurance colleagues, Celia Santana and Dale Krupowicz at Personal Risk Management Solutions ("PRMS"), have known about this venture, its purpose and my Goal from September 2010. Over the last 10 years Celia and Dale had advised me about structuring my insurance for the Property and protecting my largest single investment from the day it was acquired. It was and is my belief that they understood my unique insurance needs. That is why, for the past 10 years, I have entrusted Chubb and PRMS to insure this Property and another vacation home at the beach in New Jersey. *See* December 29, 2019 Email from MJK to TL attached hereto, incorporated herein, as Exhibit "D".

The Insured Property has been rented out no less than ten (10) times. It was rented out in December of 2010; from February 12, 2011 through February 19, 2011; from December 26, 2012 to January 2, 2013; from January 18, 2013 to January 23, 2013; from March 25, 2013 to April 1, 2013; from July 1, 2013 to July 6, 2013; from February 14, 2014 to February 23, 2014; February 12, 2105 to February 19, 2015; from March 14, 2015 to March 21, 2015; and from December 25, 2015 to January 3, 2016. *See* October 10, 2015 Rental Contract for Insured Property attached hereto, incorporated herein, as Exhibit "E".

On January 2, 2020 you advised me in writing that the fair rental value (the "FRV") "under the vacation home policy is payable on an incurred cost" and "[i]f [I] intend[ed] to rent the home in March 2020 [I needed to provide a lease agreement]." In response to your interpretation of my insurance contract with Chubb, I asked you to show me where in the Policy it required "an incurred cost" by the insured. You and Chubb have *never* been able to support that contention. In your ROR Letter you advise of Chubb's intent to deny my 15 day limit FRV claim stating that "there is no indication that [I] 'usually rent' the [P]roperty." That denial is unfounded, and not factually supported by the detailed information I have provided to you and Chubb and as set forth in this correspondence and the January 7, 2020 Declaration of Andi Ohde attached hereto, incorporated herein, as Exhibit "F"; *see also* Exhibit D and January 1, 2020 Email from MJK to TL attached hereto, incorporated herein, as Exhibit "G".

Mr. Tommy Le
General Adjuster, Property
Chubb North American Claims
*Re: Claim 047519042569*
January 27, 2020

In October of 2015 the Insured Property was offered for rent for $20,000.00 a day for the entire house and $16,000.00 for the entire house (except the owner's suite). *See* Exhibit "F" January 7 Declaration of Andi Ohde at ¶9. In 2015 and 2016, as well as currently in 2020, the fair rental value ("FRV") for the Insured Property during peak ski season (December 25 through January 2 and February 15 through March 31) was and is $20,000.00 a day for the entire Property and $16,000.00 a day for the entire Property (except what is identified as the owner's suite). *See* Exhibit "F" January 7 Declaration of Andi Ohde at ¶10.

For the last few years, as well as currently, I have advertised the Insured Property for rent on the internet at the professional website titled "The World's Greatest Ski Lodge" at: MJProperties LLC.com. *See* Exhibit "F" January 7 Declaration of Andi Ohde at ¶11. On or about November 18, 2019, I contacted a local real estate broker about retaining her services and relisting the Insured Property for sale *and* rent in 2020. *See* Exhibit "F" January 7 Declaration of Andi Ohde at ¶12. On Tuesday afternoon, November 26, 2019, I had a specific conversation with a real estate broker about relisting the Property for sale in the spring of 2020 and about listing and marketing the Insured Property in January and February of 2020 for rent during ski season in March of 2020 and also listing the Insured Property for rent in the summer months of July and August of 2020. *See* Exhibit "F" January 7 Declaration of Andi Ohde at ¶13.

On January 1, 2020, I was contacted by a potential luxury renter from Kansas who found the Property on the internet, had reviewed my professional rental video and website, and wanted to rent the Insured Property for his family during President's weekend in February and/or in March of 2020. *See* Exhibit "F" January 7 Declaration of Andi Ohde at ¶14.

I respectfully point out that Chubb had been provided with the January 7, 2020 Declaration of Andi Ohde *prior* to its January 17 ROR Letter. Chubb chose to deliberately and/or recklessly disregard the information provided under oath by Ms. Ohde.

Furthermore, you and Chubb continuously acted unreasonably by delaying and not approving my alternative living expenses -- ALE (as you defined in your email correspondence to me of December 27, 2019) or my extra living expense - - ELE as identified in Your ROR Letter. None of the properties you have offered are of a "similar size", caliber, nor have they equivalent amenities. You and Chubb have not accepted any of the properties that I and my qualified real estate representatives have located that are of similar size and distinction as the Insured Property which provides 11,000 square feet, 8 bedrooms, and a true ski-in and ski-out experience. *See* January 25, 2020 four page Declaration of Andi Ohde attached hereto, incorporated herein, as Exhibit "G".

You have unreasonably denied my repeated requests for ALE housing at 446 Forest Road, Vail, Colorado (previously identified in email correspondence as "Vail Rental #3"). *See* January 12, 2020 Email from MJK to TL attached hereto, incorporated herein, as Exhibit "H"; *see also* January 13, 2020 Email from MJK to TL attached hereto, incorporated herein, as Exhibit "I"; *see also* January 14, 2020 Email from MJK to TL attached hereto, incorporated herein, as Exhibit "J". Vail Rental #3 has ski-in and ski-out access that is similar to the Insured Property.

The price of Vail Rental #3 is $20,000.00 per night. It is now being offered at $10,867 per night for a long term rental; however, as I have made you aware, with some further negotiation I am confident the owners will accept a formal offer for $1,730,000.00 (if a substantial portion is paid in advance) for roughly 300 nights which would be approximately $5,767 per night and would allow me to have a very similar home until December of 2020. *See* EXHIBIT "G" January 25, 2020 Declaration of Andi Ohde at ¶11.

Vail Rental #3 is approximately 10,000sf and is being offered minus the main master suite which will be locked off during my stay. This home has similar interior amenities such as a movie room. Like the Insured Property Vail Rental #3 has excellent exterior living areas with a hot tub, and luxury landscape features. Vail Rental #3 meets my household's usual standard of living. *See* EXHIBIT "G" January 25, 2020 Declaration of Andi Ohde at ¶12.

In an attempt to justify in some way Chubb's position that the ALE/ELE provision in my Policy has not been "triggered," you now are requesting for the first time my electric bills, water bills, etc., my "management company contract" and flight reservations for two years. My Insured Property has been ruined; I certainly have every right to remain here locally to make sure it is correctly rebuilt and properly restored under the terms of my Policy, regardless of what my electric and water bills mean to you. You are placing the insurer's interests before that of the insured's.

**INSPECTION BY CHUBB'S EXPERT ON CONTENTS**

Cricket Dye of Cricket Greenwald Interiors ("Cricket") is a licensed interior designer with over 40 years experience both nationally and internationally in the field of interior design; construction coordination, specification, and supervision; cabinetry design and installation. I have worked professionally with Cricket since 1996. Over the last twenty plus years Cricket has professionally provided me with her design and construction related services. She has been instrumental in building and renovating my homes in New York City, Philadelphia, the South Jersey Beach and Beaver Creek, Colorado. She is well recognized with an impeccable reputation amongst industry and trade professionals throughout the United States.

On Thursday morning, December 26, 2019, you on behalf of Chubb requested and authorized Cricket to fly and travel from South Carolina to Beaver Creek in order to assess all the damage to my contents and artwork. At that time, in the presence of Tony Pierce of ServPro and Brian Beatty of J.S. Held, I asked you if you preferred your Chubb's contents and art expert come out to the Insured Property in lieu of Cricket "to avoid duplication of effort and costs". You, again, in the presence of Tony Pierce and Brian Beatty, specifically stated that "Chubb was not" going to have a contents expert and was going to rely solely on Cricket who was the Insured Property's interior designer. You further stated: "There is no need for us to have another expert." At that time, you specifically assured me that Chubb would promptly pay all of Cricket's travel expenses and all fees associated with her analysis of the damage to the Property's contents and artwork. *See* MJK email correspondence to TVL on December 26 attached hereto, incorporated herein, as Exhibit "K"; *see also* TVL response email correspondence to MJK on December 27 ("As discussed, [Cricket's] fees

will be paid under the contents portion of the claim") attached hereto, incorporated herein, as Exhibit "L".

On Monday, January 6, 2020, as you were aware and approved, Cricket flew from South Carolina to Denver and traveled to the Property in Beaver Creek. This was a difficult trip since Cricket had just undergone a total knee replacement in November of 2019.

When Cricket arrived on Monday afternoon, January 6, 2020, she had already prepared many notes and gathered information from her accounting records, emails, etc. and computer records pertaining to the purchases she made for the Insured Property. As Cricket told you on January 10, she and her husband moved from Charlotte, NC to the coast in 2017; since then many of her records have been moved several times. Some records were lost, others were taken to storage facilities and placed on 8' high racking in order to escape the threats of impending hurricanes and storm surge flooding. Finding and accessing those records has been no small task. Nonetheless, Cricket used her excellent memory, past records, her room-by-room inventory, accounting information, and emails/computer data to immediately begin to compile her report. In the days following her arrival, Cricket walked each room of the house, making copious notes about the condition of each room and documenting its contents. She consulted her previously prepared notes to confirm, where possible, when the item(s) were purchased, the purchase price, the vendor, and any other pertinent information. In addition, Cricket engaged the assistance of a furniture cleaning specialist from Denver with whom she has worked before to come to the Property, and carefully clean, where possible, the glycerin contaminant from the wooden case goods and antique pieces in anticipation that these items would be wrapped and packed for storage/shipment, etc., and later restored in accordance with my instructions. Further, she engaged two additional reputable cleaning people to wash glassware, wipe down glass and generally clean the glycerin contaminant from other non-antique case goods to avoid leaving the contaminant on them during packing.

Within days of Cricket's arrival at the Property, despite your prior representations, your representative Mr. Tom Kirkpatrick of Contents Consulting was on site to examine the contents at the request of Chubb. Cricket accompanied Mr. Kirkpatrick during his examination, and took detailed notes of his comments, dollar valuations and recommendations, etc. Mr. Kirkpatrick was at the Insured Property for over 12 hours during two consecutive days (Friday, January 10 and Saturday, January 11). In my presence, Mr. Kirkpatrick and Cricket discussed at length the estimated costs to repair/replace many pieces of furniture and antiques and the estimated costs of fabrics used in the upholstery at the Property. Mr. Kirkpatrick specifically stated to both Cricket and me that "this needs to be a collaborative process" between Cricket and himself. In fact, he stated that he does not do this any other way. Following Mr. Kirkpatrick's visit, Cricket then compiled all the inventory items, all the notes she took from Mr. Kirkpatrick's comments, etc., and put them into a written report form. Cricket has also called vendors to determine if items are still available and if so, the current price for the item; when items are no longer available, she has contacted various resources to provide an estimate.

Mr. Tommy Le
General Adjuster, Property
Chubb North American Claims
*Re: Claim 047519042569*
January 27, 2020

Cricket has also created a spreadsheet, applying the item description, the price to replace or repair/restore, her Designer Fee (45%) where applicable, an estimated cost to pack and wrap, freight costs both outbound and inbound, warehousing estimate and delivery/installation estimate. This has been an exhaustive task requiring weeks of work with an incredible amount of documentation and preparation. That is why I confirmed with you back on December 27, 2019 that Cricket was to get paid by Chubb for her services that were directly requested by Chubb.

On January 10 and January 11 Mr. Kirkpatrick and Cricket discussed in detail how the interior furnishings, specifically wooden case good pieces and antiques, are affected by sudden changes in humidity in the home; both agreed that the 80% humidity in the home just after the Event (per information provided by ServPro representative, Tony Pierce), was above normal, acceptable levels and that the sudden drop in humidity, which occurred upon installation of the dehumidifiers and other water mitigation efforts performed by ServPro, was generally considered by industry professionals to be harmful to case good and antique pieces. These sudden changes in the humidity can cause humidity-swollen veneers and joints to lift and crack as the furniture contracts in the drier conditions created during mitigation.

On January 10 while Mr. Kirkpatrick and Cricket were examining the antique bergère chairs in the foyer, I observed that you took photographs of the chairs and even rubbed your hand over the fabric on the bergère chairs, noting that the "sheen" and "slippery" feel of the fabric indicated that the glycerin product remained on the chairs and fabric despite initial efforts to wipe the excess contaminant from the chairs. Mr. Kirkpatrick noted then, that once the glycerin was deposited on the upholstery, depending upon the size of the upholstered piece, and the feasibility of re-upholstering it, the remedies were (1) to remove the fabric and re-upholster or (2) in the case of a large sofa or fully upholstered piece, simply to replace the piece itself. Mr. Kirkpatrick removed the fabric jackets from cushions, examined the cushion inserts, noted the down, feather, and/or fiber inserts, and pointed out that the glycerin had penetrated the insert material. In the case of the bergère chairs, his specific recommendation was to replace all the fabric and make new cushions and inserts since the bergère chairs were valuable antiques, and sentimental pieces. With regard to the sofas in the Great Room and the Study, Mr. Kirkpatrick stated they were a total loss and that I could dispose of them. Mr. Kirkpatrick did not feel that the sofa in my owner's study was a total loss and only needed to be reupholstered. Cricket and I disagree with that, and believe the sofa is a total loss.

Mr. Kirkpatrick, accompanied by Cricket and I proceeded to other areas of the home, taking measurements, photographs, and examining antiques, case goods, and upholstered pieces. Mr. Kirkpatrick entered his observations into his notes, collaborating at times with Cricket about the feasibility of recovering upholstery pieces versus replacing them, cleaning area rugs versus replacing them, and very importantly, whether to send my antiques to a certified conservator outside of Colorado or to simply take the pieces to a highly qualified antique and furniture specialist who can repair and restore them. Cricket and Mr. Kirkpatrick were very often "on the same page" in determining what needed to be done to items and the estimated costs to replace or repair/restore. Quite frankly, I was pleased with most of what I heard from Mr. Kirkpatrick who seemed to carefully examine every upholstered piece in the home and recommended that the vast majority be

replaced entirely. Mr. Kirkpatrick recommended conservators/restoration specialists in New York with whom he had worked; he acknowledged that the location of the Insured Property made finding Colorado shops equipped to properly repair and restore these precious items impracticable given the value, special nature of and the techniques for restoration/repair of the items being examined.

Mr. Kirkpatrick often offered his opinion as to the estimated cost to repair/restore items; he noted that one had to take into consideration that in addition to the cost to repair/restore, there was a supplemental cost for packing, crating, shipping to a conservator/restoration specialist, then re-packing, return shipping, and finally delivery and installation in my home. Warehousing, if necessary was yet another cost factor. He noted that in his experience freight costs alone ranged anywhere from 7-12% depending upon one's location in the country. Colorado is not in proximity to New York or Los Angeles where most of the country's best antique restoration specialists are based, therefore, freight costs would be anticipated to be on the higher side of these ranges. Cricket took notes on the dollar figures Mr. Kirkpatrick stated would be his recommendation for restoration and/or replacement. They will be set forth in her report.

Cricket and I have reached out to Mr. Kirkpatrick multiple times over the last two weeks so that they could both "collaborate" as he had promised on January 10 and again as he was leaving on Saturday evening, January 11. Incredibly, we have been advised that you on behalf of Chubb are preventing that important collaboration from occurring. This has been the reason why you have not received Cricket's detailed report to date. This is another example of you placing the insurer's interests above the insured's and unreasonably delaying this adjustment process which is causing me financial harm and preventing me from attending to my professional and personal obligations.

This will acknowledge that Chubb has reimbursed me for Cricket's January 6, 2020 flight to Denver and Cricket's January 16 flight to South Carolina. Chubb, however, has not reimbursed me for Cricket's airline flight to Denver on January 22 in the amount of $130.13 (reservation receipt provided to you on January 14, 2020). Why hasn't Chubb reimbursed me for this cost?

You will shortly be receiving from Cricket her detailed findings (the "Contents' Report").[2] Cricket will also be sending you this week her first Invoice for all her expenses incurred to date and her fees for her services rendered to date at our agreed upon hourly rate of $125.00.

**FRANKENTEK**

I have been working closely with Marc Franken and Mike Pavluk of Frankentek Residential Systems LLC ("Frankentek") for 30 years. They built and designed my first movie theatre in Philadelphia in early 2000. In 2008, Frankentek received an award for building the number one Home Theater in the United States that year valued at $860,000 (the "2008 Theater"). In June of

[2] All information contained the Contents' Report is the sole property of Mark Jay Krum and/or Cricket and you, Chubb and/or your representatives are prohibited from providing it to any third-party without the specific written approval and authorization of Mark Jay Krum and Cricket Dye.

Mr. Tommy Le
General Adjuster, Property
Chubb North American Claims
*Re: Claim 047519042569*
January 27, 2020

2010 I engaged Frankentek to provide services for the Insured Property. I instructed Frankentek that for the Property they had to exceed the 2008 Theater in acoustic quality and performance levels; in other words, I wanted a "World Class" movie theatre that by anyone's professional and industry standards would be valued at no less than $1 Million.

On Thursday morning, December 26, 2019, you on behalf of Chubb requested and authorized that Mike Pavluk of Frankentek fly from New Jersey to Beaver Creek in order to assess the damage to my movie theatre and home automation systems. At that time, in the presence of Tony Pierce of ServPro and Brian Beatty of J.S. Held, I asked you if you preferred your Chubb's AV and Home Automation expert/consultant to come out in lieu of Mr. Pavluk to avoid duplication of effort and costs. You, again, in the presence of Tony Pierce and Brian Beatty, specifically stated that "Chubb was not" going to have a movie theatre and/or an AV Home Automation expert/consultant and was going to rely on Mr. Pavluk whose firm installed my movie theatre and home automation systems. You specifically assured me that Chubb would promptly pay all of Mr. Pavluk's and Frankentek's travel expenses and *all* fees associated with their analysis of the damage to my movie theatre and home automation systems. *See* Exhibit "K" MJK email correspondence to TVL on December 26; *also* Exhibit "L" TVL response email correspondence to MJK on December 27 ("As discussed, [Frankentek's] fees will be paid under the dwelling portion of the claim").

On January 5, 2020, I sent you Mr. Pavluk's December 31, 2019 email specifically stating that Frankentek's

> 'on-site' rate to assess (and resolve damages if possible) [to] the electronic systems such as yours is $1500/day. All work completed by myself or Marc Franken at our offices will be at the rate of $175/hour. Labor will be tracked for all others required to take part at Frankentek including Technicians, Engineers, Programmers, Office and Administrative staff and range from $75/ Hour to $150/hour. Any repairs or purchase of replacement equipment must be paid in advance prior to shipping. A detailed invoice will be provided to you bi-weekly for the above items and amounts.

At no time did you raise any issue regarding Mr. Pavluk's rate(s) or did you stipulate any conditions and/or requirements regarding conditions for his travel and expense reimbursement or prerequisites for prompt payment of his/Franketek's invoice(s) for all services rendered at *your* request. To do so now in your ROR Letter is unreasonable, not in good faith, and certainly not fair dealing. You and Chubb have now placed me, your insured, in an untenable position to pay for substantial bills that you had agreed were your obligation to promptly pay.[3] I relied on your oral representations made to me on December 27, 2019, and your written representations that were subsequently set forth and confirmed in email correspondence between both of us. *See* Exhibit "L".

[3] I sent you Frankentek's second invoice, that you clearly had previously agreed to pay, on January 24, 2020. Is Chubb going to promptly pay this second invoice?

Mr. Tommy Le
General Adjuster, Property
Chubb North American Claims
*Re: Claim 047519042569*
January 27, 2020

Your ROR Letter states that "we are unaware of any report or evidence of any kind demonstrating that the AV System was damaged as a result of the loss." You cannot be serious. That is an outright false statement. You along with Brian Beatty, Nathan Roberts and Tony Pierce were standing right there in the theatre when Mr. Pavluk explained the damage and its cause in great detail. The next statement, in your ROR Letter is even more preposterous, and an unmitigated lie, where you state: "During our meeting with Mr. Michael Pavluk . . . he was unable to provide Great Northern with any information or support on anything having to do with the AV System." I specifically read this statement by you word-for-word to Tony Pierce of ServPro who then unequivocally confirmed for Cricket and me that your assertion is "laughable" and outright false.

As of January 10, 2020, Mr. Pavluk spent well over 35 hours on-site that week examining and assessing each piece of electronic equipment at the Insured Property to determine if the movie theatre and its components along with the home automation systems were in any way salvageable.

On Friday morning, January 10, 2020, Mr. Pavluk spent well over an hour with you, Brian Beatty, Nathan Roberts, Tony Peirce, Cricket Dye and myself taking you through each piece to the movie theatre and its uniquely engineered equipment explaining to you how it was directly and/or indirectly damaged by and affected from and by the Event. We all saw you standing right next to Mr. Pavluk who provided you along with the rest of us great detail about the contaminant affecting the acoustical treatment, acoustic fabric, electronic speakers and electronic components. You and Mr. Beatty specifically acknowledged to all of us that you were aware how there could be substantial secondary damage due to the well over documented 80 percent humidity at the time of the Event. I observed that you even took your own camera and photographed the Runco Projector Controller displaying a "Communication Error" with the Runco Projector. I believe you also photographed the red error light flashing in the Request Movie Storage Unit that was in the center of the movie theatre rack.[4]

On December 26, 2019, Tony Pierce of ServPro specifically told you that he observed first-hand contaminant on the movie theatre equipment rack and saw one of the rack monitors blow out and shut down in his presence. That observation by Mr. Pierce was again repeated by me on Friday, January 10, 2020 directly in front of Tony Pierce and you and acknowledged by Mr. Pierce to be a correct statement of what he had observed. At one point during the January 10 "walking conference" you specifically stated that "I've seen enough" and noted to all of us that you understood how my million dollar world class movie theatre was destroyed by the Event.[5] You then specifically stated: "Chubb is about replacing the theatre as it was the day before the damage occurred." Brian Beatty

---

[4] This confirms my request that in the next 15 days you provide me with a copy of all the photographs that were taken at the Insured Property by yourself and/or any of your representatives since the Event. That was a express condition that you agreed to on December 26 before you took your first photograph.

[5] You also stated just before leaving on January 10 in response to my request for another meeting on the movie theatre and home automation systems: "Why do we need to drive back out here for another meeting when we have seen all the damage."

specifically stated: "We have been through and seen this before and understand what you are telling us Mike [Pavluk]." Mr. Pavluk specifically told you and Mr. Beatty that the manufacturers of all the equipment in the movie rack stated to him directly that extended exposure to a high humidity environment and potentially corrosive chemicals due to a fire sprinkler failure likely will cause premature product failure. The manufacturers told Mr. Pavluk that any equipment exposed to high humidity must be replaced. You were directly told that all the manufacturers of my electronic components stated to Mr. Pavluk that they will not accept products back for testing, certification, or future repair due to the excessive humidity and the likely corrosiveness of the contaminant.

On January 10, 2020, Mr. Pavluk went into great detail with you and Brian Beatty about how each component in the movie theatre was chosen based upon dozens if not hundreds of hours of engineering. He specifically provided you and Mr. Beatty with information on each component. At no time did he not answer any of your questions. Mr. Pavluk took the time to explain how California Audio Technologies ("CAT") supplied for my movie theatre the custom fabricated equipment such as enclosures, baffles, drivers, tweeters, and subwoofers, Digital Sound Processors, and amplifiers. He was available to you to answer any questions regarding the equipment and how it was damaged. He was there at your request and was supposed to be promptly paid for his time and expenses by Chubb.

At no time did I ever state "I gave Frankentek a budget of $1,000,000.00 and don't know how much they actually spent." That is just ridiculous. I did tell you that Frankentek was contractually obligated to provide me with a movie theatre that would rank as one of the top movie theatre's in the world and that it would have to include no less than $1 million of engineering, design and equipment. At no time did Mr. Pavluk or I say we did not have any documentation "to support the type of system and original costs" for my theatre. Quite the opposite is true. In June of 2010 I entered into a written contract with Frankentek wherein I purchased Construction Related Services, a movie theatre, and a Home Automation System for the Insured Property in the amount of $2,242,403,000.00 (the "Frankentek Purchase Price"). Frankentek was paid the Frankentek Purchase Price in six installments paid in full by September 7, 2010. The Krum Theatre was contracted for $891,000.00 (exclusive of construction, interior design furnishings, carpet, plumbing fixtures, lighting fixtures, flooring, carpeting and art).

Earlier this morning you received Mr. Pavluk's detailed findings and analysis along with thirteen attachments (the "Frankentek Report").[6] You specifically requested this report and on no less than two separate occasions agreed that Chubb would be solely responsible to pay for Mr. Pavluk's time to fly to the Insured Property, analyze the damage and prepare a written report in support of his findings.

---

[6] All information contained the Frankentek Report is the sole property of Mark Jay Krum and/or Frankentek, and you, Chubb and/or all of your representatives are prohibited from providing it to any third-party without the specific written approval and authorization of Mark Jay Krum and Frankentek.

Mr. Tommy Le
General Adjuster, Property
Chubb North American Claims
*Re: Claim 047519042569*
January 27, 2020

As with your oral and written representations regarding Ms. Cricket Dye, I relied on those same representations concerning Mr. Pavluk and Frankentek. Your unreasonable denial of Frankentek's invoices is affecting my long standing professional relationship with one of the premier AV companies in the world with whom I have a 30 year relationship. Frankentek's first invoice in the amount of $8,949.30 was sent to you on January 13, 2020. *See* January 13, 2020 Email from MJK to TL and Frankentek's First Invoice attached hereto, incorporated herein, as Exhibit "M". Frankentek's Second Invoice in the amount of $4,635.00 was sent to you on January 24, 2020. *See* January 24, 2020 Email from MJK to TL and Frankentek's Second Invoice attached hereto, incorporated herein, as Exhibit "N".

Your ROR Letter requests access to the Property for your "AV Systems expert who can work alongside Frankentek to determine what, if any, damages exist related to this loss and an appropriate plan for scope and pricing." The fact that you use the words "what, if any, damages exist" is the most contemptible of the many egregious assertions you have made to date considering your in person conversations with Mike Pavluk and your statement "I've seen enough" indicating you did not need to see or hear any more damage pertaining to the movie theatre. How can you make such a statement and still assure me that your insured's interests are not being placed well below those of Chubb's? You stood in the theatre on December 26, 2019 with myself, Brian Beatty and Tony Pierce and again on January 10, 2020, with myself, Cricket, Mike Pavluk, Tony Pierce, Brian Beatty and Nathan Roberts, while the contaminant was still oozing from the walls, ceiling and flooring.

PLEASE BE ADVISED that Mr. Pavluk will be at the Insured Property on Friday morning (from 8 a.m. to 12 noon), February 7, 2020, to do further evaluation. I am REQUESTING that you have your AV experts/consultants there on that date and during that time when Mr. Pavluk will be available to fully answer any and all of their questions. Unless you can cite to a Policy provision that requires otherwise, I am placing you and Chubb ON NOTICE that we will soon be proceeding with removal of all the damaged theatre components, furnishings and acoustic treatment, wall and ceiling fabrics, etc. Chubb has unreasonably delayed this process long enough.

## DOCUMENTS REQUESTED BY CHUBB

Your ROR Letter demands that I provide you with the following:

(i) Flight/Reservation records for my trip to Colorado at the time of the loss;

(ii) The past two years of flight reservations reflecting my occupancy at the loss location;

(iii) Contact information of the management company that prepares the house prior to my arrival;

(iv) Contact information for the alarm company that monitors the property when not in use; and

(v) The last 2 years of electric and water bills.

On Tuesday, December 10, 2019, I flew from London, England to Denver. I stayed at the Insured Property from December 10 to Friday, December 13, 2019. On December 13, 2019 I flew to Washington, D.C. On December 19, 2019 I flew from Philadelphia back to Denver and remained at the Insured Property until January 1, 2020 at which time I flew to Las Vegas, Nevada as a direct result of the Event. On January 24, 2020 I started to provide you with the past 24 months of flight reservations you demanded reflecting my occupancy at the Insured Property.[7]

I do not have a "management company that prepares the house prior to [my] arrival." Accordingly, there is no contact information that you request.

My alarm company is Thul Alarm Inc. Their address is P.O. Box 534, Avon, CO 81620. Their phone number is 970-949-4638. Mike Thul is the owner. The Property is always monitored. Mike and his crew have been to the Insured Property a few times over the last month as a result of the damage caused by the Event to my alarm system.

On Wednesday, January 22 I provided you with the last 24 months of my electric and water bills that you demanded for the Property.[8]

**HOTEL EXPENSES FROM JAN. 1 to JAN. 6 / ALE**

You state in Your ROR that I "previously reported that [I] have continued to occupy the section of the residence that was not impacted by this water event from the date of loss through our last inspection on Friday January 10, 2020." Again, that statement is not accurate. The entire house has been compromised by the Event. I certainly acknowledge that we have been staying in areas of the house that have been secured off because Chubb has still not approved my requested ALE pursuant to the Policy. Staying at the Property has been extremely difficult with trying to navigate around all the damage and mitigation equipment and, not least of all, having no functioning kitchen and having to run my law practice in this mess.

You next state in Your ROR Letter that "[w]ithout [your] prior knowledge, [I] reported to Great Northern that [I] had decided to travel to Las Vegas, NV for four (4) nights from January 2, 2020 to January 6, 2020." That statement is not correct and is a bad faith attempt by Chubb to benefit itself at its insured's expense. You clearly know your statement is taken way out of context. The truth is that you as well as Tony Pierce of ServPro were informed on December 26 that my girlfriend and her children were expected to arrive at the Property for holiday on December 30th and

---

[7] I believe, however, that this request is unreasonable. I request that you set forth in writing why your demand is relevant and made in good faith. As I set forth in my email correspondence to you of January 24 this task is monumental.

[8] I believe, however, that this request is also unreasonable. I request that you set forth in writing why your demand is relevant and made in good faith.

"that since my house was destroyed we will be leaving Colorado on January 1 for another vacation destination," likely Las Vegas. *See* Exhibit "D" the December 29, 2019 Email correspondence to TL and statements which can also be confirmed by Tony Pierce of ServPro.

On January 8, 2020 I spoke to you on the phone about these hotel bills. You told me to submit then for consideration for ALE reimbursement. What is most disturbing now, is that after telling me to submit my modest Las Vegas hotel receipts (totaling only $828.49 for four nights), you, acting on behalf of Chubb, are attempting to create/manufacture some impropriety and to further suggest that I should accept ALE/ELE in the amount of $200 per night in Beaver Creek.[9] *See* MJK January 9 Email Correspondence to TL attached hereto, incorporated herein, as Exhibit "O". Again, no good deed goes unpunished with Chubb. This is incomprehensible.

**ADDITIONAL FOOD EXPENSES**

In your email correspondence to me of January 2, 2020, you advised that Chubb will "pay the additional food expenses less [my] normal expenses." Accordingly, later this week I will be providing you with meal receipts totaling $1,638.62. Please advise what percentage you feel is reasonable to reimburse me for these meal expenses. I just want what I am entitled to under the terms and conditions of my Policy.

**CHUBB CONTINUES TO REFUSE TO ANSWER MY INSURANCE COVERAGE QUESTIONS AND RESPOND TO MEETING REQUESTS**

I feel like my insurance company and my NYC insurance agents at PRMS are abandoning me in my hour of greatest need. I have been a loyal Chubb policy holder for over ten (10) years and have paid in excess of $100,000.00 in policy premiums, yet I continue to be frustrated by not receiving guidance and support along with answers to numerous coverage questions. For example,

* January 2 – Where in the Policy does it state the FRV is only payable on an "incurred cost" to the insured?
* January 8 – Who is paying the invoices and expenses of J.S. Held, LLC?
* January 8 - Do these costs and expenses deplete/erode/decrease my available dwelling coverage limits? If so, what provision of my insurance contract with Chubb allows this to occur?
* January 9 - Please confirm that all costs associated with your representatives will not affect/decrease/diminish my contents and/or coverage limits.
* January 14 - Please confirm the exact amount of my ALE. It is certainly no less than $2,069,100.00, correct? This also confirms that my ALE does NOT erode my contents and dwelling coverages, correct?
* January 16 - Has the "detail" been provided for ServPro estimates?

---

[9] On January 8, 2020 I also had a conversation with Dale Krupowicz of PRMS who advised that I should submit the Las Vegas hotel bills for ALE reimbursement.

Mr. Tommy Le
General Adjuster, Property
Chubb North American Claims
*Re: Claim 047519042569*
January 27, 2020

* January 16 - Has Ryan and/or James at ServPro provided any additional "detail" to Chubb as you requested and as set forth in James' January 13 email directly below (is there a revised estimate)? If so, please promptly send me the information as I have requested.
* January 20 - On January 3, 2020, in direct response to your January 2 email, I directed that we "immediately" start the remediation process. No real work has begun by you, Chubb, JS Held and/or ServPro. Beyond your writing that you are "available to speak" about this (and stating your standard mantra "that we are in receipt and will review and respond"), you have consistently failed to meaningfully and substantively engage in response to my multiple requests to talk about immediately starting this vital process. Chubb continues to delay, subjecting me and the Property to additional harm and damages. Chubb has not approved my ELE/ALE nor has Chubb approved the removal of the Property's substantial and valuable contents which is obviously necessary before remediation and demolition commences. Please make yourself available by conference call no later than noon EST this Wednesday, January 22.
* January 21 - I never cared who moved my contents or provided remediation services as long as they had the skill, were properly insured, and approved by Chubb. Why did it take almost a month for you to tell me that you were not pre-approving ServPro?
* January 22 - Please promptly let me know if some of these electric charges are reimbursable and fall within the scope of my coverage under the Policy.
* January 23 - I have spoken with Tony Pierce of ServPro who is adamant that I never made that statement to him or to anyone in his presence. Who (as you state below) at ServPro has stated otherwise?
* January 23 - This is why I keep asking for a meeting to understand what are Chubb's policies and procedures on how vendors will be paid and why am I responsible to advance those payment under my insurance contract? Where does my Policy require that?
* January 23 - As I have previously requested, please forward to me a copy of all the prior estimates from ServPro that were submitted to and considered by Chubb. The only estimate that I have is the one provided on Saturday, January 11 for the amount of $219,902.00. I have not seen any others (e.g., the estimate you refer to as an estimate not to exceed $225,425.75; and the less than $50,000.00 estimate you also referred to in your Jan. 21 email correspondence).
* January 25 and 27 - Would you please provide Sabo Electric and me with the Chubb criteria and/or guidelines setting forth reimbursement and payment under the Policy.
* January 27 – Where in the Policy does it state a cost and/or expense has to be "incurred" before it can be reimbursed to me.
* January 27 – Is Chubb refusing to advance me any funds to "perform the necessary pack-out and storage of the contents" as you refer to in your Jan. 22 Email.
* January 27 – Will Chubb promptly provide me with a copy of all photographs taken by you and/or any of your representatives.

* January 27 - I cannot understand why I am just now (late Sunday evening, January 26, 2020) being provided with ServPro's contents' removal estimates. I asked for them multiple times. Were you withholding the estimates from me? I have requested that I see *all* of them.
* January 27 – Will Chubb provide prompt payment for contents damage that is not in dispute?
* January 27 - Will Chubb reimburse me under my ALE provisions of the Policy for meal expenses?

At the end of all your email correspondence is the quote: **I strive to take care of all issues and questions directly with you.** I hope you will honor that here.

**REMOVAL OF DAMAGED PROPERTY**

You and Chubb's consultants and/or representatives have had unfettered access to the Property for over thirty (30) days in which to examine and document all the damaged contents in the Insured Property. While Cricket has documented that you and/or Mr. Kirkpatrick have already verbally authorized the disposal of certain furnishings, PLEASE BE ADVISED that, unless you instruct otherwise in writing providing support, on Saturday morning, February 1, 2020 I will start to have items removed from the Insured Property and discarded. I have been trying to meet with you to discuss this for the last two weeks.

**REQUEST FOR MEETING WITH MY CHUBB ADJUSTER**

In light of your recent January 22, 2020 statement that I have somehow not answered every and all substantive questions, on January 23 I wrote you stating that "I will make myself available for an on-site meeting on Monday morning, January 27, between 9 a.m. and 11 a.m. for you and your building consultant Brian Beatty to answer any and all questions you have. I can also make myself available for an on-site meeting all day (morning, afternoon, and/or evening) Tuesday, January 28 if that is more convenient for you. Please understand that I expect and insist that you will reciprocate and answer all of my questions that have been written to you previously and not answered. I also have quite a few other questions that need to be answered by you before the contents begin to be removed from the Property next week. I will send those questions to you in writing this weekend so you can be well prepared to facilitate our discussion and get this project under way." *See* Exhibit "C" the January 23, 2020 Email from MJK to TL.

Until very late last night (Sunday, January 26) you had not responded to my request for an in person meeting, even though your Jan. 22 Email states: "please let us know when you are available to meet at the home." Your Jan. 26 Email now states that you will be meeting me at the Insured Property on Tuesday, January 28 at 11:00 a.m. with Nathan Roberts. That is great. Cricket and I look forward to meeting you and Nathan then.

Mr. Tommy Le
General Adjuster, Property
Chubb North American Claims
*Re: Claim 047519042569*
January 27, 2020

**CHUBB'S SELF SERVING SUNDAY EVENING EMAIL CORRESPONDENCE**

Late last night you sent an email with 72 pages attached. Your Jan. 26 Email, consistent with your prior communications, contains many false statements.

First, you state that "[I] have chosen to make unreasonable demands, threatened litigation against all parties, and have yet to begin taking the necessary steps to prevent further damages to [my] home." This correspondence establishes that I have not made any demands, let alone unreasonable ones, have not threatened litigation against any party, let alone "all parties", and have done my best, despite Chubb's lack of cooperation and adversarial bad faith posturing, to mitigate further damages to my home.

I have made clear to you in writing, and at all times in your presence, that "I certainly have no intention of commencing litigation (or as you say, file suit) against my own insurance company before I have issued any formal written demands for insurance benefits that I am promised and pledged under the Policy". *See* December 29, 2019 Email from MJK to TL attached as Exhibit "D" at ¶2. I do agree, however, that those reasonable demands pursuant to the terms and conditions of my Policy will shortly be forthcoming.

Second, there was no need to meet at my house last Thursday to discuss Chubb's policies and procedures on how vendors get paid and why am I responsible to advance those payments under my insurance contract. *See* January 23, 2020 Email from MJK to TL attached as Exhibit "C" at ¶9. That discussion and meeting could have taken place in-person in Denver where you reside and where we were located that day. My flight from Philadelphia to Denver landed at lunchtime on Thursday, January 23, 2020. That is why on January 22 I offered to meet you in Denver on January 23. That is also why Cricket stayed overnight in Denver when she flew from South Carolina on Wednesday night, January 22. You, Tommy, declined to have and participate in a meeting on Thursday, January 23 in Denver. It was you, not me, who "wasted" the opportunity to meet and move this claim forward.

Third, the Chubb inspection at the Insured Property was confirmed for 12:30 p.m. on Friday, January 24, 2020 by Tony Pierce of ServPro and Carl Finocchiaro from Spectrum Forensics. They set the date and time, not me. I was never requested or expected by Tony Pierce or Mr. Finocchiaro to be at that inspection. *See* Exhibit "C" at ¶5. You did not advise me that you were going to be at the January 24 inspection until the evening of January 22. *See* Exhibit "C" at ¶5. My schedule did not allow me to participate in that inspection at 12:30. However, late Thursday afternoon, Tony Pierce and Mr. Finocchiaro decided they wanted to meet at 11 a.m. the next day, Friday, January 24. Since the inspection time was changed, on Friday morning I made time to greet Mr. Finocchiaro when he arrived and I was able to spend a little over 30 minutes with him and Tony Pierce. I also bring to your attention again, that you were always welcome to participate and attend that inspection and meeting on Friday, January 24. You are playing games.

Fourth, I did not remove any hardwood flooring from the Insured Property "within one (1) hour of the loss occurring." In light of Brian Beatty's remarks on January 10, 2020 at the Property (regarding the second floor bridge hardwood flooring cupping and crowning causing damage to my bookcase) on Tuesday, January 14 I had flooring removed to remediate the problems observed by Mr. Beatty. *See* Second Floor Bridge Hardwood Flooring Photograph attached hereto, incorporated herein, as Exhibit "O".

Fifth, your statement that I "do not have a response to Chubb's outstanding request for documents" has been fully answered above. You have the documents that you asked for only last week. You are playing more games.

Sixth, how could there be any progress made on moving my contents when I was not provided with any estimate (despite my repeated requests for over two weeks for such information) until late last night in an attachment to your Jan. 26 Email. Any delay in taking necessary steps to prevent further damages to the Insured Property and its contents is twofold, and certainly not of my making or choice. One, remediation and demolition cannot begin until my contents are packed up and moved. Two, pack out and removal cannot occur until a reasonable estimate is approved. Until I, the insured, have reviewed the estimate provided by ServPro, which took you until last evening to provide me, I can certainly not be expected to authorize work to begin (the work you refuse to advance payment on) until I know the cost which will get deducted from my contents coverage. This is a perfect example of you taking facts completely out of context to serve Chubb's interest at your insured's interest and expense. This is what the law prohibits.

Seventh, your comments/concerns regarding Mr. Tom Kirkpatrick are not genuine. There has been no confusion between me, Cricket and/or Mr. Kirkpatrick. That is addressed above at page 10. Furthermore, Mr. Kirkpatrick was first to text me and not copy you. It is illogical to me that you now express concern about mutual exchanges of information to take place directly between Cricket and Mr. Kirkpatrick[10] (at Mr. Kirkpatrick's request and suggestion on January 10) when it was you who within 30 minutes of bringing Mr. Kirkpatrick to the Insured Property on Friday, January 10, decided to leave Mr. Kirkpatrick with myself and Cricket alone for the next two days. Why didn't you stay that Friday? Why didn't you come back on Saturday, January 11 when Mr. Kirkpatrick spent another 10 hours alone with both Cricket and me, if you were so concerned with avoiding "any confusion"?

I wish to make note of the fact that weeks ago I had requested that you cc me and provide me with all communication between Chubb and J.S. Held and/or ServPro. That has not occurred. Nonetheless, you will be copied on any further communications with Mr. Kirkpatrick.

Your Jan. 26 Email attaches a 62 page report titled "Damage Assessment" prepared by J.S. Held dated Thursday, January 23, 2020. Obviously, I have not had a chance to skim let alone review this document by the time this correspondence is being sent to you. If necessary, I will

[10] Your Jan. 26 Email mistakenly refers to him as Tom Fitzpatrick.

respond to this 62 page report later this week. Why did it take J.S. Held so long to issue its Damage Assessment? Have you reviewed it? Is J.S. Held cooperating and making this claim a priority? Please be prepared to discuss it in detail at our meeting tomorrow morning. I am requesting that Brian Beatty be present for this meeting. I will specific questions for him. He told me there was no mold in the Property.

**CHUBB'S INTENT TO CONDUCT AN EXAMINATION UNDER OATH**

Your ROR Letter states "Great Northern's intent to conduct an Examination Under Oath. This again confirms that myself and my daughter Erika Krum are available at your earliest convenience to attend and answer any and all questions under oath as permitted pursuant to the Policy. Please provide dates and locations. Erika lives in Washington, D.C. I can certainly make myself available in Washington, D.C. or in Colorado.

You are constantly asserting (without any factual support) that I am not cooperating with you. I believe this letter sets forth the facts that demonstrate that is not true. Please understand that just like Chubb, I reserve all my rights and remedies pursuant to statutory and common law. Specifically, that you as well as Chubb are required to act in my best interests under the Policy. That you and Chubb do not breach your duty of good faith and fair dealing. That you and Chubb fully comply with Colorado's Unfair Claims Settlement Practices Act. And most importantly, that you and Chubb not unreasonably delay or deny payment of a claim for benefits owed to me pursuant to my Policy.

Sincerely,

Mark Jay Krum

MJK/mjk
Enclosures (via email only)

cc: Ms. Dale Krupowicz at PRMS (via email w/encls.)