**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **MARK JAY KRUM**<br>**Plaintiff,**<br>**v.**<br><br>**CHUBB LIMITED;**<br><br>**AND**<br><br>**GREAT NORTHERN INSURANCE COMPANY;**<br><br>**AND**<br><br>**CELIA SANTANA;**<br><br>**AND**<br><br>**DALE KRUPOWICZ;**<br><br>**AND**<br><br>**PERSONAL RISK MANAGEMENT SOLUTIONS, LLC,**<br><br>**Defendants.** | **CASE NO.: 1:20-cv-03616-RM-NRN**<br><br>**PLAINTIFF'S RESPONSE AND OPPOSITION EXHIBITS TO DEFENDANT GNIC's MOTION FOR SJ** |

**PLAINTIFF'S RESPONSE AND OPPOSITION TO DEFENDANT GREAT NORTHERN INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

## OPPOSITION EXHIBIT NO. 51
## S ROBERT LANDOW EXPERT REPORT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **MARK JAY KRUM** Plaintiff, v. | **CASE NO.: 1:20-cv-03616-RM-GPG** |
| **CHUBB LIMITED;** AND **GREAT NORTHERN INSURANCE COMPANY;** AND **CELIA SANTANA;** AND **DALE KRUPOWICZ** AND **PERSONAL RISK MANAGEMENT SOLUTIONS, LLC,** Defendants. | **EXPERT REPORT OF S ROBERT LANDOW** |

**EXPERT REPORT OF S ROBERT LANDOW IN SUPPORT OF PLAINTIFF'S BAD FAITH CLAIMS AGAINST DEFENDANT GREAT NORTHERN INSURANCE COMPANY**

## I. BACKGROUND AND QUALIFICATIONS AS AN EXPERT WITNESS.

I am the Managing Member of MLA Claims, LLC ("MLA") a public adjustment / property loss consulting firm founded in 2007. I founded Main Line Adjustment Company in 1994, which merged with Claims International to form MLA. MLA is one of the nation's most accomplished public adjustment / property loss consulting firms. I have a Master of Business Administration from the McDonough School of Business at Georgetown University and a BS in Consumer Economics from the University of Maryland.

My professional qualifications include possessing a public insurance adjuster's license in 35 states and/or jurisdictions (including a Non-Resident Public Adjuster License for the State of Colorado). For over 28 years, I have advised and assisted property insurance policyholders with compiling claims totaling well in excess of one billion dollars. A number of these claims resulted in payment in excess of $300,000,000 by The Chubb Corporation and its affiliated insurance entities, such as Great Northern Insurance Company.

A true and correct copy of my curriculum vitae is attached hereto, and incorporated herein, as Exhibit "1".

My firm specializes in resolving large residential and complex commercial property losses stemming from catastrophic events such as fires, hurricanes, floods and other water damage events across the country and internationally. I have handled a broad spectrum of claims for clients, ranging from homeowners and small businesses, to Fortune 500 companies and municipalities, including spearheading a Hurricane Katrina settlement in excess of $250,000,000 for one of the largest hospital management companies in the country.

I am being compensated in his matter at an hourly rate of $500 per hour and $600 per hour for deposition and trial testimony, plus expenses.

I have had no professional and/or personal relationship with Mr. Krum prior to the instant litigation. While I have spoken to Mr. Krum on numerous occasions regarding the instant litigation, I first met him in-person on Friday, November 4, 2022.

I am submitting this Expert Report at the request of the Plaintiff Mark Jay Krum and have been asked to evaluate and express my opinions as to the breach of contract and the bad faith conduct of Chubb and Great Northern Insurance Company and its employees, agents and representatives and as a result of such conduct the damages sustained by Mr. Krum.

I have read the allegations and reviewed the exhibits included in the Amended Complaint filed by the Plaintiff Mr. Mark Jay Krum at ECF Document 31. In the course of preparing this Expert Report I was provided certain materials as set forth in Exhibit "B" attached hereto and incorporated herein. Exhibit B also sets forth additional materials that I have independently obtained and reviewed. I have reviewed numerous documents (including deposition exhibits) in this case, but to a large extent, focused my attention on the deposition testimony obtained by Attorney Mark Jay Krum.

I agree to the provisions set forth in the parties Stipulation and Protective Order regarding the treatment of Confidential Information that may have been provided to me to render my Expert Opinions.

## II. FACTUAL BACKGROUND AND BASIS FOR OPINION.

### The Instant Civil Action.

This is a civil action filed by Plaintiff Mark Jay Krum against the Defendants Great Northern Insurance Company ("Great Northern" or "Defendant Great Northern") and against Celia Santana ("Defendant Santana"), Dale Krupowicz ("Defendant Krupowicz") and their insurance firm, Personal Risk Management Solutions LLC ("PRMS"). Mr. Krum's Amended Complaint (ECF Doc. 31) was accepted as filed with the Court on March 1, 2021 (*see* ECF Doc. 37). I am also aware that Mr. Krum had filed a similar complaint against PRMS in New York State ("New York PMRS Complaint").[1]

[1] New York PRMS Complaint refers to ECF Doc. 1-1, ECF Doc. 1-2, ECF Doc. 1-3 and ECF Doc. 1-4 all filed and docketed in the United States District Court for the Southern District of New York and transferred to the District of Colorado in Case No.: 22-cv-01028-MEH and subsequently consolidated with this Case 03616 on June 1, 2022 (ECF Doc. 175), including all its referenced exhibits.

**The Insured Event.**

The Insured Event occurred at Mr. Krum's Colorado residence at 373 Strawberry Park Road, in Beaver Creek, Colorado 81620 (the "BC Property").

Upon completion of what was a two plus year renovation project the BC Property is approximately 11,000 square feet; at 2.8 acres it is the second largest lot in the exclusive gated community of Strawberry Park; it sleeps 21 comfortably, has eight full bathrooms (five full bathrooms all with both a jacuzzi tub and a large shower); three half bathrooms; a spectacular game room with six 55 inch flat screen tvs; three full wet bars; eight fireplaces and one outdoor fire pit; a 26 foot climbing wall; a world class movie theatre (the "Theatre"); an indoor 25 foot climbing rope; an indoor basketball court; and spectacular ski-in and ski-out to Beaver Creek, Bachelor Gulch and Arrowhead Mountains. The Theatre was designed by Frankentek who in 2008 received an award for building the number one Home Theatre in the United States (the "2008 Theatre"). *See* Mark Jay Krum November 10-11, 2022 Deposition Transcript ("MKDT") at 231:11-232:4, 132:17-133:5; Defendants' Deposition Exhibit No. 1014 at 1-2; and allegation para. 86 to Exhibit 1 and allegation para. 91 to Exhibit 1A.

In or about June of 2010 Mr. Krum engaged Frankentek to build the Theatre and to engineer, provide and install the Home Automation Services for the BC Property. Mr. Krum instructed and reached an agreement with Frankentek to ensure that specifications for the BC Property Theatre exceeded the 2008 award-winning Theatre in acoustic quality and performance levels and a Theatre "that by anyone's professional and industry standards would be valued in excess of $1 Million." *See* MKDT at 137:24-138:11; Defendants' Deposition Exhibit No. 1014 at 2; and allegation para. 88 to Exhibit 1 and allegation para. 93 to Exhibit 1A.

During the morning of Tuesday, December 24, 2019, a single actuated sprinkler head inside the BC Property (the "Sprinkler Head") failed and released hundreds of gallons of liquid contaminant throughout all four levels of Mr. Krum's residence (the "Insured Event").

At the time of the Insured Event Mr. Krum had made his required premium payment and had property insurance coverage with Chubb and Great Northern Insurance Company. Mr. Krum was insured under a *Chubb Masterpiece Policy* bearing policy number 13787210-02, and subject to the terms, conditions, exclusions and endorsements contained within the policy and under Colorado law in effect from August 15, 2019, through August 15, 2020 (the "Policy"). The Policy provided Mr. Krum with Dwelling Coverage in the amount of $6,897,000.00 and Contents Coverage in the amount of $1,379,400.00 and additional coverages. *See* Plaintiff's Deposition Exhibit No. "6".

At the time of the Insured Event Mr. Krum was and is currently a "first-party" claimant asserting an entitlement to benefits as an insured under the Policy.[2] *See* Tommy Le October 24, 2022, Deposition Testimony ("LDT") at 334:8-9.

On December 26, 2019, Chubb Senior General Adjuster Tommy V. Le ("Chubb Adjuster Le") from Colorado and Chubb's building consultant Brian D. Beatty (Vice President of J.S. Held, LLC) inspected the damage to the BC Property and were given full and unlimited access to the BC Property. *See* LDT at 66:25-67:13. 98:23-99:27.

On December 26, 2019, during his site visit, Chubb Adjuster Le stated to Mr. Krum: "Don't worry about anything, you are insured by Chubb." Chubb Adjuster Le also repeated that exact quote to Mr. Krum and his representatives on at least two other occasions in January 2020.

[2] First party claimant means a policyholder (here Mr. Krum, the insured) asserting an entitlement to benefits against his/her/its own insurance company.

Chubb Adjuster Le has testified at his deposition that he acts at the specific direction and instruction of his manager Matthew Witcher ("Witcher" or "Chubb Manager Witcher"). *See* LDT at 28:17-21, 55:12-15.[3]

On December 27, 2020, Chubb's Environmental Scientist and Industrial Hygienist Andrew Fredericks ("Chubb's Scientist") spent hours inspecting the entire BC Property and the damage caused by the water released by the Sprinkler Head (the "Initial Scientific Inspection"). Chubb's Scientist performed a visual assessment and used infrared imaging and a contact moisture meter at the BC Property to confirm the damage directly and indirectly caused by the Insured Event.

Immediately following the Initial Scientific Inspection, Chubb, Great Northern, Chubb Adjuster Le and Chubb Manager Witcher were all advised by Chubb's Scientist who confirmed: (i) that both full bathrooms as well as the two bedrooms on the lower level were identified as sustaining contaminant damage from the Insured Event; (ii) that Mr. Krum's daughter's bedroom on the Second Floor was also substantially impacted both in the bedroom and her bathroom; (iii) the Game Room bathroom as well as the fabric ceiling and stone and wood flooring in the Game Room, and the Game Room crawl space, were also substantially damaged from the contaminant; (iv) first floor hardwood floors in the Great Room, Kitchen, Dining Room, Main Hallway, Foyer, Theatre Room and Study were all affected and damaged from the Insured Event; (v) Plaster Walls in each of the aforementioned areas were impacted including the Entry Room Bathroom and Entry Closet (which contained stored fabric, drapery, carpet, antiques and antique books – most of which were ruined); (vi) Entry Wood Columns, Great Room and Kitchen and house chandeliers were all affected and damaged from the Insured Event; (vii) Fabric Walls and

[3] Chubb Adjuster Le had contact with Chubb Manager Witcher, "every day, every other day" for the entire time he was handling Mr. Krum's claim. LDT at 77:13-78:13.

furniture in Theatre Room were affected; (viii) Wood Panel Walls and hardwood flooring in Study were affected; (viii) Stone Floors in Entry, Entry Bathroom and Entry Coat Closet were all impacted; (ix) "Due to the design of the house and the point of origin, numerous areas of the subgrade were identified as being subjected to water damage, including[] ceilings, wall and ceiling cavities, hardwood floors, fabric walls, carpeted flooring, and plaster walls"; (x) first floor Gym plaster walls and carpet were affected; (xi) Maintenance Room flooring was affected; (xii) Second Floor bridge, column illumination, bookshelves and hardwood flooring were all ruined; (xiii) Owner's Suite Kitchen and Study were affected; and (xiv) "Upon evaluation of staining and drip marks, it appears that water from the sprinkler head was able to infiltrate the first-floor sub-floor and traveled along certain electrical and HVAC conduits before being deposited in the subgrade areas." *See* MKDT at 234:21-236:23; Plaintiff's Deposition Exhibit No. "75C" at page 2.

Immediately following the Initial Scientific Inspection, Chubb Adjuster Le and Chubb Manager Witcher were advised by Chubb's Scientist "that professional remediation activities should commence immediately [and that i]t is likely that materials within the wall, floor, and ceiling cavities of the subject areas are holding moisture [and that i]f left in place without removal or drying, these pockets of moisture could potentially support microbial growth over time." *See* Plaintiff's Deposition Exhibit No. "75C" at page 4. Furthermore, on January 8, 2020 Chubb's Scientist advised Mr. Krum that it what his recommendation that Mr. Krum "obtain alternative housing as soon as possible." *See* Plaintiff's Deposition Exhibit No. 233 and Exhibit No. 233A.

As of March 13, 2020, Chubb and Great Northern's direct representatives and/or

Consultants (none of which were retained by Mr. Krum) had spent well over 165 man-hours investigating the damage at the BC Property and had taken and/or been provided with hundreds of photographs documenting all the damage. *See* Plaintiff's Deposition Exhibit No. 273 and allegation para. 117 to Exhibit 1.[4]

On every email correspondence sent by Chubb Adjuster Le to Mr. Krum it stated "Welcome to Chubb Claims. Life is about to get easier. I strive to take care of all issues and questions directly with you. If you need to speak with my manager, Matthew Witcher, you can reach him at (818) 437-8715 or via email at matthew.witcher@chubb.com." On every email correspondence sent after January 26, 2020, by Mr. Krum to Chubb Adjuster Le, Chubb Manager Witcher was copied. Adjuster Le testified that Chubb Manager Witcher received and/or has direct access to a copy of every communication between Mr. Krum and Chubb Adjuster Le. Between January 27, 2020, and August 28, 2020, Chubb Manager Witcher was copied on no less than 160 separate email correspondence sent by Mr. Krum to Chubb, Chubb Executive General Adjuster Steve W. Mortensen[5], Chubb Executive General Adjuster Steven J. Magnotta ("Chubb Adjuster Magnotta") and Chubb Adjuster Le. *See* LDT at 73:17-74:22, 169:12-15; Plaintiff's Deposition Exhibits No. 12 and 12A and allegation para. 120 to Exhibit 1.

Despite Mr. Krum's requests, Chubb Manager Witcher never once communicated directly with him. *See* Plaintiff's Deposition Exhibits No. 262, 265 at 3, 12 and 12A and allegation para. 121 to Exhibit 1. Matthew Witcher November 9, 2022, Rough Deposition Transcript ("WRDT") at 149:6-151:11.

**BC Property's Prior Rental History And**

[4] *See* Plaintiff's Deposition Exhibits 400 to 440 are photographs taken during Serv Pro's remediation and demo photographs 450 to 462 were taken by Chubb and JS Held on October 29, 2021, and photographs 470 to 503 were taken on behalf of Mr. Krum on November 30, 2022 (See Krum_003001 through Krum_003074).

[5] Chubb Executive General Adjuster Steve W. Mortensen ("Chubb Adjuster Mortensen") was employed by Chubb and also worked for Great Northern.

**Mr. Krum's Intent to Rent[6] The BC Property In 2020.**

The BC Property has been rented out (as documented in written contractual agreements) no less than twelve (12) times. It was rented out from December 21, 2010[7] to January 2, 2011 (13 days/12 nights); from February 4, 2011 to February 8, 2011 (5 days/4 nights); from February 12, 2011 through February 19, 2011 (8 days/7 nights); from March 4, 2011 to March 12, 2011 (9 days/8 nights); March 12, 2011 to March 19, 2011 (8 days/7 nights); December 26, 2012 to January 2, 2013 (8 days/7 nights)[8]; from January 18, 2013 to January 23, 2013 (6 days/5 nights); from March 25, 2013 to April 1, 2013 (8 days/7 nights); from July 1, 2013 to July 6, 2013 (6 days/5 nights); from February 14, 2014 to February 23, 2014 (10 days/9 nights); from February 12, 2105 to February 19, 2015 (8 days/7 nights); from March 14, 2015 to March 21, 2015 (8 days/7 nights); and from December 25, 2015 to January 3, 2016 (10 days/9 nights).[9] *See* Plaintiff's Deposition Exhibit Nos. 75C (Krum_000800), 206, 207, 208, 209, 210, 211, 242, 243,

---

[6] Merriam-Webster defines "rent" as "property (such as a house) rented or for rent."

[7] At his deposition Chubb Adjuster Le was asked: Question- "You're aware, right that I bought the property in September 2010, right?" Answer- "I'm not aware of that." Question- Well, you would have been of that, wouldn't you, as your responsibilities based upon habit, routine, and practice when you were the claim owner of my claim? You would want to know when my property was bought?" Answer- "Not really." Question: "You wouldn't care?" Answer- "I wouldn't care as long as you had a policy in force." LDT at 153:7-16.

[8] This December 2012 rental was obtained through a October 3, 2012 agreement with a private home rental management company Luxury Home Rentals, LLC ("LHR") that was effective on October 3, 2012. *See* Plaintiff's Deposition Exhibit Nos. 200, 200A (fully executed); 200B (bc email to Defendant Santana); 200C (Santana Krupowicz_001475 to 001494).

[9] Prior to the Insured Event Mr. Krum had rented the BC Property out no less than 107 days. 2010-2011 Policy Period with Chartis was 43 rental days; 2011-2012 Policy Period with Chubb was 0 rental days (because the BC Property was under renovation and construction); 2012-2013 Policy Period 26 rental days; 2013-2014 10 rental days; 2014-2015 Policy Period 16 rental days; 2015-2016 Policy Period 10 rental days. Four of Mr. Krum's six first policy periods he rented out the BC Property more than the maximum 15 days. The record before me establishes that during four of Mr. Krum's eight first policy periods *prior* to the Insured Event contained rental periods in excess of 15 days; in other words, prior to the Insured Event Mr. Krum rented his BC Property for more than 15 days for all of the policy periods 50% of the time. Moreover, Mr. Krum rented out his BC Property for 26 days as of August 2011, when his insurance brokers at PRMS switched him from Chartis to the Chubb Policy. The record also establishes that the stated purpose of Mr. Krum's 2011-2012 renovations was to build the "World's Greatest Ski House" for rentals.

244A, 244B, 244C, 244D, 244E, 244F, 245, 246 (Defense Ex. 1015), 246A (Defense Ex. 1018), 246B (Defense Ex. 1019), 246C (Defense Ex. 1020), 246D, 247, 248, 249, and allegation para. 89 to Exhibit 1 and para. 94 to Exhibit 1A. *See also* MKDT 188:15-190:6, 316:3-20; Defendants' Deposition Exhibit No. 1014 at 12.

In October of 2015 the Insured Property was offered for rent for $20,000.00 a day for the entire house and $16,000.00 for the entire house (except the owner's suite). *See* January 7, 2020, Declaration of Andi Ohde (the "January 7 Declaration") at ¶9 marked as Exhibit "B" to Plaintiff's NY Complaint and also identified as Plaintiff's Deposition Exhibit No. 3. *See also* MKDT at 29:11; Defendants' Deposition Exhibit No. 1014 at 12.

In 2015 and 2016, as well as in 2020 and currently, the fair rental value ("FRV") for the Insured Property during peak ski season (December 25 through January 2 and February 15 through March 31) was and is $20,000.00 a day for the entire BC Property and $16,000.00 a day for the entire BC Property (except what is identified as the owner's suite). *See* Plaintiff's Deposition Exhibit No. 3, the January 7 Declaration at ¶10. *See also* MKDT at 29:11, 252:22-253:9; Defendants' Deposition Exhibit No. 1014 at 12.

For the last few years prior to the Insured Event without interruption, with the intent of renting the BC Property at an agreed upon rental rate, Mr. Krum has advertised the BC Property for rent on the internet at the professional website titled "The World's Greatest Ski Lodge" at: MJPropertiesLLC.com. *See* Plaintiff's Deposition Exhibit No. 3, the January 7 Declaration at ¶11.[10] *See also* MKDT at 253:10-15; Defendants' Deposition Exhibit No. 1014 at 13.

On or about November 18, 2019, Mr. Krum contacted a local Vail Valley real estate broker about retaining her professional services and relisting the BC Property for sale *and* rent in

[10] Chubb Adjuster Le testified at his deposition that as of 12/26/19 he was aware of Mr. Krum's rental website. LDT at 68:5-69:14.

2020. *See* Plaintiff's Deposition Exhibit No. 3, the January 7 Declaration at ¶12. *See also* MKDT at 287:4-9. Defendants' Deposition Exhibit No. 1014 at 13.

On Tuesday afternoon, November 26, 2019, Mr. Krum had a conversation with a real estate broker about relisting the BC Property for sale in the spring of 2020 and about listing and marketing the BC Property in January and February of 2020 for rent during high demand ski season in March of 2020 and listing the BC Property for rent in the high demand summer months of July and August of 2020. *See* Plaintiff's Deposition Exhibit 3, the January 7 Declaration at ¶13. MKDT at 287:4-9, 253:16-19; Defendants' Deposition Exhibit No. 1014 at 13.

On January 1, 2020, Mr. Krum was contacted by a potential luxury renter from Kansas and Las Vegas who found the BC Property on the internet, had reviewed Mr. Krum's professional rental video and website, and wanted to rent the BC Property for his family during President's weekend in February and/or in March of 2020. *See* Plaintiff's Deposition Exhibit 3, the January 7 Declaration at ¶14 and Plaintiff's Deposition Exhibit No. 14. *See also* MKDT at 254:5-10; Defendants' Deposition Exhibit No. 1014 at 13.

**The Policy, Mr. Krum's Claims and Factual History for ALE, ELE And FRV.**

The Policy states in part:

"**Extra Living expenses.** If a covered loss makes your house or other permanent structure uninhabitable during your usual vacation occupancy, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living, including boarding of domestic animals not primarily owned or kept for business use. We will pay for the boarding of your domestic animals displaced from an other permanent structure even when you have not been displaced by the covered loss. We cover these increases for the reasonable amount of time required to restore your house or other permanent structure to a habitable condition, or if you or members of your household permanently relocate, the shortest amount of time required to settle elsewhere. However, if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, we only cover the increase in your normal living expenses incurred by you for the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss. We cover these extra living expenses for up to 60 days, even if the policy period ends during that time.

**Fair rental value.** If a covered loss makes a part of your house or other permanent structure which you usually rent to others uninhabitable, we cover its fair rental value during the period of time it is usually rented for the reasonable amount of time required to restore it to a habitable condition. We cover fair rental value for up to 15 days, even if the policy period ends during that time."

The Policy allows Mr. Krum a maximum amount of $2,069,100.00 in additional coverage for his Additional Living Expenses (*i.e,* Extra Living Expenses and Fair Rental Value Expenses) with no deductible for this coverage. *See* Plaintiff's Deposition Exhibit No. 6 and allegation para. 124 to Exhibit 1.

By correspondence dated December 27, 2020, Chubb Adjuster Le advised Mr. Krum that "[w]e noted the [BC] property was last leased on December 25, 2015 thru January 3, 2016, which was supported by the lease that we received via email from your agent, [Defendant PRMS setting forth rental income of $16,000 per night]. We understand that you are currently residing in the undamaged portion of the home which does not have a functional kitchen. As discussed in our initial conversation, we have resources that can assist in relocating you and your family to a local hotel while we locate a temporary home. . . . Throughout every aspect of this process, we are here to help you." *See* Plaintiff's Deposition Exhibit No. 227C and allegation para. 126 to Exhibit 1.

On January 1, 2020, Mr. Krum sent Chubb Adjuster Le an Email correspondence stating in part:

> I believe the policy provisions have been triggered pursuant to the terms and conditions of the Policy. If you require any affidavits or declarations under oath from local Rental Agents and/or other experts in the luxury rental market for Vail Valley please advise. These professionals will certainly be able to affirm that I would have no difficulty renting my [BC] Property (as set forth in my December 29 email to you below[11]) for at least 15 nights during January through and including the first week of April 2020.[12] As I have already explained, it was my

[11] See Plaintiff's Deposition Exhibit No. 228.
[12] See Plaintiff's Deposition Exhibit No. 5.

> clear intent to rent out the [BC] Property for the month of March 2020 for rates between 16,000 and 20,000 per night.
>
> You stated in your December 30 email (also directly below) that the [BC] Property sleeps 18 guests. The [BC] Property, however, sleeps 21 not 18 and has been fully occupied at times by both renters and my personal guests as well as my staff.
>
> My agents have identified at least one suitable and available property in Vail Valley to rent (the "Vail Rental" [or "Vail Rental #1]). Its listing is attached below. It does not have ski-in or ski-out (that is a significant difference between the Vail Rental [#1] and the [BC] Property and could cause a problem for me). It does *not* have an indoor basketball court, a 26 foot climbing wall, a game room or a world class movie theatre. It has five bedrooms not eight. It sleeps 12 not 21. My home is approximately 11,000 square feet whereas this home is 6,525 sq. feet. I certainly acknowledge it is a beautiful home and could likely serve my purpose (if no other acceptable rentals are found) during the next 9 to 12 months while the [BC] Property is being restored. I have been advised that the Vail Rental [#1] price is $25,000 per night and is non-negotiable. I am going to visit the Vail Rental [#1] later today, Wednesday late afternoon, January 1.
>
> This also confirms that yesterday (Tuesday, December 31) I was advised by my Ambassador Service at Marriott that the following suites are available at the Ritz-Carlton in Bachelor Gulch. There is a luxury Penthouse, four bedroom suite at $9,800 USD per night. That can likely be combined with other small suites at an additional cost. Please understand, however, I would need to have more rooms during certain nights when additional family, friends and/or business colleagues would be visiting (because of my Ambassador status I am confident that could likely be worked out with the hotel manger with whom I am acquainted). The other issue with hotel accommodations is that I would also need a daily food and laundry allowance.
>
> For ease of reference, I am again attaching my web site for the [BC] Property.
>
> http://mjpropertiesllc.com/
>
> We need to resolve this part of my claim quickly.
>
> Thank you for your prompt attention.

*See* Plaintiff's Deposition Exhibit No. 229 and allegation para. 127 to Exhibit 1.

On or about January 1, 2020, Mr. Krum was contacted by an affluent individual who wanted to rent the BC Property in February 2020. *See* Plaintiff's Deposition Exhibit Nos. 232A, 14 and 3 and allegation para. 128 to Exhibit 1.

On January 2, 2020, Chubb Adjuster Le stated to Mr. Krum that the fair rental value (the "FRV") "under the vacation home policy is payable on an incurred cost" and "[i]f [Mr. Krum] intend[ed] to rent the home in March 2020 [Mr. Krum needed to provide a lease agreement]." In response to Chubb Adjuster Le's interpretation of Mr. Krum's insurance contract with Chubb, Mr. Krum asked Chubb Adjuster Le to show him where in the Policy it required "an incurred cost" by the insured. *See* LDT 148:14-149:10.

Until the deposition testimony of Mr. Corey Everett, the Great Northern designated corporate representative witness, Mr. Krum was never advised by Great Northern, PRMS, Defendant Krupowicz, Defendant Santana, Chubb Adjuster Mortensen, Chubb Manager Witcher, Chubb Adjuster Magnotta and Chubb Adjuster Le where in the Policy for FRV coverage it required "an incurred cost" by the insured. *See* Plaintiff's Deposition Exhibit Nos. 230E and 230H and allegation para. 129 to Exhibit 1. In fact, the Policy does NOT require an "incurred cost" to establish loss of FRV. *See* Deposition Testimony of Corey Everett (Great Northern 30b6 witness) ("EDT") on September 29, 2020, at 94:4 to 94:22; 95:11 to 96:9 and 98:12 to 98:25 (and Chubb Manager Witcher had an obligation to correct Chubb Adjuster Le's false statement).[13]

On January 2, 2020, Chubb Adjuster Le stated to Mr. Krum that he would assist him in finding temporary housing during remediation/repairs to Mr. Krum's BC Property. The three

[13] Chubb Adjuster Le at his October 24, 2022, deposition did finally acknowledge that nowhere in the Policy does it say, "incurred cost" for FRV or ELE." LDT at 149:4-10. Le further testified to the following: "Question: You misrepresented that to me on January 2, right? You took a policy provision where it wasn't a policy provision, right?" Answer: "As I stated earlier to you, that was a - - that was a bad choice of word[s] to use." LDT at 217:2-8.

rental options Chubb Adjuster Le and Defendant Great Northern offered Mr. Krum were for a minimum six (6) month lease term (the "Three Rental Option Email"). The three rental options were for 104 Rabbitbrush, 352 Tall Timber, and 2083 Daybreak Ridge. *See* Plaintiff's Deposition Exhibit Nos. 15 and allegation para. 130 to Exhibit 1.

On January 2, 2020, Chubb Adjuster Le stated to Mr. Krum that: "We understand the difficulty in locating a temporary home which is unique as yours, and we will try our best. You should have received 3 properties in Avon with rental costs. If you have located a property on your own, please supply our office with the rental costs. We will reach out to them to discuss. . . . If you choose the Ritz-Carlton as a temporary housing, when will you need it and for how long? We will reach out to vendor to secure a rate either at weekly and/or monthly." *See* Plaintiff's Deposition Exhibit No. 230H and allegation para. 131 to Exhibit 1.

On January 3, 2020, Mr. Krum sent Chubb Adjuster Le an Email responding to the Three Rental Option Email stating:

> Thank you for your email correspondence below of yesterday, Thursday, January 2, attaching the letter from Assured Relocation dated December 30, 2019.
>
> My daughter Erika and I greatly appreciate your efforts on our behalf to find a similar property where we can relocate during this difficult time. Having your resources to work on this is much appreciated. I will likely be staying in Colorado, certainly at least for the next four months, to make sure the remediation and restoration of my home, art, and antiques goes smoothly and meets my expectations.
>
> Let me address the three properties that Assured Relocation identified in their December 30 letter.
>
> <u>104 Rabbitbrush</u>:
>
> This property is in Mountain Star which is 7 miles from the Beaver Creek Mountain. Obviously it is not ski-in or ski-out and, therefore, neither comparable nor acceptable.
>
> <u>352 Tall Timber</u>:

> This is a listed home and could possibly sell at any time during my stay. Furthermore, I have no intention of allowing showings during my stay. If this is acceptable to the owner please immediately advise and I will promptly visit the property as set forth below.
>
> 2083 Daybreak Ridge:
>
> This is also a listed home and I am told that your numbers are not correct. Will the owner agree not to show the property while I am under lease?
>
> I am flying back to Colorado on Monday, January 6, 2020. If you and your associates find acceptable properties, I will make myself available to look at them on Tuesday, January 7 and/or Wednesday, January 8, 2020. Please advise.
>
> Again, I direct your attention to my emails of January 1, 20[20] and earlier today, January 3, 2020 regarding the Ritz Carlton at Bachelor Gulch[14] and the Vail Rental at 99 Vail Road [Vail Rental #1]. Yesterday afternoon, I was also provided with information regarding another residence at the Luxury Chalets at the Lodge at Vail that is available from January 25 until April 15, 2020 at a nightly rate of $15,000.00 ("Vail Rental #2"). The rental sheet for Vail Rental #2 is attached below.

*See* Plaintiff's Deposition Exhibit Nos. 229, 230A and 15 and allegation para. 132 to Exhibit 1.

On January 7, 2020, Chubb Adjuster Le sent Mr. Krum an email stating in part: "Pursuant to our conversation from this morning, please see the below regarding the property for lease [at 3219 Daybreak Ridge, Avon, CO, (the 'Daybreak Ridge Rental']. . . . They have confirmed that the owner of the home have pulled the house off market and will not have any showings if you decide on this property." *See* Plaintiff's Deposition Exhibit No. 231D (Santana Krupowicz_002445-_002447) and allegation para. 136 to Exhibit 1.

On January 7/8, 2020, Mr. Krum sent Chubb Adjuster Le an Email (the "Jan. 8 Le Email") stating in part: "In support of my Fair Rental Value claim in the amount of $300,000.00, under my Masterpiece Home Policy No. 13787210-02, please find the attached

[14] Mr. Krum's January 3, 2020, Ritz Carlton request (attaching an email from Scott Breen, Executive Assistant Manager at The Ritz Carlton, Bachelor Gulch, was never approved by Chubb, Great Northern and/or Chubb Adjuster Le. *See* Plaintiff's Deposition Exhibit 230B.

declaration under oath of Ms. Andie Ohde. This again demonstrates why the policy has been "triggered" and why the claim needs to be timely processed." *See* Plaintiff's Deposition Exhibit Nos. 231 and 3 and allegation para. 137 to Exhibit 1.

The Jan. 8 Le Email further advised Chubb, Great Northern and Chubb Adjuster Le that Mr. Krum and his interior designer had looked at and visited the 3219 Daybreak Ridge Rental at Chubb Adjuster Le's request on January 8, 2020, and that it was "clearly not comparable" to the BC Property. *See* Plaintiff's Deposition Exhibit Nos. 231 and 4 (at ¶¶8-9) and allegation para. 138 to Exhibit 1.

On January 8, 2020, Chubb Adjuster Le advised Mr. Krum that "we are currently reviewing both the fair rental value and the temporary housing." *See* Plaintiff's Deposition Exhibit No. 232B and allegation para. 139 to Exhibit 1.

On January 8, 2020, Chubb's Scientist recommended that Mr. Krum "obtain alternative housing as soon as possible." *See* Plaintiff's Deposition Exhibit Nos. 233 and 233A and allegation para. 140 to Exhibit 1.

On January 12, 2020, Mr. Krum sent Chubb Adjuster Le, Defendant Santana and Defendant Krupowicz an Email correspondence stating in part:

> My agents have identified another suitable property in Vail Valley to rent (the "Vail Rental #3"). Its listing is attached below. It does have ski-in and ski-out that is similar to my [BC] Property. As I have advised, that is a must. The Vail Rental #3 price is $20,000.00 per night. It is now being offered at $10,867 per night for a long term rental; however, with some further negotiation I believe the owners will accept a formal offer for $1,730,000.00 (if a substantial portion is paid in advance) for 300 nights which would be approximately $5,767 per night and would allow me to have a similar home until Thanksgiving [2020]. This will also allow me to preserve my FRV claim in the amount of $300,000.00.
>
> I visited the Vail Rental #3 earlier this evening. It is acceptable and I would appreciate Chubb promptly approving this ALE.
>
> Thank you for your immediate attention.

*See* Plaintiff's Deposition Exhibit No. 235 and allegation para. 141 to Exhibit 1 (the Jan. 12, 2020, e-mail from Mr. Krum to Chubb attached to the Amended Complaint as Exhibit "I" and Krum_0000098-0000099).

The record shows that Vail Rental #3 is approximately 10,000sf and was being offered for rent to Mr. Krum minus the main master suite which would be locked off during Mr. Krum's stay. This home has similar interior amenities to the BC Property such as a movie room. Like the BC Property Vail Rental #3 has excellent exterior living areas with a hot tub, and luxury landscape features. Vail Rental #3 met Mr. Krum's household's usual standard of living. *See* Plaintiff's Deposition Exhibit No. 4 at ¶12 and allegation para. 142 to Exhibit 1.

On January 13, 2020, Chubb Adjuster Le stated: "We are currently reviewing your request noted below. Pursuant to our conversation on Friday Jan. 10, 2020, Chubb requests that you move into a temporary hotel so that demolition can begin. Please let us know when you plan to relocate and we can take over billing."[15] *See* Plaintiff's Deposition Exhibit No. 236A and allegation para. 143 to Exhibit 1.

On January 13, 2020, Mr. Krum advised Chubb Adjuster Le that he was requesting that Chubb "promptly approve Vail Rental #3" and that he only wanted to move once. *See* Plaintiff's Deposition Exhibit No. 236B (Chubb_006843) and allegation para. 145 to Exhibit 1.

On the morning of January 14, 2020, Chubb Adjuster Le advised Mr. Krum that "[w]e are currently reviewing your request for temporary housing in Vail, CO." *See* Plaintiff's Deposition Exhibit No. 237 and allegation para. 146 to Exhibit 1.

On January 14, 2020, Mr. Krum sent Chubb Adjuster Le an Email correspondence stating:

---

[15] Earlier on January 13, 2020, Chubb Adjuster Le had determined that a "3 months [rental for 446 Forest Road] was $978,000 [and that a t]otal amount for 6 months was $1,956,000." *See* Plaintiff's Deposition Exhibit 236 (Chubb_048155).

> I was sincerely hoping that you would have gotten back to me before COB today. With all due respect, any reasonable person in this situation would have lost their patience awhile back. This delay by CHUBB is unacceptable. This is substantially affecting my personal and professional life. Please obtain this approval tomorrow so I can immediately proceed with negotiations to maximize my covered ALE (in total number of days) and mitigate my out-of-pocket expenditures.
>
> Lastly, please confirm the exact amount of my ALE. It is certainly no less than $2,069,100.00, correct? This also confirms that my ALE does NOT erode my contents and dwelling coverages, correct?

*See* Plaintiff's Deposition Exhibit No. 238 and allegation para. 147 to Exhibit 1.

On January 15, 2020, Chubb Adjuster Le sent Mr. Krum an email correspondence stating, "We acknowledge the receipt of your communication below. We continue to review your request and will respond accordingly." *See* Plaintiff's Deposition Exhibit No. 239 and allegation para. 148 to Exhibit 1.

On January 17, 2020, Chubb Adjuster Le advised Mr. Krum in a Reservation of Rights Letter ("ROR") that it was Chubb's "position that the Policy coverage provided under the Fair Rental Value ("FRV") would not be triggered as there is no indication that you "usually rent" the [BC] [P]roperty, which is specifically required under the FRV provision." *See* Plaintiff's Deposition Exhibit No. 75A and allegation para. 149 to Exhibit 1.

In the same ROR on January 17, 2020, Chubb Adjuster Le advised Mr. Krum that Chubb has "analyzed [Mr. Krum's] demand for coverage under the Policy's ELE. The above coverage applies to 'your usual vacation occupancy' of the property. In order for [Chubb] to determine the extent of coverage afforded under this provision, it must first confirm what 'your usual vacation occupancy' entails. Please provide all of the following to help assist us in confirming whether and/or to what extent the ELE coverage applies:

> Flight/Reservation records for your trip that was in process at the time of the loss. The past 2 years of flight reservations reflecting your occupancy at the

> loss location.
>
> Contact information of the management company that prepares the house prior to your arrival.
>
> Contact information for the alarm company that monitors the property when not in use.
>
> The last 2 years of electric and water bills.

*See* Plaintiff's Deposition Exhibit No. 240 and allegation para. 150 to Exhibit 1.

On January 22, 2020 (pursuant to Chubb Adjuster Le's January 17, 2020, request) Mr. Krum provided Chubb Adjuster Le and Chubb Manager Witcher with the last twenty-four (24) months of Plaintiff's electric and water bills that Chubb Adjuster Le demanded for the BC Property. *See* Plaintiff's Deposition Exhibit No. 251 and allegation para. 151 to Exhibit 1.

On January 24, 2020, Mr. Krum started to provide Chubb, Great Northern and Chubb Adjuster Le with the past 24 months of flight reservations Chubb Adjuster Le demanded reflecting Mr. Krum's occupancy at the BC Property. Mr. Krum provided Chubb Adjuster Le with all of the detail and airline receipts/confirmations confirming airline travel to/from the BC Property from June 12, 2019, through and including January 6, 2020.[16] *See* Plaintiff's Deposition Exhibit No. 252 and allegation para. 152 to Exhibit 1.

In late January 2020, on at least two separate occasions, Chubb Adjuster Le solicited Tony Pierce of ServPro (who was the manager in charge of the remediation and demolition at the BC Property) to "get Krum to agree to stay at The Ritz-Carlton until we could agree to a long term stay at a comparable property." *See* Plaintiff's Deposition Exhibit No. 253A at ¶9 and allegation para. 153 to Exhibit 1.

---

[16] *See* Airline Documents Group One (Chubb_005437-005471).

On January 27, 2020, Mr. Krum provided a detailed response to Chubb Adjuster Le's January 17, 2020, correspondence (the "Jan. 27 Response"). *See* Plaintiff's Deposition Exhibit Nos. 254, 76 and allegation para. 154 to Exhibit 1.

On the morning of January 28, 2020, Chubb Adjuster Le stated to Mr. Krum: "You can stay at the Ritz until we find a comparable property." *See* Plaintiff's Deposition Exhibit No. 253A at ¶10 and allegation para. 155 to Exhibit 1.

On January 30, 2020, Mr. Krum sent Chubb Adjuster Le an Email correspondence stating in part:

> Earlier this evening (Thursday, January 30, 2020) I was advised that the owners of 446 Forest Road (Vail Rental #3) will accept a formal offer of $1,730,000.00 for 318 nights (which will be $5,440 per night). This will allow me to have one home residence in Vail Valley until mid December 2020 (at which time I can hopefully move back into my [BC] Property). Vail Rental #3 is ski-in, ski-out, and approximately 15 minutes from Beaver Creek.
>
> It's time that Chubb provides me approval (for a similar like kind property) under my ALE provisions of my Policy and allows me to finalize this rental agreement. I am being pressed by the owners of Vail Rental #3 that if we do not reach an agreement soon, they will accept other offers in March of 2020 for $20,000 per night.
>
> Please set up a time tomorrow (Friday, January 31) or this weekend when we can talk about this and reach an agreement. I am also available this evening if that is more convenient for you.

*See* Plaintiff's Deposition Exhibit No. 256 and allegation para. 156 to Exhibit 1.

On January 31, 2020, Chubb Adjuster Le stated to Mr. Krum: "Thank you for your email below. As discussed during our visit on Tuesday, January 28th, Great Northern is currently reviewing the Extra Living Expense and Fair Rental Value under this policy. Once we have completed our review, we will contact you to discuss." *See* Plaintiff's Deposition Exhibit No. 258 and allegation para. 157 to Exhibit 1.

On January 31, 2020, Mr. Krum responded to Chubb Adjuster Le stating:

> I need to have an answer on this please, time is of the essence. When will that occur? Can Chubb commit to providing me an answer early next week?
>
> I have professional, family and personal guests scheduled to come throughout February. This is prime ski season. What am I supposed to do? I need to have a long term plan regarding my living situation.

*See* Plaintiff's Deposition Exhibit No. 259 and allegation para. 158 to Exhibit 1.

On February 3, 2020, Chubb Adjuster Le sent an email stating in part: "[w]e continue to review your request for temporary housing at Vail #3, for your daughter and her five friends, and your colleagues during February." *See* Plaintiff's Deposition Exhibit No. 261 and allegation para. 159 to Exhibit 1.

On February 6, 2020, Mr. Krum sent Chubb Adjuster Le and Chubb Manager Witcher an email stating:

> Would you please provide me with a status update tomorrow on 446 Forest Road. My daughter and guests are scheduled to arrive in a week.
>
> As I stated last Sunday, I have to have a plan in place for everyone's accommodations.
>
> Thank you.

*See* Plaintiff's Deposition Exhibit No. 262 and allegation para. 160 to Exhibit 1.

In the morning of Friday, February 7, 2020, Chubb Adjuster Le stated to Mr. Krum: "We are working on getting a response to you regarding the below [February 6 email]." *See* Plaintiff's Deposition Exhibit No. 263A and allegation para. 161 to Exhibit 1.

On Friday evening, February 7, 2020, Chubb Adjuster Le informed Mr. Krum *for the first time* (and after six responses to Mr. Krum that Chubb was "reviewing" his requests for ELE accommodations) that Chubb and Great Northern would only cover ELE for up to sixty (60) days. *See* Plaintiff's Deposition Exhibit Nos. 263 and 76A and allegation para. 162 to Exhibit 1.

The record before me establishes that from the Insured Event through and including February 6, 2020 (for over six full weeks) Chubb Adjuster Le, Chubb Manager Witcher, Chubb, Great Northern never once stated in any communication to Mr. Krum that he was *only* covered for up to sixty (60) days of ELE and that Chubb and Great Northern would not provide coverage for any of the proposed rentals that Mr. Krum was negotiating. By this time thirty (30) days had passed during which Mr.Krum spent numerous hours of his valuable time over many-days and several weeks researching, visiting, and considering properties to rent for a term well in excess of six months. *See* Plaintiff's Deposition Exhibit No. 76B; Defendants' Deposition Exhibit No. 1014 at 13-14 and allegation para. 163 to Plaintiff's Deposition Exhibit No. 1.

On February 7/8, 2020, Mr. Krum sent Chubb Adjuster Le, Chubb Manager Witcher, Chubb and Great Northern an email correspondence stating and documenting every airline flight Mr. Krum took to/from Colorado while traveling to/from the BC Property between October 30, 2018, and June 12, 2019 (the "Feb. 8 Email").[17] Mr. Krum attached to the Feb. 8 e-mail every American Airlines, United Airlines, and Southwest Airlines flight receipt/confirmation supporting the stated travel. There were 11 attachments to the Feb. 8 e-mail.[18] The Feb. 8 e-mail advised Chubb Adjuster Le, Chubb Manager Witcher, Chubb and Great Northern "[t]his confirms that from October 30, 2018 until January 1, 2019 (for 14 months) I stayed at the [BC] Property for 152 days. That is an average of 11 days per month." *See* Plaintiff's Deposition Exhibit No. 264 and allegation para. 164 to Plaintiff's Deposition Exhibit No. 1.

---

[17] It must be noted that Chubb Manager Witcher testified at his deposition that Chubb Adjuster Le said to him that Mr. Krum "had work meetings in Denver and that [Mr. Krum] would come in and out of Denver for work meetings." WRDT at 210:15-212:2. On the contrary, Mr. Krum was going through Denver to get to the BC property. This appears to be false statement by Mr. Le on behalf of Chubb to the detriment of Mr. Krum, the insured. This false information at a minimum created unreasonable delays in Chubb approving Mr. Krum's covered benefits, and an unnecessary hardship on Mr. Krum to produce minutia to prove he was going to the BC Property.

[18] *See* Airline Documents Group Two (Chubb_018512-018548).

On February 7, 2020, Chubb Adjuster Le, Chubb and Great Northern stated to Mr. Krum that despite Chubb requesting two years of electric and water bills, "[t]he last two years of electric and water bills do not prove 'usual occupancy' month after month in any calendar year as you previously claimed." *See* Plaintiff's Deposition Exhibit No. 76A and allegation para. 165 to Exhibit 1.

Additionally on February 7, 2020, Chubb Adjuster Le, Chubb Manager Witcher, Chubb and Great Northern demanded that Mr. Krum provide the following records:

> (i) Any and all security records from your community which identify your "usual occupancy."
>
> (ii) Contact name and phone number along with records from your alarm company that monitors the property for the last two years.
>
> (iii) What is your mode of transportation from Denver International Airport to your Vacation home in Avon, CO? Please provide receipts from taxi services, Uber, and the like, that take you to and from the airport when you stay at your vacation home.

*See* Plaintiff's Deposition Exhibit No. 76A and allegation para. 166 to Exhibit 1.

On February 9, 2020, Mr. Krum advised Chubb Adjuster Le, Chubb Manager Witcher, Chubb, and Great Northern:

> Again, my daughter and guests are scheduled to arrive this week. You have still not provided me with any answer to my reasonable accommodation questions and concerns.
>
> On Monday, February 3, you wrote to me stating: "We continue to review your request for temporary housing at Vail #3, for your daughter and her five friends, and your colleagues during February."
>
> We are now past the 11th hour. What is the deal? My requests deserve a prompt answer beyond "We continue to review . . ."
>
> Would you along with your Manager Matthew Witcher please call me tomorrow morning (Monday, February 10).

*See* Plaintiff's Deposition Exhibit No. 262 and allegation para. 167 to Exhibit 1.

Mr. Krum has never directly heard from, nor received any direct communication from, Chubb Manager Witcher regarding Mr. Krum's multiple ELE and FRV claims. See allegation para. 168 to Plaintiff's Deposition Exhibit No. 1.[19]

On February 9, 2020, Mr. Krum requested approval for a nine (9) night ELE stay at the Bachelor Gulch Ritz-Carlton (the "Ritz") (the "February 9 Request"). The February 9 Request quoted daily rates of $6,149, $5,789, and $5,599 plus applicable tax and a $20 daily resort fee. Chubb and Great Northern denied Plaintiff's February 9 Request. *See* Plaintiff's Deposition Exhibit No. 265 and allegation para. 169 to Exhibit 1.

On February 10, 2020, Chubb Adjuster Le falsely stated to Mr. Krum that "[i]n your January 27, 2020 response letter, you provide dates, but not records or official documentation of your flights." *See* Plaintiff's Deposition Exhibit No. 265 and allegation para. 170 to Exhibit 1.

On February 10, 2020, Mr. Krum requested that Chubb Adjuster Le inform him of the meaning of "Usual Vacation Occupancy" and "where is that defined in the Policy."[20] *See* Plaintiff's Deposition Exhibit No. 265A and allegation para. 171 to Exhibit 1. There was never a response to Mr. Krum's question. *See* LDT at 311:17-313:20.

The record before me establishes that "Usual Vacation Occupancy" is not defined in the Policy. LDT at 311:17-313:20; and allegation para. 172 to Plaintiff's Deposition Exhibit No. 1.

---

[19] Contrary to Chubb's written representation that Mr. Witcher was always available, Chubb Manager Witcher testified at his deposition that he only handles customer service issues and does not respond to direct claims requests. WRDT at 149:6-22.

[20] As of October 24, 2022 (at the time of his deposition) Chubb Adjuster Le still was confused as to what the term "usual vacation occupancy" means. At his deposition the following Q and A occurred: Question: ". . . I'm asking you what is 'usual vacation occupancy,' what did that mean while you were the claim owner of my claim?" Answer: "I don't remember. It's certain amount of days. I don't recall." Question: Nobody ever told me what the days were. How many days was it? . . . You're saying it's a certain amount of days. Where did you get that from?" Answer: When did I say that? I never said an amount. I just - - I said I don't recall." Question: "You just said it's a certain amount of days. You just said that in your answer. [Last Answer Read Back] My question is what is the certain amount of days?" Answer: "I don't know." Question: "Where would we go to find that out?" Answer: "I don't know." Question: "As the insured, where would I go to find that out?" Answer: "I do not know." LDT at 312:8-313:9.

On February 11/12, 2020, Mr. Krum requested approval for a fifty (50) night ELE period at 446 Forest Road (previously identified as Vail Rental #3) or at 99 Vail Road (previously identified as Vail Rental #1) (the "February 12 Request"). Chubb Adjuster Le, Chubb Manager Witcher, Chubb and Great Northern denied Mr. Krum's February 12 Request.[21] *See* Plaintiff's Deposition Exhibit Nos. 266, 269A and allegation para. 173 to Plaintiff's Deposition Exhibit No. 1.

Mr. Krum's February 12 Request (sent also to Chubb Manager Witcher) further stated:

> Remediation and demolition were supposed to begin this morning (Tuesday, February 11) . . . . For well over a month now I have advised you that it is vital that I have another home to stay at during the substantial renovation of the Insured Property. Quite frankly, while every time we met you would tell me everything is going to be okay, you and Chubb have not cooperated in this process resulting in great personal stress, anxiety, and substantial financial detriment to me.
>
> I certainly dispute your new position, first asserted in your February 7, 2020, Friday evening letter to me, stating that Chubb will only cover extra living expenses for up to sixty (60) days. Since December 27, 2019, in our numerous oral and written communications, you have never referred to a sixty (60) day limit when discussing relocation to a similar home. In fact in your January 2, 2020 email you specifically state that you will help me find temporary housing during remediation/repairs to my home and every option you provided was for a six (6) month lease term. Not a two month (or 60 day) lease term. None of the homes you had provided were quoting monthly rents for a two month (60 day) lease term during the h[e]ight of the ski season in Colorado.
>
> While I reserve all my rights and remedies pursuant to law and as set forth in the terms and conditions of the Policy, I must proceed expeditiously with my remediation, demolition, and renovation of the Insured Property directly required by the Insured Event. Accordingly, I have attached below the email correspondence I received from Invited Home this evening. The

[21] On February 19, 2020, Chubb Adjuster Le sent Mr. Krum an email stating: "I write in response to your February 11[/12], 2020 email regarding ELE coverage for the following rental properties: 1. 446 Forrest Rd, [Vail Rental #3] . . . for $15,000 per night ($750,000 for 50 nights), and 2. 99 Vail Road, [Vail Rental #1] . . . for $25,000 per night ($1,25000 for 50 nights)[.] Chubb does NOT approve of payment for rent for either of the above-referenced properties." (Emphasis in original). *See* Plaintiff's Deposition Exhibit 269A and LDT 199:9-201:22 (where Chubb Adjuster Le further testified "that's not the denial. That's just . . . not approving those two properties above"). *See also*, LDT at 204:7-209:5 and Plaintiff's Deposition Exhibit 4 (Ohde 1/25/20 Dec.) at ¶¶ 8, 9, 11-13.

> rental property at 446 Forest Road (previously identified as Vail Rental #3) and the rental property at 99 Vail Road (previously identified as Vail Rental #1) are available for rent for a fifty (50) day rental period. Both of these rentals meet my household's usual standard of living. *See* Ohde Declarations of January 7, 2020 and January 25, 2020 previously provided to both you and your Chubb manager Mr. Matthew Witcher.
>
> I am requesting that Chubb promptly (without any further unreasonable delay) approve and authorize one of these two fifty (50) day rentals. Time is of the essence.
>
> I am also attaching below the web site link to my insured Property that was first provided to you and Chubb on December 26, 2019.[22]
>
> Lastly, I have repeatedly asked you in writing to confirm the exact amount of my ALE (Additional Living Expenses) under the Policy. Why do you refuse to answer this direct coverage question? Is it the $2,069,100 that I was advised by my insurance agents at PRMS? I am also requesting that you fully answer all of the Policy questions set forth on pages 16, 17 and 18 of my detailed 21 page response to your January 17 ROR Letter.

*See* Plaintiff's Deposition Exhibit No. 266 and allegation para. 174 to Exhibit 1 - - a copy of the Plaintiff's February 12 Request (and the cover email and attachment from Invited Home)

On February 13, 2020, Mr. Krum sent Chubb Adjuster Le and Chubb Manager Witcher an email correspondence stating every airline Mr. Krum took to/from Colorado while traveling to/from the BC Property between December 17, 2017, and October 17, 2018 (the "Feb. 13 Email"). Mr. Krum attached to the Feb. 13 e-mail every American Airlines flight receipt/ confirmation detail supporting the stated travel. There were 17 attachments to the Feb. 13 e-mail.[23] The Feb. 13 e-mail advised Chubb Adjuster Le and his Chubb Manager Witcher "[t]his confirms that from December 17, 2017 until January 1, 2019 (for 24 months and 14 days) I

---

[22] Chubb Adjuster Magnotta has been the Claim Owner for the BC Property Insured Event since April 3, 2020, through the date of his deposition on October 15, 2021, and during such time did not believe it "important" to look at Mr. Krum's rental web site. *See* Steve J. Magnotta October 15, 2021, Deposition Testimony ("MDT") at 18:12-19:2 and 116:13-118:2 and allegation 92 to Plaintiff's Deposition Exhibit No. 1.

[23] *See* Airline Documents Group Three (Chubb_020002-020077).

stayed at the [BC] Property for 277 days. That is an average of over 11 days per month." *See* Plaintiff's Deposition Exhibit No. 267 and allegation para. 175 to Exhibit 1.

On February 18, 2020, Mr. Krum advised Chubb Adjuster Le of the following regarding Chubb Adjuster Le's demand for security, alarm, and rental car records:

> First, I am not aware of any security records from my community that concern me or the Insured [BC] Property, nor do I possess any. There is a gate code to the Strawberry Park gate that I enter on the keypad every time I enter and/or exit Strawberry Park (unless the gate is open for service/mechanical reasons). If you draft a reasonable and limited authorization, I will sign it in order to allow you to be provided with any and all records that exist in the possession of Beaver Creek Public Safety documenting my entry code being entered for access to the Strawberry Park gate.
>
> Second, I already provided you with my alarm company information. In Krum's January 27 ROR Response at page 15 I stated: "My alarm company is Thul Alarm Inc. Their address is P.O. Box 534, Avon, CO 81620. Their phone number is 970-949-4638. Mike Thul is the owner. The [BC] Property is always monitored. Mike and his crew have been to the Insured Property a few times over the last month as a result of the damage caused by the Event to my alarm system." I do not possess any records regarding my alarm company other than payment for my annual monitoring.
>
> Third, I believe that over 90 percent of the time I travel to/from my Insured Property from DIA and/or Eagle County Regional Airport in a Hertz rental vehicle. Your request for "receipts" for my "mode of transportation from Denver International Airport to your Vacation home in Avon, CO" is unreasonable and unduly burdensome (and not made in good faith) in light of the monumental task I performed establishing dozens of airline flights to and from my Insured [BC] Property and producing all of those airline receipts. Nonetheless, if you would like to draft a reasonable and limited authorization for my Hertz car rental records while traveling in the state of Colorado I will sign it.

*See* Plaintiff's Deposition Exhibit Nos. 76B and 76C and allegation para. 176 to Plaintiff's Deposition Exhibit No. 1.

On February 19, 2020, Chubb Adjuster Le stated to Mr. Krum: "to obtain coverage for ELE you must provide your 'usual vacation occupancy . . . [and that t]he statements made by

your real estate broker, Andie Ohde, which were provided in two affidavits . . . are simply opinions." *See* Plaintiff's Deposition Exhibit No. 269A.

On February 20, 2020, Mr. Krum requested approval for a fifty (50) night ELE stay at the Ritz (the "February 20 Request"). The February 20 Request quoted daily rates of $6,149, $5,789, and $5,599 plus applicable tax and a $20 daily resort fee. Chubb denied Mr. Krum's February 20 Request. *See* Plaintiff's Deposition Exhibit Nos. 269B and allegation para. 177 to Exhibit 1

The February 20 Request further stated to Chubb Adjuster Le: "As you are aware remediation and demolition began last Wednesday, February 12, and I have been advised by J.S. Held and ServPro that it is not recommended for me to continue to stay at the home during remediation and demolition. I would like to work with you to get something approved quickly and efficiently." *See* Plaintiff's Deposition Exhibit Nos. 269B and allegation para. 178 to Exhibit 1.

On February 22, 2020, Mr. Krum sent Chubb Adjuster Le and Chubb Manager Witcher all the records he received from his Alarm company on February 21, 2020, for the period of January 28, 2017, to February 2, 2020. These are the only records that exist according to Mr. Krum's Alarm company. *See* Plaintiff's Deposition Exhibit Nos. 270 (Chubb_022106-022109 and 280A and allegation para. 179 to Exhibit 1.

On February 22, 2020, Mr. Krum stated to Chubb Adjuster Le and Chubb Manager Witcher: "Again, I request that you please immediately provide me with the coverage I am entitled to under the terms and conditions of my Policy." *See* Plaintiff's Deposition Exhibit Nos. 271 and allegation para. 180 to Plaintiff's Deposition Exhibit No. 1. There was no response

from Chubb, Great Northern, Chubb Manager Witcher and Chubb Adjuster Le to Mr. Krum's request for ELE accommodations.

On February 29, 2020, Chubb Adjuster Le stated to Mr. Krum: "I would like to make an introduction to our Executive General Adjuster, Steve Mortensen. He and I will co-adjust your claim moving forward. Steve is requesting full access to your home on Tuesday March 3rd thru Thursday March 5th. Steve would like an opportunity to meet and discuss the claim process and to provide answers to questions that you may have." *See* Plaintiff's Deposition Exhibit Nos. 272 and 277B and allegation para. 181 to Exhibit 1; *see also* MortensenDT at 54:7-13, 143:3-8. It should be noted here that Chubb Adjuster Le testified and his direct line supervisor (Chubb Manager Witcher) both testified at their depositions that Chubb Adjuster Le never co-adjusted Mr. Krum's claim with Chubb Adjuster Mortensen. *See* LDT at 29:17-30:8, 30:25-31:6; WRDT at 207:9-14.

On March 1, 2020, Mr. Krum sent an email to Chubb Adjuster Le and Chubb Manager Witcher (cc'd to Chubb Adjuster Mortensen) stating in part:

> Thank you for the introduction; I look forward to meeting Mr. Mortensen. Please advise if Mr. Mortensen, along with his duties as Executive General Adjuster, will have the authority to start expediting coverage decisions and Payments under my Policy.
>
> . . .
>
> [P]lease provide me the day and approximate times that Mr. Mortensen will want access to my home from Tuesday, March 10 through and including Friday, March 13. . . . As to [Chubb Adjuster Mortensen] answering my questions, all my remaining questions concerning the claim process and Chubb policies remain unanswered to my satisfaction despite having been included in emails to you on multiple occasions. It would be extremely helpful if Mr. Mortensen could respond to those questions in writing prior to his arrival; if he is willing to do that his visit will be very efficient as well as productive.
>
> . . .
>
> [This confirms that y]ou and all your representatives have already had *complete access to my entire home*, including, but not limited to the following days and times:

(1) For well over two hours for you and Brian Beatty of J.S. Held on Thursday, December 26, 2019;
(2) For well over four hours for Chubb Scientist Andrew Fredericks on Friday, December 27, 2019;
(3) For well over two hours for Chubb Scientist Andrew Fredericks on Wednesday, January 8, 2020;
(4) For well over three hours for you on Friday, January 10, 2020;
(5) For well over two hours for Brian Beatty and Nathan Roberts of J.S. Held on Friday, January 10, 2020;
(6) For well over 12 hours for your contents' consultant Thomas Kirkpatrick on Friday, January 10 and Saturday, January 11, 2020 (Mr. Kirkpatrick entered every room of the home);
(7) For approximately two hours (where I was only present for 35 minutes) for Carl Finocchiaro, on Friday, January 24, 2020;
(8) For well over an hour for you and Nathan Roberts on Tuesday morning, January 28, 2020;
(9) For well over two and half hours for Chubb Scientist Andrew Fredericks on Friday, January 31, 2020; and
(10) For over an hour and thirty minutes for Carl Finocchiaro, on Tuesday, February 25, 2020.

. . .

This also confirms that I have on a few occasions asked Nathan Roberts, Director of J.S. Held LLC, to come to the [BC] Property; these have been written requests to which I have received no response. Your Environmental Scientist/Industrial Hygienist and recently appointed "Clerk", Andrew Fredericks, had complete (8+ hours daily) access to all the damaged areas of my home this past Wednesday, February 26; Thursday, February 27; and Friday, February 28; and he has verified that all work performed by ServPro to date was within the scope as authorized by J.S. Held and Chubb.

*See* Plaintiff's Deposition Exhibit No. 273 (Krum_001895-001898) and allegation para. 182 to Plaintiff's Deposition Exhibit No. 1.

On March 2, 2020, Mr. Krum sent Chubb Adjuster Le and Chubb Manager Witcher an email stating in part:

> This is yet another ELE request.
>
> As you can see from [the Ritz Carlton] Ms. Alexander's email below, every time Chubb delays in its response to my ELE request, I lose the availability for hotel stays for which I need and to which I am entitled under my Policy. It is very

> difficult, unhealthy, and somewhat hazardous to continue to stay in the home during demolition and remediation. Having my home in its current state continues to adversely affect my personal and professional life. I must have a home for myself and my guests for the next six weeks.
>
> Would you kindly respond tomorrow with approval for the 22 day ELE stay at the Ritz.

*See* Plaintiff's Deposition Exhibit No. 274 (Santana Krupowicz_005987-005990 and Chubb_000932-000935) and allegation para. 183 to Plaintiff's Deposition Exhibit No. 1.

On March 2, 2020, Mr. Krum provided to Chubb Adjuster Le and Chubb Manager Witcher the "Declaration of Heather Beckett which further supports [Mr. Krum's] FRV claim" (the "March 2 Declaration"). *See* Plaintiff's Deposition Exhibit Nos. 275 and 5 and allegation para. 184 to Plaintiff's Deposition Exhibit No. 1.

The March 2 Declaration further provided Chubb Adjuster Le, Chubb Manager Witcher, Chubb Adjuster Mortensen, Chubb and Great Northern with additional factual support that Mr. Krum "usually rent[s] to others" his BC Property. *See* Plaintiff's Deposition Exhibit No. 5 at ¶¶ 11, 12, and 13 and allegation para. 185 to Plaintiff's Deposition Exhibit No. 1.

On March 2, 2020, Mr. Krum requested approval for a twenty-two (22) night ELE stay at the Ritz (the "March 2 Request"). The nightly range was for $5,599 plus tax of 15.37% and a $20 daily resort fee. On March 3, 2020, Chubb and Great Northern denied Mr. Krum's March 2 Request. *See* Plaintiff's Deposition Exhibit Nos. 274 (Chubb_000932-000935) and allegation para. 186 to Plaintiff's Deposition Exhibit No. 1.

On March 3, 2020, Chubb Adjuster Mortensen stated to Mr. Krum: "While your claim is technically being reassigned to me, I will continue to co-adjust your claim with Mr. Le. Mr. Le is a superb claims representative, and will certainly be an asset going forward. Until further notice, we request that communications relating to your claim include both of us." *See* Plaintiff's

Deposition Exhibit Nos. 277A and 272 (Krum_001898 2/29/20 Email from Le); and allegation para. 187 to Plaintiff's Deposition Exhibit 1.

On March 3, 2020, Chubb Adjuster Le stated: "Chubb does NOT approve of payment for 22 day stay at the Ritz Carlton at this time. . . . Chubb continues to seek to confirm your 'usual vacation occupancy' to provide you the full amount of ELE coverage in which you are entitled." *See* Plaintiff's Deposition Exhibit No. 276B (Chubb_000833 and Chubb_046655; 3/3/20 e-mail from Le); and allegation para. 190 to Plaintiff's Deposition Exhibit 1.

On March 5, 2020, Chubb Adjuster Le stated to Mr. Krum that he had not yet provided "proof" of "usual vacation occupancy" at his BC Property for 2018 and 2019. *See* Plaintiff's Deposition Exhibit No. 279 (Santana Krupowicz_006068 and Chubb_024848; 3/5/20 e-mail from Le); and allegation para. 191 to Plaintiff's Deposition Exhibit No. 1.

One day later, on March 6, 2020, Mr. Krum provided Chubb Adjuster Mortensen and Chubb Manager Witcher with the Strawberry Park gate code entry/exit records that Mr. Krum received on March 5, 2020, from Beaver Creek Public Safety for the twenty-six (26) month period of January 6, 2018, to March 2, 2020. *See* Plaintiff's Deposition Exhibit Nos. 280A and 281(Chubb_024966 and Chubb_02941 3/6/20 e-mail to Mortensen); and allegation para. 192 to Plaintiff's Deposition Exhibit 1.

On March 7, 2020, Chubb Adjuster Mortensen stated to Mr. Krum that Chubb does "not agree with [Mr. Krum's] conclusion that your airline receipts document that you stayed at your residence for approximately 277 days during a period of 24 months and 14 days." *See* Plaintiff's Deposition Exhibit No. 282 (Chubb_000750 and Chubb_025057; 3/7/20 e-mail from Mortensen); and allegation para. 193 to Plaintiff's Deposition Exhibit 1.

By Mr. Krum's email to Chubb Adjuster Mortensen on March 11, 2020, it was apparent that Chubb, Great Northern, Chubb Adjuster Le and Chubb Adjuster Mortensen were searching for, and in fact manufacturing, explanations to justify Chubb Adjuster Le, Great Northern and Chubb's lack of cooperation and their pursuit of delay in paying and approving Mr. Krum's ELE and FRV claims. Chubb and Great Northern's insistence on requiring Mr. Krum to provide records that have already been previously provided, that are difficult to obtain, or that simply do not exist are several examples. *See* Plaintiff's Deposition Exhibit No. 283A and allegation para. 194 to Plaintiff's Deposition Exhibit 1 (the March 11, 2020, e-mail Correspondence from Mr. Krum to Chubb Adjuster Mortensen attached to the Amended Complaint as Exhibit "O").

On March 10, 2020, Mr. Krum requested that Chubb Adjuster Mortensen promptly reconsider Chubb Adjuster Le's denial of Mr. Krum's March 2 ELE request and immediately allow Mr. Krum to move into the Ritz for the balance of the 2020 ski season. *See* allegation para. 196 to Plaintiff's Deposition Exhibit No. 1.

On March 11, 2020, Mr. Krum told Chubb Adjuster Mortensen in person that he "did not fly to Denver International Airport or to the airport in Eagle, Colorado for any other reason than for the sole purpose of spending time at my Beaver Creek residence." Chubb Adjuster Mortensen stated in response to Mr. Krum's statement: "I do not have information to support that". Mr. Krum asked Chubb Adjuster Mortensen what information does Chubb have that indicates "I was not at my Beaver Creek residence on the days I claim."[24] Chubb Adjuster Mortensen would not respond to Mr. Krum's question. *See* Plaintiff's Deposition Exhibit No. 283A and allegation para. 199 to Plaintiff's Deposition Exhibit No. 1.

---

[24] On March 11, 2020, Mr. Krum further stated to Chubb Adjuster Mortensen: "To prove my point, pick any 10 days you question my stay at my home in Beaver Creek for 2018 and another 10 days for 2019; I will promptly provide a receipt from a local business establishment confirming that I was in the Beaver Creek area on that day.

On March 11, 2020, Chubb Adjuster Mortensen physically inspected Mr. Krum's BC Property and as an Executive General Adjuster should have been fully aware that it had sustained millions of dollars of damage from the Insured Event. *See* allegation para. 200 to Plaintiff's Deposition Exhibit No. 1.

On March 11, 2020, Mr. Krum provided Chubb Adjuster Mortensen with the following Hertz rental car information and with all the supporting Hertz receipts:

> Rented at Denver International Airport ("DIA") on December 19, 2019 at 11:40 p.m. and returned to DIA on January 1, 2020 at 10:00 p.m., miles driven 579;
> Rented at DIA on December 10, 2019 at 8:08 p.m. and returned to DIA on December 13, 2019 at 7:43 p.m., miles drive 306;
> Rented at DIA on November 21, 2019 at 12:21 a.m. and returned to DIA on November 27, 2019 at 5:22 a.m., miles driven 353;
> Rented at DIA on October 21, 2019 at 10:14 a.m. and returned to DIA on October 26, 2019 at 1:26 p.m., miles driven 316;
> Rented at DIA on October 10, 2019 at 6:26 p.m. and returned to DIA on October 16, 2019 at 8:12 a.m., miles driven 545;
> Rented at Eagle County Regional Airport ("EGE") on October 1, 2019 at 6:30 p.m. and returned to DIA on October 2, 2019 at 4:48 a.m., miles driven 159;
> Rented at DIA on September 21, 2019 at 9:30 a.m. and returned to DIA on September 22, 2019 at 6:17 a.m., miles drive 446;
> Rented at EGE on September 4, 2019 at 11:39 p.m. and returned to DIA on September 18, 2019 at 11:00 p.m., miles drive 320;
> Rented at DIA on August 18, 2019 at 11:43 a.m. and returned to DIA on August 26, 2019 at 3:00 p.m., miles drive 640;
> Rented at EGE on July 8, 2019 at 9:30 a.m. and returned to DIA on July 18, 2019 at 9:30 p.m., miles drive 303;
> Rented at EGE on June 13, 2019 at 4:48 p.m. and returned to DIA on June 25, 2019 at 7:30 p.m., miles drive 400;
> Rented at DIA on June 12, 2019 at 8:25 p.m. and returned to EGE on June 13, 2019;
> Rented at DIA on May 9, 2019 at 8:30 p.m. and returned to DIA on May 10, 2019 at 8:30 p.m.;
> Rented at DIA on April 18, 2019 at 11:20 p.m. and returned to DIA on April 22, 2019 at 11:00 p.m.;
> Rented at DIA on March 6, 2019 at 11:15 p.m. and returned to DIA on March 17, 2019 at 11:00 p.m.;
> Rented at DIA on February 6, 2019 at 9:24 p.m. and returned to EGE on February 20, 2019 at 2:42 p.m.;
> Rented at EGE on December 19, 2018 at 1:30 p.m. and returned to EGE on January 4, 2019 at 11:42 a.m., miles driven 514;

> Rented at DIA on October 30, 2018 at 8:38 p.m. and returned to DIA on November 1, 2018 at 9:30 a.m., miles driven 272;
> Rented at DIA on October 17, 2018 at 9:27 p.m. and returned to DIA on October 18, 2018 at 9:30 p.m.;
> Rented at DIA on September 18, 2018 at 9:46 p.m. and returned to DIA on September 25, 2018 at 4:25 a.m.;
> Rented at DIA on May 12, 2018 at 11:35 a.m. and returned to DIA on May 13, 2018 at 11:30 a.m.

*See* Plaintiff's Deposition Exhibit No. 283A and allegation para. 201 to Plaintiff's Deposition Exhibit No. 1.

On March 13, 2020, and again on March 18, 2020, Mr. Krum advised Chubb Adjuster Mortensen that "it has become even more critical that I am in a position to rent out my Beaver Creek home for the 2020 Christmas holiday and 2021 New Year [and winter] ski season. Making sure that construction is completed and my home is in prime rentable condition as of December 15, 2020 is of paramount concern. I need the help of my insurance company to please assist me meet this critical deadline." *See* Plaintiff's Deposition Exhibit No. 284 (Chubb_ 004530) and allegation para. 204 to Plaintiff's Deposition Exhibit 1.

On March 19, 2020, Chubb Adjuster Mortensen stated in an email to Mr. Krum:

> We are writing in response to your [March 2nd twenty-two night] request for coverage for an upcoming stay at the Ritz-Carlton, Bachelor Gulch. As you know, as a sign of our good faith, we have already advanced you seven days[25] of ELE coverage while we work to confirm your 'usual vacation occupancy.' You now have requested consideration for an additional **13 nights**, for a four bedroom suite with a rate of approximately $5,000 per night. With our agreement, Chubb will have advanced 20 days of the 60 day ELE coverage limit. . . . Chubb will reimburse the invoices, up to a maximum of $65,000. Please be advised that if your stay exceeds 13 days and/or $65,000 maximum, Chubb will not be responsible for these excess costs. Additionally, please note that under a full reservation of rights, Chubb reserves the right to re-adjust the claim based on the 'usual vacation occupancy' when that information is determined.

[25] The only temporary lodging ELE coverage offered to Mr. Krum and accepted was for a seven (7) night stay at the Ritz-Carlton, Bachelor Gulch, in a one bedroom hotel room for a total of $5,998.06 ($2,523.14+$3,474.92) which includes tax. *See*, Plaintiff's Deposition Exhibit Nos. 261A (Chubb_006891) and 261B (Chubb_001274).

> Additionally, please be aware that the Agreement is made pursuant to the Policy's Extra Living Expense ("ELE") provision. Accordingly, the agreed-upon 13 day Stay applies to the ELE's 60-day 'usual vacation occupancy" maximum to date (the existing seven days plus the requested 13 days).

*See* Plaintiff's Deposition Exhibit 285A (Chubb_004478-_004479).[26]

On March 29, 2020, Mr. Krum again advised Chubb Adjuster Mortensen and Chubb Manager Witcher that "it is imperative that my Theatre must be fully operational by the start of the Christmas Rental Vacation Holiday ski season (no later than December 15, 2020). The Theatre is essential to receiving the very high end of my rental rates." *See* Plaintiff's Deposition Exhibit Nos. 285D and 285E (Chubb_004202 and Chubb_004082-Chubb_004083) and allegation para. 204 to Plaintiff's Deposition Exhibit No. 1.

On March 30, 2020, Chubb and Great Northern in writing finally "confirmed that Mr. Krum has submitted sufficient information to establish that his 'usual vacation occupancy' is 60 days per year." *See* Plaintiff's Deposition Exhibit No. 285C (Chubb_045997); *see also* Exhibit 285B (Chubb_004249) (The Chubb Claim File contains a File Note from Chubb Adjuster Le confirming that Chubb knew as of March 26, 2020, that "The Ritz-Carlton, Bachelor Gulch is currently closed, effective Saturday, March 21, 2020").

As of April 1, 2020, Mr. Krum never again heard from Chubb Adjuster Mortensen. *See* Plaintiff's Deposition Exhibit No. 286 and allegation para. 207 to Plaintiff's Deposition Exhibit No. 1. Likewise, as of early April 2020 Mr. Krum never again heard from Chubb Adjuster Le. *See* Plaintiff's Deposition Exhibits No. 128A (Krum_002211) and 128B (Krum_002290); LDT

---

[26] *See also* Plaintiff's Deposition Exhibit No. 72 and Defense Deposition Exhibit 1036, 1037 and 1038. Chubb Adjuster Magnotta approving ELE for a house rental more than $20,000 per night on December 3, 2021, further proves Chubb's bad faith conduct of not timely providing Mr. Krum the benefits he was entitled to under ELE. Moreover, it illustrates how Chubb Adjuster Mortensen attempted to misconstrue the policy, hold affording coverage over Mr. Krum's proverbial head to further Chubb's financial interests back in March of 2020.

at 11:22-23, 33:9-19; and allegations paragraphs 208 and 213[27] to Plaintiff's Deposition Exhibit No. 1.

On April 3, 2020, Chubb Executive General Adjuster Steven J. Magnotta became the new Claim Owner of the BC Property Insured Event. *See* MDT at 18:19-19:2.

On April 18, 2020, Chubb Adjuster Magnotta wrote Mr. Krum stating: "On the issue of incurred ELE for food. You have demonstrated you have and will be incurring incurred food expenses above normal. If you are in agreement we can make an allowance for incurred food expense above normal for $500/week and pay four months in advance or $8,000. After four months if your kitchen is not repaired, we can review this issue." *See* Plaintiff's Deposition Exhibit No. 126A and allegation para. 209 to Plaintiff's Deposition Exhibit No. 1. At this point in Mr. Krum's claim, Chubb Adjuster Magnotta is not taking a position that ELE needs to be "incurred". **Most importantly, the logical inference from Chubb Adjuster Magnotta's four additional months of increased food costs offer is that he is now the second experienced, large loss Chubb adjuster that believes that the *Chubb Policy* provides more than 60 days of ELE.[28] It should also be noted that neither Chubb Adjuster Le nor Chubb Adjuster Magnotta clarify with Mr. Krum promptly or even within 25 days, nor did I find any evidence that they were corrected by their respective supervisors promptly or within 25 days. Moreover, despite the clear evidence of the mixed messaging to their insured and/or inconsistent internal ALE/ELE/FRV reserves, I did not find any evidence that Chubb or its adjusters properly accepted responsibility for and/or appropriately explained their mixed**

[27] On May 8, 2020 Mr. Krum received an "Automatic Reply" email from the Chubb mail account of Chubb Adjuster Le stating: "Hello, Starting Monday May 4, 2020, I am no longer employed with Chubb Insurance."

[28] Plaintiff's Deposition Exhibit No. 27F (Chubb_011376) shows that Chubb and Great Northern placed a High Low Range of $1 Million to $1.2 Million on ELE/FRV. Document justifies the high range by allowing $75,000 per month of ELE for 12 months (12 x 75K = $900K) and appears to add the well documented $300,000 FRV request by Mr. Krum. *See also* Plaintiff's Deposition Exhibit 27G (Chubb_002634-_002635).

**communications to their insured. Indefensibly and in bad faith, Chubb tried to convince Mr. Krum that their pre-February 7 communications were clear, i.e., that Mr. Krum is unambiguously capped at 60 days of ELE, yet Chubb Adjuster Le's actions and/or communications pre-February 7, Chubb internal reserve *reports*, and Chubb Adjuster Magnotta's April 18 food offer are evidence to the contrary.**

On April 21, 2020, Mr. Krum responded to Chubb Adjuster Magnotta stating: "On this issue of further reimbursement for 'ELE for food' I thank you for your offer below. I agree that if you start the four (4) additional months as of Monday, March 9, 2020, $500 a week is acceptable for the time period of March 9, 2020 through and including July 9, 2020 for ELE Meal Expenses. Please have your next SOL indicate the agreement. If I leave my Beaver Creek home for any reason between March 9 and July 9, 2020, I will agree that the days I am gone should not count toward this $8,000 and those days will be applied (or deducted from further ELE Meal Reimbursement) after July 9, 2020." *See* Plaintiff's Deposition Exhibit No. 126B and allegation para. 210 to Plaintiff's Deposition Exhibit No. 1.

On April 22, 2020, Chubb Adjuster Magnotta responded to Mr. Krum's additional ELE Meal Expenses reimbursement (set forth directly above) with an email stating: "I will include this in an updated SOL." *See* Plaintiff's Deposition Exhibit No. 126C and allegation para. 211 to Plaintiff's Deposition Exhibit No. 1.

On April 23, 2020, Chubb Adjuster Magnotta wrote Chubb Adjuster Le stating: "Can you send me your Reserve Rationale for the ELE coverage? I want to be able to reserve this claim, but I will need your input on ELE." *See* Plaintiff's Deposition Exhibit No. 27E and LDT at 227:2-25, 228:10-230:13. Chubb Adjuster Le responded stating:

> "We had figured $60k/month at a location near the insured home.
> Since Mr. Krum Only has 60 days of ELE under the vacation home,

> we were going to cap at that including 15 days of FRV.
>
> Mr. Krum did want to rent property in Vail at $10-25k/night. We were not going to honor that. For reserve purposes, it would be $600,000-$1.5million.
>
> Hope that helps."

*See* Plaintiff's Deposition Exhibit Nos. 27E and 27B;[29] LDT at 223:4-225:6. *See also* Plaintiff's Deposition Exhibit Nos. Exhibits 48 (Chubb_001976-001977), 79 (Chubb_ 002298), and 101 (Chubb_003405).

It should be noted that Chubb and Great Northern's Property Field Adjuster (OSA) Best Practices Guidelines states that:

> All reserve activity should be clearly documented within the claim including the rationale behind the decision to set or change a particular dollar amount. Reserve adequacy should be further reviewed at each scheduled diary review with documentation or rationale of any changes made to reserve.
>
> The OSA should establish a reserve with documented rationale that reflects the ultimate exposure, **net of the policy terms and conditions (exclusions, limits sublimits, deductibles, etc.)** to arrive at Chubb's exposure to ultimate payments, as soon as it is known, but no later than 30 days from the date the claim was assigned to the OSA. Time element losses should be reserved within 90 (Calendar) days or appropriate extension should be requested.
>
> . . .
>
> The OSA should request Supervisor approval via a file note if they identify a need for a 30 days extension on the reserve.

Plaintiff's Deposition Exhibit No. 292 at 11 (Chubb_050666) (Emphasis added).

On May 13, 2020, Chubb Adjuster Magnotta informed Mr. Krum that Chubb would only reimburse ELE Meal Expenses for 60 days. *See* Plaintiff's Deposition Exhibit No. 127 and allegation para. 212 to Plaintiff's Deposition Exhibit No. 1.

[29] Le further testified that he "would have written that up originally. We have a range. I sent it to Witcher, and Witcher would probably have to send it up to Everett based on the authority dollar amount." LDT at 231:2-5; *see also* LDT at 230:14-232:2.

On or about May 8, 2020, Mr. Krum received an "Automatic Reply" email from the Chubb email account of Chubb Adjuster Le stating: "Hello, Starting Monday May 4, 2020, I am no longer employed with Chubb Insurance."[30] *See* Plaintiff's Deposition Exhibit No. 128 and allegation para. 213 to Plaintiff's Deposition Exhibit No. 1.

Based on the record before me, while Chubb Adjuster Magnotta never addresses the lodging portion of ELE with Mr. Krum (before his deposition on October 15, 2021) during the time he is the "claim owner", on December 3, 2020, Joe Smith (Magnotta's supervisor's boss) asks Chubb Adjuster Magnotta: "Ok. But what is open on frv and ele? How do we progress those as well?" *See* Plaintiff's Deposition Exhibit No. 121.

Based on the record before me, from December 24, 2019 (the day of the Insured Event) through and including the date of this Expert Report, Mr. Krum has never received any verbal or written communication from Chubb Manager Witcher or Chubb Adjuster Mortensen's Manager James Hamilton. *See* Allegation para. 214 to Plaintiff's Deposition Exhibit No. 1.

**Chubb, Great Northern and Their Counsel's Attempt During Adjustment Of The Claim To Distort Facts and/or Make False Statements to Intimidate Mr. Krum.**

On April 6, 2020, Attorney Rocco sent Mr. Krum a correspondence with several outrageous and/or false material statements (the "April 6 Correspondence") regarding Mr. Krum, the BC Property and the Insured Event.[31] *See* Plaintiff's Deposition Exhibit No. 122 and

[30] However, Mr. Le testified that he "probably [stopped handling Mr. Krum's claim in] March 2020." LDT at 33:9-19.

[31] Some of the outrageous and/or false accusations were (i) Mr. Krum's "refus[al] to submit proof necessary to establish coverage", (ii) "[a]fter being advised that declarations are not sufficient to establish a claim under the Policy's 'Extra Living expenses' provision . . ., [Mr. Krum's] continued submission of such declarations", (iii) Mr. Krum's "continual requests for payment for extensive Ritz-Carlton hotel stays without first establishing [his] 'usual vacation occupancy', as required by the ELE", and (iv) Mr. Krum's "failure to provide full responses to Great Northern's specific requests for documents to establish coverage pursuant to the ELE, and [Mr. Krum's] subsequent insistence that the submissions were sufficient", and (v) Mr. Krum's "behavior has escalated to the active disruption of Great Northern representatives conducting the Claim Investigation."

allegation para. 214 to Plaintiff's Deposition Exhibit No. 1 (A copy of the April 6 Correspondence (and its cover email) marked as Exhibit "P" to the Amended Complaint).

Based on the record before me, Attorney Rocco's April 6 Correspondence was without vetted and/or factual support based on the information, records, and documents in his client's (Great Northern, Chubb and particularly in Adjuster Le's) possession. *See* Plaintiff's Deposition Exhibit Nos. 75A, B and C, 76A and B, 253A and 253B and allegation paragraphs 218 and 219 to Plaintiff's Deposition Exhibit 1 (Exhibit "J" the April 14 Declaration at ¶¶ 9-22 and the March 1, 2020, Declaration of Tony Pierce marked as Exhibit "Q" to the Amended Complaint).

On April 9, 2020, Mr. Krum responded in writing to the April 6 Correspondence (the "April 9 Response"). *See* Plaintiff's Deposition Exhibit No. 123 (a copy of the April 9 Response and cover email marked as Exhibit "R" to the Amended Complaint) and allegation para. 222 to Plaintiff's Deposition Exhibit 1.

It is my opinion that the statements in Attorney Rocco's correspondence of "interference with the Claim Investigation" and the "limiting of access to the Insured Property" were false and/or misleading, and as such bad faith attempts by Great Northern and Chubb to intimidate and to ultimately extract financial concession(s) from their insured, Mr. Krum.

**THAS Claim History and Mr. Krum's Notice Demanding Appraisals.**

The Policy states in part:

> Appraisals
> If you or we fail to agree on the amount of loss, you or we may demand an appraisal of the loss. Each party will select an appraiser within 20 days after receiving written request from the other. The two appraisers will select a third appraiser. If they cannot agree on a third appraiser within 15 days, you or we may request that the selection be made by a judge of a court having jurisdiction. Written agreement signed by any two of the three appraisers shall set the amount to the loss. . . . Each appraiser will be paid by the party selecting the appraiser. Other expenses of the appraisal and the compensation of the third appraiser shall be shared equally by you

> and us. We do not waive our rights under this policy by agreeing to an appraisal.

*See* Plaintiff's Deposition Exhibit No. 6 and allegation para. 226 to Exhibit 1.

The parties throughout the claim and litigation have referred to the BC Property Movie Theatre and AV Home Automation Systems which was developed, designed, engineered, and installed by Frankentek as the Krum Theatre and Home Automation Systems (the "THAS"). I will use the same acronym in my Expert Report.

On January 27, 2020, Mr. Krum provided Chubb Adjuster Le, Chubb Manager Witcher, Chubb and Great Northern with Frankentek's January 26, 2020, Expert Report on the Plaintiff's claims for his THAS (the "January 26 Frankentek Report"). *See* Plaintiff's Deposition Exhibit Nos. 31, 32A, 32A-1, 32A-2, 32A-3, 32A-4, 32A-5, 32B, 32B-1, 32B-2, 32B-3, 32B-4, 32B-5, 32B-6, 32B-7, 32B-8, 32B-9 and allegation para. 228 to Exhibit 1; *see also* MDT at 135:18-136:21.

The January 26 Frankentek Report states that the "current calculation to replace the Home Theater System damaged equipment plus the Whole House Systems damaged equipment to performance and specifications . . . [just before the Insured Event] is $1,085,151.00 [$851,121.00 for Theatre and $234,030.00 for Home Automation Systems]. . . . However, it should be expected that upon further investigation and construction in the home, other equipment and cable may need to be replaced" and that this amount does not include "demolition, disposal, removal of equipment, removal of cables, travel expenses." *See* Plaintiff's Deposition Exhibit No. 31 and allegation para. 229 to Plaintiff's Deposition Exhibit No. 1.

Mr. Krum was also claiming general contracting and management fees (the "GCMF") for all THAS repairs (which are not included as a dollar amount as part of the January 26 Frankentek Report). That amount is $206,430.20 and is set forth as an "Appraisal Claim" line item on page 3

in the October 15, 2020, Chubb Statement of Loss ("SOL") prepared by Chubb Adjuster Magnotta on behalf of Chubb and Great Northern (the "Chubb SOL Pages 2-3"). A redacted copy of the October 15, 2020, Chubb SOL Pages 2-3 are at Plaintiff's Deposition Exhibit 29, *see also,* para. 230 to Exhibit 1.

On February 7, 2020, Chubb and Great Northern had complete access to the BC Property THAS for any and all inspections and testing they desired under the agreed condition that "all liability for said inspections (and for removal of Mr. Krum's equipment/components) by Chubb's consultants shall and will be borne by Chubb and Great Northern (the "Chubb February 7 THAS Inspection"). *See* Plaintiff's Deposition Exhibit Nos. 51A (Krum_000182-000214), 59A and 102A and allegation para. 231 to Exhibit 1.

At no time during the Chubb February 7 THAS Inspection did Chubb's agents/ representatives ever once attempt to activate (turn on and run) the BC Property Movie Theatre. *See* Plaintiff's Deposition Exhibit No. 51A (Krum_000182-000214) and allegation para. 232 to Exhibit 1.

On February 23, 2020 Mr. Krum provided Chubb Adjuster Le, Chubb Manager Witcher, Chubb and Great Northern with Frankentek's Supplemental Expert Report dated February 20, 2020 (the "Feb. 20 Frankentek Supp. Report"). *See* Plaintiff's Deposition Exhibit No. 51 and allegation para. 233 to Exhibit 1.

The Feb. 20 Frankentek Supp. Report states that "Frankentek does not agree with the February 17, 2020 . . . [Chubb] Inspection Protocol . . . . Frankentek firmly asserts that its report of January 26, 2020 accurately sets forth the damage to the Theater, Home Automation [S]ystem, and Whole House Electronic System directly caused by the December 24, 2019 sprinkler head

failure." *See* Plaintiff's Deposition Exhibit No. 51 and allegation para. 234 to Plaintiff's Deposition Exhibit No. 1.

The Feb. 20 Frankentek Supp. Report states that "Mr. Krum made it clear that JS Held [Chubb's construction, scientific and THAS consultant] had complete access to inspect and remove and test any equipment Frankentek had claimed to be damaged under the condition that any individual or company inspecting, testing, and/or removing the equipment would be responsible for any additional damage caused to the Theater and any other Audio Video equipment in the home." *See* Plaintiff's Deposition Exhibit No. 51 and allegation para. 234 to Plaintiff's Deposition Exhibit No. 1.

On February 24, 2020, Mr. Krum provided Chubb Adjuster Le, Chubb Manager Witcher, Chubb and Great Northern with the detailed report from SimpleTech, of Carbondale, Colorado, dated February 23, 2020, on Mr. Krum's claims for his THAS (the "February 23 SimpleTech Report"). *See* Plaintiff's Deposition Exhibit No. 51A and allegation para. 236 to Plaintiff's Deposition Exhibit No. 1.

The February 23 SimpleTech Report (provided to Chubb Adjuster Le, Chubb Manager Witcher, Chubb and Great Northern on February 23, 2020) set forth that the repair and replacement cost for the damage to the Krum THAS as a direct result of the Insured Event is $1,655,868.31. *See* Plaintiff's Deposition Exhibit No. 51A and allegation para. 237 to Plaintiff's Deposition Exhibit No. 1.

On March 10, 11, 12, and 13, 2020, for over thirty hours, Chubb's Consultant J.S. Held, Chubb Adjuster Mortensen and Chubb Adjuster Le had complete access to the BC Property THAS for any and all inspections and testing they desired under the agreed condition that "all liability for said inspections (and for removal of Plaintiff's equipment/components) by Chubb

shall and will be borne by Chubb and its agents" (the "J.S. Held March 2020 THAS Inspection"). *See* Plaintiff's Deposition Exhibit Nos. 24B, 102A, 150 and 151 and allegation para. 238 to Plaintiff's Deposition Exhibit No. 1.

At the J.S. Held March 2020 THAS Inspection, J.S. Held, at the sole direction, and on behalf of, Chubb, Great Northern and Chubb Adjuster Mortensen, took apart all of Mr. Krum's Movie Theatre equipment and components without ever once obtaining any manufacturers' approval and guidance. *See* Plaintiff's Deposition Exhibit No. 59 and allegation para. 239 to Plaintiff's Deposition Exhibit No. 1; *See also*, Tom Kirkpatrick November 18, 2021 Deposition Transcript ("TKDT") at 266:14-269:11.

At no time during the J.S. Held March 2020 THAS Inspection did J.S. Held and Chubb ever once attempt to activate (turn on and run) the BC Property Movie Theatre. *See* allegation para. 240 to Plaintiff's Deposition Exhibit No. 1.

On April 3, 2020, Chubb, Great Northern, Chubb Adjuster Le, Chubb Manager Witcher and Chubb Adjuster Mortensen were again advised that "Frankentek and [Mr. Krum] are ready to immediately proceed with rebuilding [Mr. Krum's] Theatre." *See* Plaintiff's Deposition Exhibit No. 85 and allegation para. 241 to Plaintiff's Deposition Exhibit No. 1.

On April 17, 2020, Mr. Krum was advised by Mr. Magnotta that the Chubb Defendants' "loss assessment of the equipment to date" for the THAS is "$39,039.22". *See* Plaintiff's Deposition Exhibit No. 24 and allegation para. 242 to Plaintiff's Deposition Exhibit No. 1.

On April 24, 2020, Mr. Magnotta stated to Mr. Krum: "We believe it is best to obtain another expert opinion on the extent of damage to the THAS. We have engaged Dr. Hajjam to assist in determining the extent of damage to the Theatre and Home Automation Systems

("THAS")." *See* Plaintiff's Deposition Exhibit No. 89 and allegation para. 243 to Plaintiff's Deposition Exhibit No. 1.

On April 28, 2020, Chubb additional and new Audio Video Expert Arash Hajjam, Ph.D., P.E., CFEI, acknowledged to Mr. Krum and Tony Pierce of ServPro that it was "professionally inappropriate" for J.S. Held (at the J.S. Held March 2020 THAS Inspection, under the direction and instructions of Chubb and Chubb Adjuster Mortensen) to remove the cover plates of any of Mr. Krum's THAS (and expose the electronics) without first contacting the manufacturer(s) and second, doing so in a secure clean room environment, not on the unclean floor at Mr. Krum's reconstruction and demolition site at the BC Property. *See* Plaintiff's Deposition Exhibit Nos. 59, 150 and 151 and allegation para. 244 to Plaintiff's Deposition Exhibit No. 1.

On May 20, 2020, Mr. Krum outlined for Chubb Adjuster Magnotta all the prior THAS inspections by Chubb (1/10/20; 2/7/20; 3/10-13/20; 4/28/20; 5/1/20; & 5/19/20) and further requested that Chubb provide him "a date when [he] can get Chubb's final decision on receiving reimbursement for all the damage to [his] Theatre and Home Automation Systems." *See* Plaintiff's Deposition Exhibit No. 59A.

On June 12, 2020, Chubb Adjuster Magnotta, Chubb and Great Northern informed Mr. Krum that they assessed Mr. Krum's THAS damage claim to be in the amount of $128,165.00 plus a percentage for Frankentek's travel expenses. *See* Plaintiff's Deposition Exhibit Nos. 25 and 109 and allegation para. 245 to Plaintiff's Deposition Exhibit No. 1. See also Plaintiff's Deposition Exhibit No. 28B (Chubb_038534-038541).

On June 17, 2020, Mr. Krum sent Chubb Adjuster Magnotta, Chubb Manager Witcher, Chubb, and Great Northern his Notice Demanding Appraisals (the "Plaintiff's Appraisal

Demand"). *See* Plaintiff's Deposition Exhibit No. 26 at 4 and allegation para. 246 to Plaintiff's Deposition Exhibit No. 1.

Mr. Krum's Appraisal Demand selected Mr. Michael Pavluk of Frankentek ("Mr. Pavluk") as his designated appraiser for his THAS Claims. *See* Plaintiff's Deposition Exhibit No. 26 and allegation para. 247 to Plaintiff's Deposition Exhibit No. 1.

On or about July 1, 2020, Chubb and Great Northern designated Mr. Tom Kirkpatrick of Contents Consulting LLC ("Mr. Kirkpatrick") as their designated appraiser for Mr. Krum's THAS Claims. *See* Plaintiff's Deposition Exhibit Nos. 53 and 54 and allegation para. 248 to Plaintiff's Deposition Exhibit No. 1 (the July 1, 2020, e-mail from Mr. Krum to Chubb attached to the Amended Complaint as Exhibit "Y"). The July 1, 2020, e-mail further stated in part:

> Mr. Pavluk has advised me that he proposes the following three (3) neutral THAS firms to serve as the umpire:
>
> HomeTronics
> 17819 Davenport Road, Suite 210
> Dallas, TX 75252
> (972) 490-1090
>
> Roberts Home Audio and Video
> 1611 South La Cienega Blvd.
> Los Angeles, CA 90035
> (310) 276-3955
>
> Mr. Daniel Stern
> Aurum
> 3002 Walnut Street
> Denver, CO 80205
> (303) 558-9050
> Please have Mr. Tom Kirkpatrick promptly contact Mr. Michael Pavluk directly at Frankentek (609-780-6434) so that they can timely attempt to agree on an umpire (a disinterested and competent third THAS appraiser) to resolve our differences in accordance with the Policy.
>
> Thank you.

On July 8, 2020, Mr. Kirkpatrick advised that he nominates, "Craig Rice to be the Umpire. He is an electrical engineer who is the CEO & Principal Engineer of Golden Forensics, LLC, in Arvada, Colorado". *See* Plaintiff's Deposition Exhibit No. 54 and allegation para. 249 to Plaintiff's Deposition Exhibit 1.

On July 9, 2020 Mr. Pavluk advised Mr. Kirkpatrick that:

> [i]n addition to Mr. Stern, I believe Mr. Greg Margolis from HomeTronics and Mr. Michael Hattem from Brentwood Communications would each be capable of serving as a neutral THAS umpire and disinterested and competent third THAS appraiser. All of my three proposed Umpires are highly skilled THAS experts specializing in California Audio ("CAT") Technology systems. I have withdrawn Roberts Home Audio and Video because of a potential conflict that was discovered . . . [and] added as neutral THAS umpire: Michael Hattem" of Brentwood Communications, Inc.
>
> Please promptly provide me with a curriculum vitae that sets forth the experience Mr. Craig Rice has with determining and valuing the cost of development, operation, engineering, and installation of world class residential movie theatre systems and Luxury Home Automation Systems. This Appraisal process is to determine the amount of loss and value (*i.e.*, replacement cost). Please provide me with what competency and familiarity Mr. Rice has with the THAS items being appraised. However, do not contact Mr. Rice directly and please confirm that to date you have had no *ex party* contact with Mr. Rice regarding the Krum THAS. Has Mr. Rice and/or Golden Forensics, LLC ever been previously retained by Chubb or its representatives?

*See* Plaintiff's Deposition Exhibit No. 55X and allegation para. 250 to Plaintiff's Deposition Exhibit No. 1 (the July 9, 2020, e-mail from Mr. Pavluk to Mr. Kirkpatrick, attached to the Amended Complaint as Exhibit "Z").

On July 30, 2020, Chubb Adjuster Magnotta offered Mr. Krum (during a telephone conference) an additional $564,000.00 (more than the $128,000 already determined by Chubb and Great Northern as the loss assessment for Mr. Krum's THAS) (the July 30th SOL"). Chubb Adjuster Magnotta then authored a July 30 SOL and wrote on page three at the bottom a line item for a "Chubb Loss Assessment" of $"564,000.00" "Agreement in Lieu of Appraisal Process". *See* Plaintiff's Deposition Exhibit Nos. 28 and 116 (Chubb_002714). This $564,000

is confirmed in an email Chubb Adjuster Magnotta authored to Chubb Senior Vice President of Field Property Claim Leader Joseph R. Smith. *See* Plaintiff's Deposition Exhibit Nos. 28A, 116 and 293.

At Chubb Adjuster Mangotta's deposition on October 15, 2021, however, he testified:

> Q. Right, Mr. Magnotta? That's why you're putting that in the claim part for what Krum is claiming?
>
> A. Correct.
>
> Q. But Chubb is saying, as of June 12th [2020], we've only made that loss assessment to [$]128,265?
>
> A. Correct.
>
> Q. But if you drop down two lines, it has a line item that you authored. It says 564,000, agree - - and it says "Agreement in lieu of appraisal process"; right?
>
> A. Correct.
>
> Q. You wrote that 564,000; right?
>
> A. I believe so, yes.
>
> . . .
>
> Q. . . . it's my recollection that on or about June [*sic*] [July] 30 of 2020, you said, "Hey, Mr. Krum, Mark, the insured, if you could sign off on a general release and release us [Chubb and Great Northern], we'll give you . . . another [$]564,000 for your THAS."
>
> A. No. I don't recall that.
>
> Q. Okay. You tell me why the 564- number is there.
>
> A. The 564- probably should be in the other column because that might have been - - I'm - - not sure exactly what that number represents."
>
> **Q. So you're telling me that on or about June [*sic*] [July] 30, 2020, you, the claim owner, did not offer me an additional $564,000 to settle my THAS claim on top of the 128,165? You're telling me that my recollection is faulty, not correct?**
>
> **A. No.**
>
> . . .

**Q. Well, you tell me, Mr. Magnotta - - it's your number. You authored the document. What's the 564 there for?**

**A. I don't recall what it was there for.**

Q. Okay. Well, if you add those two numbers up, the 128,165 and the 564,000, I get 690 - - $692,165, if my calculator is correct. And it says right there to the right of the $564,000 number - - you typed it. You wrote it in your purple ink - - "Agreement in lieu of appraisal process." Did I read that correctly?

A. It states that, correct.

Q. Okay. So I'm telling you that you told me on June 30 - - on July 30 of 2020, "Krum - - Mr. Krum, Mark, insured, if you take $692,165, which is $564,000 more than what we agreed to give you 48 days ago, we'll give you that money as long as you release us from THAS." You're telling me that my recollection is faulty?

A. Yes.

. . .

Q. Do you agree that every time you say "settlement," that means I would have to forego any additional money for the THAS; I'd have to release my claims?

A. No. It'll be just like every line item on the statement of loss you and I had in negot- - - we discussed.

**Q. So it's your testimony that you were willing to give me more money and I could still keep pursuing the ultimate appraisal, but I was never willing to take more money? I refused; "Don't give me the money, Mr. Magnotta, the hundreds of thousands of dollars or more. I don't want it"? That's what you're telling me?**

**A. Yeah.**[32]

. . .

Q. Okay. Sir, between the 128,165 that you assessed the loss and you paid me sometime, I believe, in the summer of 2020, in the late summer, and the . . . [$]1,205,000 that you were forced to pay me due to the appraisal process 11 months and 1 day later, you can't give me one dollar amount that you said, "We're willing to you more, Mark"?

. . .

A. You and I, after the 128-, spent many, many days, weekends, holidays discussing settlement of the THAS. We weren't able to reach an amicable resolution, and the appraisal award was rendered, and we made a payment.

---

[32] Chubb Adjuster Magnotta's answer is difficult for me to believe.

Q. What prevented you and/or Chubb and/or Great Northern from giving me 10 cents more on the 128,000 between June 12th, 2020 and May 13th, 2021, when your own appraiser signed off on a $1.2 million award for my THAS damages? . . . What prevented you from giving me more money?

A. You and I - - were negotiating a settlement. We couldn't reach a final agreeable, amicable number.

Q. What do you mean by "amicable"?

. . .

A. We had - - difference of opinion in our loss assessment to your loss - - your claim, and we were trying to reach an amicable, agreeable number.

**Q. Is it your testimony that you're not required as a first-party insurer to pay me within a reasonable period of time the losses that I sustain?**

A. When we reach an agreeable - - agreed number, payment is made in a reasonable time, exactly what we did with the appraisal award. Appraisal award was rendered, and payment was made almost immediately.

**Q. What was your reasonable basis for delaying any additional payment on the THAS from June 12th, 2020, to the time that you were forced to pay it with the appraisal award after May 13th, 2020?**

A. There was . . . .

**Q. But you can't tell me anything that prevented you from making any payment 10,000, 50,000, 500, $564,000 more within months after the June 12th statement - - the June 12th loss assessment? Is there something that prevented you?**

**A. We were trying - - we were negotiating a settlement. During that time, we were unable to reach an amicable resolution. The appraisal award was rendered, and we made immediate payment.**

. . .

Q. I'm just saying you removed what I said to you is my representation, that you offered me 564,000 for a general release to get rid of all my THAS claims, and additional 564 – where you wrote "Agreement in lieu of appraisal process" on page 3 of Exhibit 28. On Page 4 of Exhibit 30 [the November 3, 2020 SOL], that number is removed, the 564-; correct?

A. Correct.

*See* MDT at 181:23 to 182:17; 182:23 to 184:18; 185:14 to 186:3; 186:8 to 189:6; 191:14 to 191:21 (Emphasis in bold).

The record before me shows that the $564,000 was in fact removed by Chubb Adjuster Magnotta from all future SOLs

By email correspondence on August 20, 2020, Chubb and Great Northern rejected the three individuals Mr. Pavluk requested as a neutral and competent Third Appraiser. *See* Plaintiff's Deposition Exhibit No. 160 and allegation para. 254 to Plaintiff's Deposition Exhibit No. 1.

On August 20, 2020, Chubb and Great Northern nominated Linda McGowan and the Honorable James Miller as neutral Third Appraisers. *See* Plaintiff's Deposition Exhibit No. 160 and allegation para. 255 to Plaintiff's Deposition Exhibit No. 1.

On September 19, 2020, Mr. Pavluk requested that Mr. Kirkpatrick provide Mr. Pavluk and Mr. Krum with any report(s) he had written regarding the THAS. *See* Plaintiff's Deposition Exhibit No. 134 and allegation para. 256 to Plaintiff's Deposition Exhibit No. 1 (the September 19, 2020, e-mail from Mr. Pavluk to Mr. Kirkpatrick attached as Exhibit "AA" to the Amended Complaint).

As of the filing of the Amended Complaint on February 25, 2021, against Great Northern, Mr. Kirkpatrick had not provided Mr. Pavluk or Mr. Krum with any additional THAS report(s). *See* Plaintiff's allegation para. 257 to Plaintiff's Deposition Exhibit No. 1.

As of the date of the Amended Complaint against Great Northern, Mr. Pavluk (after spending over 40 hours analyzing the damage to the BC Property THAS caused by the Insured Event) had "not been able to get the Theatre to function and ha[s] had many problems diagnosing

the Krum Home Automation Systems." *See* allegation para. 258 to Plaintiff's Deposition Exhibit No. 1.

As of April 21, 2021, Great Northern, Mr. Krum, and their respective selected designated appraisers, had not been able to agree on a Third Appraiser. *See* allegation para. 259 to Plaintiff's Deposition Exhibit No. 1.

Chubb and Great Northern have continually refused to offer as a Third Appraiser any individual who has any prior experience with the development, operation, engineering and installation of a luxury residential movie theatre and Luxury Home Automation Systems. *See* allegation para. 259 to Plaintiff's Deposition Exhibit No. 1.

On September 29, 2020, Mr. Pavluk wrote Mr. Kirkpatrick stating in part:

> On June 17, 2020 (more than 90 days ago) Mr. Mark Krum in writing notified both Chubb and its Executive General Adjuster, Steven Magnotta, that he had invoked the appraisal provision of the Policy and designated me as an Appraiser.
>
> I have represented to Mr. Krum and to Chubb that I am fair and reasonable. I selected and proposed three umpires - - all three with extensive experience in residential luxury movie theaters and home automation systems. All three are competent and impartial to this dispute. You have now rejected all three of the proposed umpires I selected without providing any reason.
>
> You have refused to disclose to me whether you have any experience in development, operation, engineering and installation of a world class residential Movie Theatre System and a Luxury Home Automation System as existed at the Krum residence on the morning of December 24, 2020 (the "Krum THAS" or "THAS") prior to the Insured Event.
>
> You recently selected Ms. Linda A. McGowan as a proposed neutral umpire who appears to be an expert in the evaluation and design of snow-country roofing systems, snow and ice management systems and solid waste handling facilities. Ms. McGowan has no experience in THAS.
>
> You selected Mr. Craig Rice as a proposed neutral umpire and he appears to be an expert with large mining equipment, overhead cranes as well as industrial machinery. Mr. Rice has no experience in THAS.
>
> You also selected the Honorable James S. Miller, who certainly has

> judicial experience, but in so far as I can determine, Judge Miller has no background, experience or training in THAS.
>
> I recognize that (unlike myself) all of your three proposed Umpires (like you) have extensive litigation experience, however, you have refused/failed to select any impartial and competent Umpire with THAS experience. I believe it is imperative, in fairness to both Mr. Krum and to Chubb, that the unbiased, disinterested and competent Umpire have an extensive background with THAS. For that sole reason, I have rejected your Umpire selections since you are not willing to advise me as to whether any of your three selections have any background/experience with THAS.
>
> . . .
>
> Lastly, with all due respect, if you have written and/or adopted any report(s) on the Krum THAS you are required to provide them to me if you intend to provide them (or the information contained in them) to our Court-appointed Umpire. Again, I request that you promptly provide me and Mr. Krum via email any written reports you authored and/or adopted on the Krum THAS.

*See* Plaintiff's Deposition Exhibit No. 135 and allegation para. 261 to Plaintiff's Deposition Exhibit No. 1 (the September 29, 2020, e-mail Correspondence from Mr. Pavluk to Mr. Kirkpatrick attached to the Amended Complaint as Exhibit "BB").

As of the filing of the Amended Complaint, the BC Property THAS remained non-operational.

On January 20, 2021, Chubb, Great Northern and Chubb Adjuster Magnotta were provided with Frankentek's Second Supplemental Report dated January 15, 2020. Plaintiff's Deposition Exhibit No. 52 and allegation para. 265 to Plaintiff's Deposition Exhibit No. 1 (the January 20, 2021, e-mail Correspondence from Mr. Krum to counsel for Great Northern attached to the Amended Complaint as Exhibit "CC").

Mr. Krum's THAS Appraisal claim was for an amount of additional damages of no less than $1,200,377.70 ($1,032,151.00 - $128,165.00 + 206,430.20 + $20,657.00 for Frankentek's estimated travel expenses + $69,304.50 for additional amounts set forth in Frankentek's Second

Supplement Report dated January 15, 2021). *See* allegation para. 266 to Plaintiff's Deposition Exhibit No. 1.

On January 5, 2021, Mr. Krum confirmed in writing to Great Northern its prior December 2020 requests that Great Northern "agree to allow the parties; Joint Request for Court Appointment of a Third Appraiser/Umpire for all THAS claims (as set forth in paragraphs 207 to 242 of the Complaint filed on December 9, 2020) to immediately proceed, without further delay, with Court approval" (the "January 5, 2021 Request"). *See* allegation para. 268 to Plaintiff's Deposition Exhibit No. 1 (the January 5, 2021, e-mail Correspondence from Mr. Krum to counsel for Great Northern attached to the Amended Complaint as Exhibit "DD").

On January 14, 2021, Great Northern "decline[d]" Mr. Krum's January 5, 2021, Request and stated it "will file a responsive pleadings on or before the current deadline of 2/8/21 pursuant to the Rules." *See* allegation para. 269 to Plaintiff's Deposition Exhibit No. 1.

On February 3, 2021, Mr. Krum again requested in writing Defendant Great Northern to allow the Plaintiff's request for Court Appointment of a Third Appraiser for all THAS claims to proceed without further delay. *See* allegation para. 270 to Plaintiff's Deposition Exhibit No. 1.

Great Northern and Chubb had compelled Mr. Krum to initiate litigation to recover amounts due for his THAS under the Policy by offering substantially less than the amounts ultimately recovered and for failing to offer a qualified and neutral third appraiser. *See* allegation para. 271 to Plaintiff's Deposition Exhibit No. 1.

On April 21, 2021, the United States District Court in this civil action granted Mr. Krum's Motion for the Court to Appoint a Third Appraiser and found it compelling to appoint a third appraiser with THAS expertise and appointed Mr. Daniel Stern, President and CEO of Aurum Home Technology in Denver, Colorado, the same third appraiser proposed on behalf of

Mr. Krum on July 1, 2020. *See* United States District Court Order dated April 21, 2021, granting Mr. Krum's Motion to Appoint and appointing Mr. Daniel Stern, President and CEO of Aurum Home Technology in Denver, Colorado as the third appraiser under the Policy's appraisal provision attached to the Amended Complaint as Exhibit "Y".

On May 13, 2021, the three-member THAS Appraisal Panel of Michael Pavluk, Tom Kirkpatrick, and Daniel Stern awarded Mr. Krum $1,205,000.00 in THAS damages. *See* Plaintiff's Deposition Exhibit Nos. 20, 21, 22 and 161 (the THAS Appraisal Panel Award dated May 13, 2021 (and Supplemental THAS Award of May 17, 2021).

**III. STANDARD OF CARE.**

It is my understanding that the Policy must be enforced as written unless there is an ambiguity in the policy language. A policy provision is ambiguous if it is susceptible to more than one reasonable interpretation. Once an ambiguity in the policy language is found, it is construed against the drafter of the document and in favor of the insured.

It is my understanding that a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff.

A claim of bad faith is separate and distinct from a claim for breach of contract. To prove a breach of contract, Mr. Krum must show that Chubb and Great Northern failed to pay a claim in accordance with the terms of the Policy. To prove bad faith, Mr. Krum must show that (1) Chubb and Great Northern breached the contract (the Policy) by failing to pay his ELE, FRV and THAS claims in accordance with the terms of the Policy, (2) there was no reasonable basis for Chubb and Great Northern's denial and not approving of Mr. Krum ELE and FRV claims and no

reasonable basis for the unreasonable delay in paying Mr. Krum's THAS claims, and (3) Chubb and Great Northern's knowledge of or recklessly disregarding the lack of a reasonable basis for denying and not approving Mr. Krum's ELE and FRV claims and unreasonable delay in paying Mr. Krum's THAS claims.

Under Colo. Rev. Stat. § 10-3-1115(1)(a), "[a] person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." Therefore, to prevail on a statutory claim, any delay or denial must be both unreasonable and for a covered benefit. An insurer's delay or denial was unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action.

To determine whether an insurer has acted in good faith necessarily requires an assessment of the information available to the insurer at the time the decision to deny or not approve the coverage. The analysis must therefore begin with a review of the information available to the insurer at the time of its decisions to deny and/or not approve coverage.

## IV. OPINIONS

It is my Expert Opinion that Chubb and Great Northern failed to pay Mr. Krum's FRV, ELE and THAS claims in accordance with the Policy for the BC Property.

It is my Expert Opinion that Chubb and Great Northern breached their contract of insurance (the Policy) with their insured, Mr. Krum.

Due to the special nature of the insurance contract and the relationship between Great Northern as the insurer and Mr. Krum as the insured, Defendant Great Northern owed a duty of good faith and fair dealing to its insured, Mr. Krum.

It is my understanding that this duty of good faith and fair dealing continued unabated during the life of an insurer-insured relationship, including through this lawsuit between Mr. Krum, Chubb and Defendant Great Northern.

There is no legitimate or factually supported reason why Defendant Great Northern, Chubb, Chubb Manager Witcher, Chubb Adjuster Mortensen and Chubb Adjuster Le had been unable to determine Mr. Krum's "usual vacancy occupancy" in a reasonable period of time without undue delay. On numerous occasions over an approximately two-month period of time, Mr. Krum established beyond any reasonable standard to Chubb, Great Northern, Chubb Adjuster Le, Chubb Manager Witcher, and Chubb Adjuster Mortensen that he stayed at the BC Property for approximately 277 days from December 17, 2017, until January 1, 2020, and well in excess of the 60 days Chubb capped his maximum ELE.

Chubb, Great Northern, Chubb Adjuster Le, Chubb Manager Witcher, Chubb Adjuster Mortensen and Chubb Adjuster Magnotta never once refuted with any factual support Mr. Krum's claims of occupancy.

The extended delays and misleading representations made by Chubb, Great Northern, Chubb Adjuster Le, Chubb Adjuster Mortensen and Chubb Adjuster Magnotta were a continuing breach of Defendant Great Northern and Chubb's duty of good faith and fair dealing with Mr. Krum.

Chubb, Great Northern, Chubb Adjuster Le, and Chubb Adjuster Mortensen provided three standard responses without any factual support to the numerous ELE and FRV claims by Mr. Krum: (i) "We continue to review . . . ."; (ii) [W]e are happy to adjust your claim and provide you with full coverage pursuant to the terms and conditions of the Policy"; and (iii) "Chubb continues to seek to confirm your 'usual vacation occupancy.'"

No reasonable basis existed for Great Northern and Chubb unreasonably delaying and denying Mr. Krum's coverage requests and claims pursuant to the ELE and FRV provisions of the Policy.

Chubb, Great Northern, Chubb Adjuster Le, Chubb Adjuster Mortensen, and Chubb Adjuster Magnotta continually acted unreasonably and with knowledge of or reckless disregard for the facts that were within their possession and the ELE reserve amounts calculated by Chubb Adjuster Le and never lowered in writing by Chubb Adjuster Mortensen and Chubb Adjuster Magnotta.

Great Northern and Chubb continually placed their self-serving financial interests above Mr. Krum's well being when applying the terms and conditions of the ELE and FRV provisions of the Policy. Furthermore, Great Northern and Chubb placed their self-serving financial interests above Mr. Krum's well being during its investigation of Mr. Krum's THAS when retaining consultants that were unqualified.

Chubb Manager Witcher, Chubb Adjuster Mortensen, Chubb Adjuster Le, Chubb and Great Northern did not investigate Mr. Krum's ELE and FRV claims in good faith to effectuate a prompt, fair and equitable settlement of Mr. Krum's insurance claims.

It is my Expert Opinion that Chubb and Great Northern and its representatives (i) misrepresented insurance Policy provisions; (ii) failed to adopt and implement a reasonable standard for the prompt investigation of certain claims arising under the Policy; (iii) refused to pay claims without conducting a reasonable investigation based upon all available information; (iv) failed to acknowledge and act reasonably promptly upon communications with respect to certain claims arising under this Policy; (v) not attempting in good faith to effectuate a prompt, fair and equitable settlement of claims; (vi) compelling Mr. Krum to institute litigation to recover

amounts due under the Policy by offering amounts substantially less than the amounts ultimately recovered and by failing to propose a qualified (in terms of subject matter expertise) and neutral third appraiser; (vii) failing to properly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other provisions of the insurance policy coverage; and (viii) failing to properly provide a reasonable explanation of the basis in the insurance policy in relation to the facts for denial of the claim or an offer of a compromise settlement.

Chubb and Great Northern in handling, assisting, and adjusting Mr. Krum's THAS claims were acting in furtherance of their own financial interests / gain.

Based on the record before me, I have concluded that the April 6 Correspondence from Attorney Rocco was sent to Mr. Krum to intimidate him and for Chubb and Great Northern to place their self-serving financial interests above their insured, Mr. Krum.

When Attorney Rocco sent Mr. Krum the April 6 Correspondence Great Northern, Chubb, Chubb Adjuster Le and Chubb Adjuster Mortensen knew the statements of "interference with the Claim Investigation" and "the limiting of access to the Insured Property" were false and/or misleading and as such were a bad faith attempt to extract financial concession(s) from Mr. Krum.

It is my Expert Opinion that the documents obtained by Mr. Krum in discovery regarding reserves (prepared in the ordinary course of business) establishes that Chubb and Great Northern reserved significantly more money than it offered to Mr. Krum for his ELE claim and requests and that in my opinion this information is material to prove that Chubb and Great Northern did not have a reasonable basis for denying, not approving and/or delaying Mr. Krum's ELE claim and multiple requests.

It is in the public interest that the business of insurance be conducted in the State of Colorado in good faith and free from deception.

Insurance encompasses the sale of goods, services, and property under the Colorado Consumer Protection Act ("CCPA") and is therefore subject to the provisions of the CCPA.

An insurance company and its claim representatives must use good faith and fair dealing in their conduct of claims handling procedures and settlement practices in insurance claims. An insurance company must use good faith and fair dealing in its affirmative representations and must not make fraudulent representations of quality of its services and products.

Chubb, Great Northern, Chubb Adjuster Mortensen, Chubb Adjuster Le and Chubb Adjuster Magnotta used bad faith conduct and unfair claims handling practices in adjusting Mr. Krum's insurance claims for ELE, FRV and THAS coverages.

It is my Expert Opinion that Chubb, Great Northern and Chubb Adjuster Le misrepresented on multiple occasions the ELE and FRV material terms and conditions of the Policy to its insured, Mr. Krum.

It is my Expert Opinion that the ELE policy language that "[w]e cover these extra living expenses for up to 60 days, even if the policy period ends during that time" is only applicable in instances where the insured is "newly constructing your house or other permanent structure or constructing additions, alternations, or renovations to your house or other permanent structure at the time of a covered loss . . . ."

## V. CALCULATION OF DAMAGES

The determination of damages are related to the direct harm caused to Mr. Krum by Defendant Great Northern's breach of contract for failure to timely provide insurance benefits to

Mr. Krum pursuant to his ELE and FRV coverages and for the harm caused to Mr. Krum by Great Northern's Bad Faith conduct in the handling of Mr. Krum's THAS, ELE and FRV claims.

Breach of Contract for ELE and FRV Coverage: $2,046,648.23[33]

It is my understanding that under Colorado Statutory law that damages are as follows:

Statutory (ELE & FRV) Bad Faith x 2: $4,138,200.00
Statutory (THAS[34]) Bad Faith x 2: $2,007,870.00

Based upon my analysis of Great Northern and Chubb's intentional, deliberate, and/or reckless disregard conduct, it is my understanding that Mr. Krum is also entitled to additional Common Law damages.

## VI. CONCLUSION

It is my professional opinion within a reasonable degree of professional certainty based on industry standards, customary practices and my analysis and detailed review of documents set forth in my Expert Report that Chubb and Defendant Great Northern breached their insurance contract with Mr. Krum and acted in Bad Faith in handling Mr. Krum's THAS, ELE and FRV claims as alleged in his Amended Complaint.

I reserve the right to amend and/or supplement this report based upon receipt and review of information not yet provided to me through depositions or other reports and materials.

DATED: December 2, 2022
Lafayette Hill, Pennsylvania

BY: ______________________

S Robert Landow
MLA Claims, LLC
644 Germantown Pike
Lafayette Hill, PA 19444
Tel: 610-940-4400

[33] Covered Benefit is 30% of $6,897,000 = $2,069,100 less $22,451.77 = $2,046,648.23.

[34] *See* Plaintiff's Deposition Exhibit Nos. 20, 21, 22 and 161 (THAS Appraisal Award of $1,205,000 less previous Chubb THAS payments of $128,165 and $72,900 = $1,003,935.00).