**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **MARK JAY KRUM** Plaintiff, | **CASE NO.: 1:20-cv-03616-RM-NRN** |
| v. | |
| **CHUBB LIMITED;** | |
| **AND** | |
| **GREAT NORTHERN INSURANCE COMPANY;** | **PLAINTIFF'S RESPONSE AND OPPOSITION EXHIBITS TO DEFENDANT GNIC's MOTION FOR SJ** |
| **AND** | |
| **CELIA SANTANA;** | |
| **AND** | |
| **DALE KRUPOWICZ;** | |
| **AND** | |
| **PERSONAL RISK MANAGEMENT SOLUTIONS, LLC,** | |
| **Defendants.** | |

**PLAINTIFF'S RESPONSE AND OPPOSITION TO DEFENDANT GREAT NORTHERN INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

## OPPOSITION EXHIBIT NO. 55
## WILLIAM P CURTIS EXPERT REPORT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **MARK JAY KRUM**<br>**Plaintiff,**<br>**v.**<br><br>**CHUBB LIMITED;**<br><br>**AND**<br><br>**GREAT NORTHERN INSURANCE COMPANY;**<br><br>**AND**<br><br>**CELIA SANTANA;**<br><br>**AND**<br><br>**DALE KRUPOWICZ;**<br><br>**AND**<br><br>**PERSONAL RISK MANAGEMENT SOLUTIONS, LLC,**<br><br>**Defendants.** | **CASE NO.: 1:20-cv-03616-RM-GPG**<br><br>**EXPERT REPORT OF WILLIAM P. CURTIS, JR., CPCU, ARM, ARe** |

**EXPERT REPORT OF WILLIAM P. CURTIS, JR., JD, CPCU, ARM, ARe IN SUPPORT OF PLAINTIFF'S CLAIMS OF INSURANCE BROKER NEGLIGENCE AND BREACH OF FIDUCIARY RELATIONSHIP AND DUTY OF LOYALTY**

## I. BACKGROUND AND QUALIFICATIONS AS AN EXPERT WITNESS.

I am a founder of Porter & Curtis, LLC a consultative insurance brokerage firm. P&C was founded by me along with Ken Porter in 1998 through a management buyout of Arthur J. Gallagher & Co's Pennsylvania operation, the office we started in 1994. In December 2020, the business merged with Heffernan Insurance Brokers in San Francisco (privately owned with over 400 employees), and serves as its East Coast platform under my and Ken's management. Porter & Curtis ("P&C") is a division of Heffernan Insurance Brokers.

I have a Master of Business Administration (MBA) in Finance and a BS in Accounting from St. Joseph's University along with a Juris Doctor (JD) from Temple University School of Law.

I hold the following professional designations from: the Insurance Institute of American Chartered Property Casualty Underwriter (CPCU), Associate in Risk Management (ARM), and Associate in Reinsurance (ARe). These designations required completion of sixteen semester length courses in coverage, inurer operations, accounting, risk control and financing and reinsurance contracts. I am a licensed reinsurance intermediary (via Trinity Reinsurance, LLC) which permits Ken Porter and me to place reinsurance directly; I am also a licensed broker and surplus lines broker. Ken Porter and I also own a third-party administration and consulting buiness (Sphere Risk Partners) and a proprietary risk management information system (Advanced Enterprise Technologies, Inc.). I am admitted to the bar in Pennsylvania and I have continued to maintain an active law license in PA. I am a licensed property and casualty insurance broker in several states including Pennsylvania, Colorado, California, New York, New Jersey, U.S. Virgin Islands and Ontario, Cananda. I have placed business (under producer agreements and on a brokerage basis) with Chubb Insurance for 40 years.

I am a nationally recognized expert in Catholic dioceses and property and casualty insurance and coverage practice.

I started my underwriting career as a personal lines underwriter with Reliance Insurance Company.

After 40 years in the insuance brokerage profession I have a clear and intimate understanding of a property and casualty insurance broker's standard of care for conducting business.

A true and correct copy of my resume is attached hereto, and incorporated herein, as Exhibit "A".

P&C is known for its roles in the industry as problem solvers for difficult and unique exposures. We pursue a general strategy in reducing a client's total cost of risk and uncertainty. We have distinguished ourselves as national experts in the following areas:

> Industries: Religious Organizations, Collaborative Consumption (such as car, ride, and home sharing), Social Services, Real Estate, Private Equity and Large Middle Market Companies.
>
> Structures: Protective Self Insurance, Pools, Captives, Direct Reinsurance, Parametric Covers.
>
> Services: Insurance and Reinsurance Brokerage (Trinity LLC), Risk Management, Integrated Risk Management, Claims Advocacy & Administration (Sphere Risk Partners), Program Design, Problem Solving, Risk Management Information Systems (Advanced Enterprise Technologies Inc).

I am being compensated in this matter at an hourly rate of $475.00 per hour and $575.00 per hour for deposition and trial testimony, plus expenses.

I am submitting this Expert Report at the request of the Plaintiff Mark Jay Krum and have been asked to evaluate and express my opinions as to the insurance broker negligence claims against Celia Santana ("Santana" and/or "Defendant Santana"), Dale Krupowicz ("Krupowicz" and/or "Defendant Krupowicz") and Personal Risk Management Solutions, LLC ("PRMS") and Santana, Krupowicz and PRMS's Breach of Fiduciary Relationship and of a Duty of Loyalty and as a result of such conduct the damages sustained by Mr. Krum resulting from the December 24, 2019 sprinkler leakage loss at his Colorado home.

I have had no professional and/or personal relationship with Mr. Krum prior to the instant litigation. While I have spoken to Mr. Krum on numersous occasions regarding the instant litigation, I first met him in-person on Thursday, November 3, 2022.

I have read the allegations and reviewed the exhibits included in the Amended Complaint filed by Mr. Krum at ECF Document 31. I am also aware that Mr. Krum had filed a similar complaint against PRMS in New York State (the "New York PMRS Complaint")[1]. I have reviewed the allegations against PRMS in the New York PRMS Complaint. In the course of preparing this Expert Report I was provided certain materials as set forth in Exhibit "B" attached hereto and incorporated herein. I have reviewed numerous documents (including deposition exhibits) in this case, and focused my attention on the deposition testimony obtained by the Plaintiff from Defendants Santana, Krupowicz and the PRMS corporate designee.

I agree to the terms set forth in the parties Protective Order regarding the treatment of Confidential Information that may have been provided to me to render my Expert Opinions.

## II. FACTUAL BACKGROUND AND BASIS FOR OPINIONS.

### The Instant Civil Action.

This is a civil action filed by Mark Jay Krum against the Defendants Great Northern Insurance Company ("Great Northern" or "Defendant Great Northern") and against Ms. Celia Santana, Ms. Dale Krupowicz and their insurance firm, PRMS.

The record establishes that Ms. Santana is a member, partner, co-founder, President and Chief Executive Officer ("CEO") of the New York City based firm, PRMS. Ms. Santana began her insurance career in the high net worth space at Chubb where she states that she managed a large portfolio of personal insurance clients and had personal lines underwriting experience ("underwriting individuals' personally owned assets" and "would review the insurability of a

---

[1] New York PRMS Complaint refers to ECF Doc. 1-1, ECF Doc. 1-2, ECF Doc. 1-3 and ECF Doc. 1-4 all filed and docketed in the United States District Court for the Southern District of New York and transferred to the District of Colorado in Case No.: 22-cv-01028-MEH and subsequently consolidated with this Case 03616 on June 1, 2022 (ECF Doc. 175), including all its referenced exhibits.

client and/or a risk"). *See* Celia Santana September 8, 2020 Deposition Testimony ("SDT") at 89:23-89:25, 90:7-90:19, 91:4-91:6, 183:13-17; PRMSDT at 34:2-7.

The record establishes that Ms. Krupowicz is a member, partner, and Chief Operating Officer ("COO") of the New York City based PRMS and that Ms. Krupowicz represents to the public that she is accredited as a "CAPI", a Certified Advisor of Personal Insurance designation which she obtained from a 12-month program offered by Chubb. *See* Dale Krupowicz September 7, 2022 Deposition Testimony ("KDT") at 85:24-88:7. Ms. Krupowicz, like Ms. Santana, has "training on what to provide the insurer like Chubb[,] what information that they need to obtain from a client, an applicant in order to obtain a premium quote." SDT at 90:1-90:6.

PRMS is organized in the State of Delaware and has its principal (and only) place of business at 335 Madison Avenue, 22nd Floor, New York, NY 10017. There are five members of PRMS. Celia Santana and Dale Krupowicz are members. *See* SDT at 38:15 to 43:19; *see* also PRMS Corporate Designee November 2, 2022 Deposition Testimony ("PRMSDT") at 13:24-16:14.

PRMS has represented that as of 2014 it employed 14 people providing coverage for some $5.1 billion of personal property insurance. PRMS currently employs 15 people. *See* SDT at 182:1-6; PRMSDT at 24:20-21.

**The Covered Event.**

The Covered Event occurred at Mr. Krum's Colorado residence at 373 Strawberry Park Road, Beaver Creek, Colorado 81620 (the "BC Property").

Upon completion of what was a two plus year renovation project that started in August of

2011, the BC Property is approximately 11,000 square feet; at 2.8 acres it is the second largest lot in the exclusive gated community of Strawberry Park; it sleeps 21 comfortably, has eight full bathrooms (five full bathrooms all with both a jacuzzi tub and a large shower); three half bathrooms; a spectacular game room with six 55 inch flat screen tvs; three full wet bars; eight fireplaces and one outdoor fire pit; a 26 foot climbing wall; a world class movie theatre (the "Theatre"); an indoor 25 foot climbing rope; an indoor basketball court; and spectacular ski-in and ski-out to Beaver Creek, Bachelor Gulch and Arrowhead Mountains. The Theatre was designed by Frankentek (from Medford, NJ) who in 2008 received an award for building the number one Home Theatre in the United States (the "2008 Theatre"). *See* Mark Jay Krum November 10-11, 2022 Deposition Transcript ("MKDT") at 231:11-232:4, 132:17-133:5; Defendants' Deposition Exhibit No. 1014 at 1-2; and allegation para. 86 to Exhibit 1 and allegation para. 91 to Exhibit 1A.

In or about June of 2010 Frankentek agreed to build the Theatre and to engineer, provide and install the Home Automation Services for the BC Property. *See* MKDT at 137:24-138:11; Defendants' Deposition Exhibit No. 1014 at 2; and allegation para. 88 to Exhibit 1 and allegation para. 93 to Exhibit 1A.

On the morning of Tuesday, December 24, 2019, a single actuated sprinkler head inside the BC Property (the "Sprinkler Head") failed and released hundreds of gallons of liquid contaminant throughout all four levels of Mr. Krum's residence (the "Covered Event").

At the time of the Covered Event, Mr. Krum had made his required premium payment and had property insurance coverage with Chubb and Great Northern Insurance Company and was insured under a *Chubb Masterpiece Policy* bearing policy number 13787210-02, and subject to the terms, conditions, exclusions and endorsements contained within the policy and under

Colorado law in effect from August 15, 2019 through August 15, 2020 (the "Policy"). The Policy provided Mr. Krum with Dwelling Coverage in the amount of $6,897,000.00 and Contents Coverage in the amount of $1,379,400.00 and additional coverages. *See* Plaintiff's Deposition Exhibit No. "6".

At the time of the Covered Event, Mr. Krum was and is currently a "first-party" claimant asserting an entitlement to benefits as an insured under the Policy.[2]

On December 26, 2019, Chubb Senior General Adjuster Tommy V. Le ("Chubb Adjuster Le") from Colorado and Chubb's building consultant Brian D. Beatty (Vice President of J.S. Held, LLC) inspected the damage to the BC Property and were given full and unlimited access to the BC Property. *See* Plaintiff's Deposition Exhibit No. 225.

On December 27, 2020, Chubb's Environmental Scientist and Industrial Hygienist Andrew Fredericks ("Chubb's Scientist") spent hours inspecting the entire BC Property and the damage caused by the contaminant released by the Sprinkler Head (the "Initial Scientific Inspection"). *See* Plaintiff's Deposition Exhibit No. "75C".

Immediately following the Initial Scientific Inspection, Chubb Adjuster Le and his manager Matthew Witcher[3] were all advised by Chubb's Scientist that the Covered Event resulted in substantial damage to the home. *See* MKDT at 234:21-236:23; Plaintiff's Deposition Exhibit No. 75C at page 2.

On January 8, 2020 Chubb's Scientist advised Mr. Krum that he recommends Mr. Krum "obtain alternative housing as soon as possible." *See* Plaintiff's Deposition Exhibit No. 233,

---

[2] First party claimant means an individual (here Mr. Krum, the insured) asserting an entitlement to benefits owed directly to or on behalf of the insured under an insurance policy.

[3] Matthew Witcher ("Chubb Manager Witcher") supervised and directly managed Adjuster Le and worked for Chubb and Defendant Great Northern. *See* October 14, 2022 Deposition Testimony of Tommy Lee (LDT") at 28:17-21, 55:12-15.

allegation at para. 114 to Exhibit No. 1, allegation at para. 116 to Exhibit No. 1A and Exhibit No. 233A.

Ms. Santana, Ms. Krupowicz, PRMS were carbon copied by Mr. Krum on email communications directly with Chubb, Great Northern, Chubb Adjuster Le, Chubb Adjuster Mortensen, Chubb Adjuster Magnotta. *See* KDT at 72:18-73:25 and 74:1-74:10 ("We had [complete] access" to Mr. Krum).

However, on January 21, 2020 Ms. Krupowicz wrote Mr. Krum stating: "Based on the [ROR] letter that Chubb delivered to you on Friday, January 17, 2020 regarding the claim, there is nothing more I can do to be helpful. . . . We have done what we can to advocate on your behalf to this point."[4] *See* Plaintiff's Deposition Exhibit No. 78 (Santana Krupowicz_000505); *see also* KDT at 328:9-13.

Krupowicz testified at her deposition that "I [Ms. Krupowicz] was cut off from the process [as of January 17, 2020]. I didn't have the information. We weren't involved after it became an adversarial situation and the insurance company marked your claim what they call SIU, special investigation unit[5], which means they were investigating it, and the - - we as a

[4] It is important to note that the PRMS Corporate Designee Ms. Santana testified as follows: Question: "So, you can see, right, that is an en-email sent from Dale Krupowicz to me, right?" Answer: "Yes." Question: "And Dale, Ms. Krupowicz, the COO of PRMS, CCs Lindsay Jordan, right?" Answer: "Yes." Question: "But [Krupowicz] doesn't CC you. Did she BC your?" Answer: "I don't recall." Question: What would be the reason why she wouldn't CC you on something? This is pretty important. This is a pretty important e-mail, isn't it?" Answer: "You know, we have hundreds of e-mails. I don't get copied on every single e-mail." Question: "Well, my question was this was a pretty important e-mail right? My trusted advisor, my insurance brokers, are saying, Mark, there is nothing more . . . we can do. It is pretty important to me. Was it not important to PRMS?" Answer: " I think that every claim that we have with every client is important. And I think that we did everything that we could. And, you know, we reached the point where we were told, you we cannot be involved in this any linger, and that is how we proceeded." Question: "You keep saying that we were told. You weren't told that by me, correct?" Answer: "I think in this process you were, you know - - you were representing yourself, and as I said earlier, you're a sophisticated client, and I think that we helped you as best we could whenever we could." *See* PRMSDT at 286:6-287:22.

[5] Krupowicz testified that the claim was turned over to SIU; however, the 30b6 corporate designee Corey Everett testified that with regard to the cause of the loss and the insured claim, Mr. Krum did nothing wrong. Corey Everett September 29, 2020 Deposition Testimony ("EDT") at 125:18-127:6.

broker do not have access to the information." *See* KDT at 73:19-73:25; *see also* Plaintiff's Deposition Exhibit No. 78. Ms. Krupowicz acknowledged that she "was not reading those E-mails because [she] was not involved in the process. KDT at 78:19- 79:25.

**Factual Representations By PRMS And Its Members Santana and Krupowicz.**

Santana and Krupowicz headed up and supervised an insurance team at PRMS that has conducted Mr. Krum's annual insurance client reviews for eleven (11) years. In April of 2014 Krupowicz stated and represented to the Mr. Krum: "Our goal is to provide every client with peace of mind . . . [w]e want them to sleep comfortably at night without having to worry about possible financial loss" ("PRMS Sales Promise One").[6] *See* MKDT at 237:15-24; Defendants' Deposition Exhibit No. 1014 at 4 and allegation para. 36 to Exhibit 1 and allegation para. 34 to Exhibit 1A; and *see also* Plaintiff's Exhibit No. 309 and PRMSDT at 295:12-19.

In April of 2014 Santana stated and represented to Mr. Krum: "Our goal from the beginning was to learn from each client and develop services and products that filled their needs" ("PRMS Sales Promise Two"). *See* MKDT at 237:25-238:5; Defendants' Deposition Exhibit No. 1014 at 4 and allegation para. 37 to Exhibit 1 and allegation para. 35 to Exhibit 1A, and *see also* Plaintiff's Exhibit No. 309.

On or about July 13, 2009, Ms. Santana met with Mr. Krum in New York City (the "July 2009 Santana Meeting") and represented to Mr. Krum that she, Krupowicz, and their "financial backer," Howard Phillip Milstein, built PRMS "on a simple premise: that the risk management needs of high-net worth individuals are highly specialized"; and that PRMS "is a boutique firm that solely focuses on affluent individuals and families." *See* SDT at 90:20-24; PRMSDT at

[6] Mr. Krum has testified that each of the eight "Sales Promises" were communicated directly to him by Ms. Santana and Ms. Krupowicz (*see* Defendants' Deposition Exhibit No. 1014); while Ms. Krupowicz has testified that they "could be marketing materials[s]" (*see* KDT at 89:8-91:13) she agreed with Mr. Krum that she is Mr. Krum's "trusted advocate," she is there to "protect [Mr. Krum's] interests" and "make sure that [he has] the right insurance" (*see* KDT at 184:24-185:11).

236:13-19, 294:11-19; MKDT at 238:6-14; Defendants' Deposition Exhibit No. 1014 at 4 and allegation para. 36 to Exhibit 1 and allegation para. 38 to Exhibit 1A; *See* SDT at 90:20-90:24.

At the July 2009 Santana Meeting, Santana told Mr. Krum that with the help, expertise and backing of Mr. Milstein as her "financier" and "business partner" PRMS represents many of Milstein's high net worth "extremely wealthy" friends, banking clients and business partners and that PRMS is dedicated to making sure that each and every one of their clients' properties insurance needs are adequately met and all their properties throughout the United States are "completely protected" ("PRMS Sales Promise Three"). *See* MKDT at 238:15-239:2; Defendants' Deposition Exhibit No. 1014 at 5 and allegation para. 39 to Exhibit 1 and allegation para. 37 to Exhibit 1A.

Ms. Santana and Ms. Krupowicz pursued individuals such as Mr. Krum as clients because they were high net worth individuals. *See* allegation para. 40 to Exhibit 1 and allegation para. 38 to Exhibit 1A.

PRMS provides personal insurance to high net worth clients in New York state and throughout the United States. Ms. Santana and Ms. Krupowicz represented to Mr. Krum that they and PRMS are "specialists in personal insurance", that PRMS represents the insured not the insurer, and that PRMS has a duty of loyalty to Mr. Krum and "will always act in [Mr. Krum's] best interest" ("PRMS Sales Promise Four"). *See* PRMSDT at 247:4-17; MKDT at 239:3-11; Defendants' Deposition Exhibit No. 1014 at 5 and allegation para. 41 to Exhibit 1 and allegation para. 39 to Exhibit 1A.

For each of the last eleven (11) years prior to the Covered Event PRMS has conducted an annual insurance review with Mr. Krum. Mr. Krum testified that PRMS represented to him that his insurance needs will be reviewed and analyzed annually by a highly skilled insurance team at

PRMS and that PRMS will be "proactive and protect" Mr. Krum to make sure that he and his multimillion dollar luxury residential properties are adequately insured - - that is, that PRMS will "prevent both financial and physical loss to [Mr. Krum] and stand by [him] when a claim occurs" ("PRMS Sales Promise Five"). *See* MKDT at 239:12-23; PRMSDT at 50:6-51:3, 247:15-17, 311:1-312:3; Defendants' Deposition Exhibit No. 1014 at 5 and allegation paragraphs 42, 43, 45 and 48 to Exhibit 1 and allegation paragraphs 40, 42 and 47 to Exhibit 1A.

On quite a few occasions PRMS guaranteed Mr. Krum that it will provide him with "the right protection at the best price with minimal involvement on [his] part" ("PRMS Sales Promise Six"). *See* MKDT at 239:24-240:4; Defendants' Deposition Exhibit No. 1014 at 5 and allegation para. 41 to Exhibit 1A.

During the summer of 2011 PRMS, Ms. Santana and Ms. Krupowicz represented to Mr. Krum that at PRMS, "we believe that it takes the attention of a proactive professional to make sure you get the proper coverage, services, and value you need. The rich are different. So are we." *See* MKDT at 240:5-11; Defendants' Deposition Exhibit No. 1014 at 5-6 and allegation para. 42 to Exhibit 1A.

PRMS, Ms. Santana and Ms. Krupowicz represented to Mr. Krum that their "clients are some of the most demanding people anywhere. They've amassed their fortunes by expecting and accepting nothing short of excellence." *See* MKDT at 240:12-17; Defendants' Deposition Exhibit No. 1014 at 6 and allegation para. 44 to Exhibit 1 and allegation para. 43 to Exhibit 1A.

PRMS, Ms. Santana and Ms. Krupowicz represented to Mr. Krum that their "job is to protect [Mr. Krum's] wealth in the most efficient and comprehensive manner possible. . . . That's why [they at PRMS] recruit quality people who are proactive and service oriented. [That

they at PRMS] offer the same reliability as your most trusted lawyer or accountant."[7] *See* MKDT at 240:23-25; PRMSDT at 238:18-231:5; Defendants' Deposition Exhibit Nos. 301, 1014 at 6 and allegation para. 45 to Exhibit 1 and allegation para. 44 to Exhibit 1A; *see also* KDT at 90:18-91:13, 110:4-111:3 and PRMSDT at 298:1-24.

PRMS represented to Mr. Krum that each of their "personal risk managers [have] significant specialized training in the personal insurance business and shares a commitment and passion for delivering beyond the expected." *See* MKDT at 241:1-6; Defendants' Deposition Exhibit No. 1014 at 6; Plaintiff's Deposition Exhibit 189 at 4; and allegation para. 46 to Exhibit 1 and allegation para. 45 to Exhibit 1A.

Ms. Santana and Ms. Krupowicz, on behalf of PRMS, represented to Mr. Krum that "[t]hey have witnessed first-hand when insurance companies get it right and when they get it wrong. That experience has helped [them at PRMS] create a company that adopts only the best practices of the industry." *See* MKDT at 241:7-13; Defendants' Deposition Exhibit No. 1014 at 6 and allegation para. 47 to Exhibit 1 and allegation para. 46 to Exhibit 1A, KDT at 111:4-112:9.

PRMS represented to Mr. Krum that "[PRMS] will be [Mr. Krum's] trusted advocate and partner in the management of [Mr. Krum's] insurance program" ("PRMS Sales Promise Seven"). *See* MKDT at 241:14-18; Defendants' Deposition Exhibit No. 1014 at 6 and allegation para. 48 to Exhibit 1 and allegation para. 47 to Exhibit 1A, *see also* KDT at 75:14-75:21 and PRMSDT at 50:24-51:3, 52:24-54:2.[8]

---

[7] While the PRMS corporate designee Ms. Santana testified that the Promises Mr. Krum has alleged were made publicly by PRMS on its website (at times not recalling that they were made directly to Mr. Krum), she attempts to neutralize these Promises by testifying that they were only "aspirational statements".

[8] Question: "So, when PRMS wants to get clients, one of the ways it does that is by representing to prospective clients that we will represent you, the insured; we will not represent the insurers if you have a claim?" Answer: "We act as the client's advocate." Question: "Right. You don't act as the advocate for the insurance company when there is a claim; if you act as the client's advocate correct?" Answer: "Yes." PRMSDT at 53:14-54:2.

Krupowicz on behalf of PRMS represented to Mr. Krum that she works very closely with everyone at PRMS to ensure she is providing the best insurance services possible for Mr. Krum ("PRMS Sales Promise Eight"). *See* MKDT at 241:19-24; Defendants' Deposition Exhibit No. 1014 at 6 and allegation para. 49 to Exhibit 1 and allegation para. 48 to Exhibit 1A.

PRMS routinely stated to Mr. Krum that they were Mr. Krum's "trusted insurance advisor." *See* MKDT at 241:25-242:2; Defendants' Deposition Exhibit No. 1014 at 6 and allegation para. 49 to Exhibit 1A; Plaintiff's Deposition Exhibit 189 at 4 (Santana Krupowicz_000590) ("We will be your trusted advisor and partner in the management of your insurance program"); *see also* KDT at 75:14-75:21, 75:22-4.

PRMS is a Chubb Colorado Producer. *See* Plaintiff's Deposition Exhibit No.178 and SDT at 323:10-16, 324:15-325:4, and 326:11-15.

**The History And Relationship Between Mr. Krum, Santana, Krupowicz and PRMS Before the Covered Event – "We Represent You the Insured, Not The Insurer."**

Mr. Krum was initially introduced to PRMS in late spring and early summer of 2008 (the "Initial PRMS Introductions"). *See* MKDT at 242:8-11; Defendants' Deposition Exhibit No. 1014 at 7 and allegation para. 50 to Exhibit 1 and allegation para. 50 to Exhibit 1A.

In July of 2008 Mr. Krum purchased a secondary residence at the beach in Ventnor City, New Jersey (the "NJ Beach House"). At that time Mr. Krum's primary residence was in New York City at 151 East 58th Street.[9] *See* MKDT at 121:6-25, 242:12-17; Defendants' Deposition Exhibit No. 1014 at 7 and allegation para. 51 to Exhibit 1 and allegation para. 51 to Plaintiff's

[9] Mr. Krum has testified that from 2008 through and including 2020 his primary residence was in New York City and that he filed a New York Resident Tax Return. *See* MKDT at 121:21-23, 124:9-18, 385:13-20.

Deposition Exhibit 1A. *See also* Plaintiff's Deposition Exhibit 18B.[10]

At the Initial PRMS Introductions, and subsequently, Mr. Krum was presented with Sales Promise One, Sales Promise Two, Sales Promise Three, Sales Promise Four, Sales Promise Five, Sales Promise Six, Sales Promise Seven and Sales Promise Eight. Mr. Krum was told that his personal property insurance needs will be handled directly by Ms. Santana and Ms. Krupowicz Mr. Krum was repeatedly told and assured by both Ms. Santana and Ms. Krupowicz that both they and PRMS represented him "not the insurance company". *See* MKDT at 211:1-2, 242:18-25; Defendants' Deposition Exhibit No. 1014 at 7 and allegation para. 52 to Exhibit 1 and allegation para. 52 to Plaintiff's Deposition Exhibit No. 1A.

In 2010 PRMS placed Mr. Krum's homeowner's insurance for the NJ Beach House with American International Group, Inc., d/b/a AIG Private Client Group, also d/b/a Private Client Group, and also d/b/a Chartis Property Casualty Co. ("Chartis"). *See* MKDT at 118:1-2; Defendants' Deposition Exhibit No. 1014 at 7 and allegation para. 53 to Exhibit 1 and allegation para. 53 to Exhibit 1A.

On or about June 16, 2010 and again on July 9, 2010 Mr. Krum advised PRMS the he has "a new place in Colorado, can we talk about insuring it." *See* MKDT at 129:14-21; Defendants' Deposition Exhibit No. 1014 at 7; allegation para. 54 to Exhibit 1 and allegation para. 54 to Exhibit 1A and Plaintiff's Deposition Exhibit No. 16.

During the summer of 2010 PRMS encouraged Mr. Krum to rely, and in fact depend, upon its advice, service, and special expertise regarding the holding of his insurance needs and protection for his BC Property. *See* MKDT at 243:17-21; Defendants' Deposition Exhibit No. 1014 at 7; allegation para. 55 to Exhibit 1 and allegation para. 56 to Exhibit 1A.

---

[10] Exhibit 18B is Mark Krum's New York State Driver's License, a copy of which was maintained as a business record in the files of PRMS prior to the Covered Event.

As of July 9, 2010 it was Ms. Santana, Ms. Krupowicz and PRMS's understanding, as set forth in internal PRMS emails, that "[t]here's also a chance it [the BC Property] will be rented approximately 30 days per year." *See* MKDT at 139:23-25; Defendants' Deposition Exhibit No. 1014 at 8; Plaintiff's Deposition Exhibit No. 164B, and allegation para. 57 to Exhibit 1A.

On or about August 13, 2010 Mr. Krum advised both Ms. Santana and Ms. Krupowicz and PRMS that on or about September 15, 2010 he was closing on the BC Property and that it is a luxury residential property in Beaver Creek, Colorado. *See* MKDT at 138:14-15, 244:2-6; Defendants' Deposition Exhibit No. 1014 at 8; Plaintiff's Deposition Exhibit No. 189[11], and allegation para. 56 to Exhibit 1 and allegation para. 58 to Exhibit 1A.

As of September 1, 2010 Mr. Krum advised PRMS that the BC Property would be used at times by him as a luxury rental property and that in 2011 it was Mr. Krum's intention to start substantial multi-million dollar renovations on the BC Property. *See* MKDT at 138:6-11, 152:17-20, and 244:7-10; Defendants' Deposition Exhibit No. 1014 at 8; and allegation para. 57 to Exhibit 1 and allegation para. 59 to Exhibit 1A.

In September of 2010 Mr. Krum advised PRMS that it was his intention and goal to build the world's greatest ski house which would generate substantial rental income, would now be Mr. Krum's most significant financial asset, and be of great assistance to Mr. Krum financially in his professional endeavors. *See* MKDT at 154:11-13, 244:13-19; Defendants' Deposition Exhibit No. 1014 at 8; and allegation para. 58 to Exhibit 1 and allegation para. 60 to Exhibit 1A.

[11] On August 13, 2010 MS. Santana sent Mr. Krum a "summary of insurance and our proposal" that sets forth Chartis will provide "Unlimited" "Additional Living Expense" for two "Residences". *See* Plaintiff's Deposition Exhibit 189 at 3-4 (Santana Krupowicz _000588 - _000589, SDT at 246:89-248:16, 251:17-251:22, 252:14-252:20. The "summary of insurance and our proposal" also stated: "Your PRMS Team" "Our team has significant training in the personal insurance business and we share a commitment and passion for delivering beyond the expected. We will be your trusted advisor and partner in the management of your insurance program."

In early September 2010 Mr. Krum advised PRMS that his BC Property will be his largest single asset and that it had to be properly insured for any potential loss, "no exceptions" and that he was relying on PRMS's expertise. *See* MKDT at 154:11-13, 244:20-22; Defendants' Deposition Exhibit No. 1014 at 8; and allegation para. 59 to Exhibit 1 and allegation para. 61 to Exhibit 1A.

On or about September 2, 2010 PRMS placed Mr. Krum's BC Property homeowner's insurance with Chartis effective September 15, 2010 with coverage that would provide Mr. Krum with *unlimited* ELE and FRV coverages. *See* MKDT at 159:20-160:6, 161:13-25, 245:2-7; Defendants' Deposition Exhibit No. 1014 at 8; Plaintiff's Deposition Exhibit No. 7, and allegation para. 60 to Exhibit 1 and allegation para. 62 to Exhibit 1A.

It is Mr. Krum's testimony that at no time did PRMS, Ms. Krupowicz and/or Ms. Santana ever communicate directly to Mr. Krum that his BC Property was to be insured by PRMS as a "Vacation Home." *See* MKDT at 245:8-14; Defendants' Deposition Exhibit No. 1014 at 8; Plaintiff's Deposition Exhibit No. 190A (Santana Krupowicz_008067-008068, and Krum_ 001247-001248), and allegation para. 61 to Exhibit 1 and allegation para. 63 to Exhibit 1A.

It is Mr. Krum's testimony that at no time did Mr. Krum ever request PRMS, Ms. Krupowicz and/or Ms. Santana to insure his BC Property as a "Vacation Home." *See* MKDT at 245:8-14; Defendants' Deposition Exhibit No. 1014 at 8; Plaintiff's Deposition Exhibit No. 190A (Santana Krupowicz_008067-008068 and Krum_001247-001248), and allegation para. 64 to Exhibit 1A.

It is Mr. Krum's testimony that on or about February 2, 2011 Mr. Krum advised PRMS that he would still continue to rent out his BC Property. *See* MKDT at 245:15-17; Defendants'

Deposition Exhibit No. 1014 at 9; and allegation para. 62 to Exhibit 1 and allegation para. 65 to Exhibit 1A.

It is Mr. Krum's testimony that on or about April 15, 2011 Mr. Krum advised PRMS that he would continue to rent his BC Property upon completion of his multi-million dollar renovations which were to begin later that year in the summer of 2011. At that time, Mr. Krum specifically discussed with PRMS that the BC Property upon completion of renovations will be marketed as a high-end luxury residential rental generating hundreds of thousands of dollars in rental income at nightly rental rates of over $10,000.00. *See* MKDT at 141:1-10, 245:18-246:3; Defendants' Deposition Exhibit No. 1014 at 9; Plaintiff's Deposition Exhibit Nos. 166, 166A (Santana Krupowicz-000261-000265)[12] and Defense Exhibit 1006 and allegation para. 63 to Exhibit 1 and allegation para. 66 to Exhibit 1A.

Ms. Krupowicz and PRMS were aware that Mr. Krum's renovations and construction on the BC Property started on or about August 1, 2011. Plaintiff's Deposition Exhibit No. 11M (Santana Krupowicz_001233).

On or about August 11, 2011 Mr. Krum was advised by PRMS that because of his construction and renovation commencing his insurance premium for Chartis for the BC Property would be increasing from "$3,700 to $53,000." Plaintiff's Deposition Exhibit No. 11N (Santana Krupowicz_001242).

It is Mr. Krum's testimony that in August of 2011 PRMS advised Mr. Krum that it will be changing his homeowners' insurance coverage for the BC Property and the NJ Beach House from Chartis to Chubb and that all his residential insurance coverage (including ELE and FRV)

[12] On April 15, 2011 Defendant Santana confirmed in writing that on April 11, 2011 Mr. Krum asked her "How does renting [his] home impact [his] coverage?" Santana further confirmed in writing that she asked Chartis how long are their customers "allowed to rent their homes without needing to advise them or being subject to a surcharge and whether a high rental income in the magnitude of $100K-$200K affect the coverage." *See* Plaintiff's Deposition Exhibit 166A.

will remain in place and provide the "same complete coverage". *See* MKDT at 193:8-194:4, 246:4-10; Defendants' Deposition Exhibit No. 1014 at 9; Plaintiff's Deposition Exhibits 11A and 11B; and allegation para. 64 to Exhibit 1 and allegation para. 67 to Exhibit 1A.

On or about August 12, 2011 PRMS provided Krum with its own "Comparison" of coverages by Chartis versus Chubb (upon which Mr. Krum relied).[13] However, PRMS's own Comparison failed to disclose to Mr. Krum specifically the material difference between Chartis and Chubb regarding maximum ELE and FRV coverage.[14]/[15] *See* MKDT at 194:16-195:1, 246:11-17; Defendants' Deposition Exhibit No. 1014 at 9; Plaintiff's Deposition Exhibits 11B, 11C, 11D, 11E and 11F; and allegation para. 68 to Exhibit 1A.

In August of 2011 PRMS advised Mr. Krum that all his future insurance premiums must be paid directly by him to Chubb. From 2011 through 2020 Mr. Krum directly paid Chubb in excess of $100,000.00 in insurance premiums. Mr. Krum's credit card statements and personal checks reflected that all premium payments were made to "Chubb Insurance" or "Chubb Group of Insurance Companies". Mr. Krum further received written payment confirmations from "Chubb Group of Insurance Companies" that "Your payment will be posted to our Chubb account" and "In a world of choices, thank you for insuring through Chubb." *See* MKDT at 246:18-25; 247:2-7; Defendants' Deposition Exhibit No. 1014 at 9; and allegation para. 65 to Exhibit 1 and allegation para. 69 to Exhibit 1A.

---

[13] Ms. Krupowicz testified and agreed that Mr. Krum asked for a chart so he could do a comparison. However, Ms. Krupowicz ultimately acknowledged that she (Krupowicz) "did not have the conversation with [Mr. Krum] . . . Celia [Santana] did, because you [Mr. Krum] refused to talk to me about it." KDT at 214:18-25.

[14] Ms. Santana testified at her deposition that "[i]n August of 2011 when [she] switched Mark Krum from Chartis to Chubb and put [him] in a Chubb policy . . . [she] knew [Mr. Krum] no longer got unlimited FRV." SDT at 169:6-169:24. However, Ms. Santana, Ms. Krupowicz and PRMS NEVER placed this loss of coverage to Mr. Krum in their "Chubb-Chartis Comparison". *See* Plaintiff's Deposition Exhibits 11C, 11F, and 188.

[15] On August 12, 2011 Ms. Santana sent Mr. Krum an email stating "Annual premium while CO house is under construction: Chartis $52,458 Chubb $12,192 . . . Once construction is done, annual premiums assuming a $6 million rebuild value: Chartis $6,661 Chubb $8,313." *See* Plaintiff's Deposition Exhibit 11F.

From August of 2011 through and including December 24, 2019, and well after, PRMS advised Mr. Krum that his "Homeowners" insurance "Carrier" for the BC Property and NJ Beach House was "Chubb". *See* MKDT at 247:8-12; Defendants' Deposition Exhibit No. 1014 at 10; and allegation para. 66 to Exhibit 1 and allegation para. 70 to Exhibit 1A.

On August 18, 2011 PRMS, Ms. Krupowicz and Ms. Santana advised Mr. Krum that his insurance "Agency" is PRMS and that his insurance "Company" is "Chubb Group of Insurance" "Covering: 373 Strawberry [Park] Road", the BC Property. *See* MKDT at 247:13-18; Defendants' Deposition Exhibit No. 1014 at 10; and allegation para. 67 to Exhibit 1 and allegation para. 71 to Exhibit 1A.

It is Mr. Krum's testimony that in or about August of 2011 PRMS advised Mr. Krum that "Chubb understands what you expect when it comes to insurance – coverage that suits your lifestyle, a policy that gives you choices and no hassles if you have to report a claim. In fact when it comes to insuring your property and possessions, we offer coverage and service beyond your expectations." *See* MKDT at 247:19-248:1; Defendants' Deposition Exhibit No. 1014 at 10; and allegation para. 68 to Exhibit 1 and allegation para. 72 to Exhibit 1A.

It is Mr. Krum's testimony that in August of 2011 PRMS advised Mr. Krum that his insurance protection for his BC Property was "sufficient" and that his insurance needs were being fully taken care of by PRMS and would be procured with the clear understanding of Mr. Krum's wealth, income and financial goals for the BC Property and its intended use as a high end luxury rental property. *See* MKDT at 248:2-9; Defendants' Deposition Exhibit No. 1014 at 10; and allegation para. 70 to Exhibit 1 and allegation para. 74 to Exhibit 1A.

At no time did PRMS, Ms. Krupowicz and Ms. Santana ever advise Mr. Krum that his Additional Living Expense ("ALE") coverage for Extra Living Expenses ("ELE") and/or Fair

Rental Value ("FRV") with the BC Property for September 15, 2011 through September 15, 2012 would not be the same under Chubb as it was intended and quoted at all times with Chartis.[16] *See* MKDT at 248:10-17; Defendants' Deposition Exhibit No. 1014 at 10; Plaintiff's Deposition Exhibit 190A (Santana Krupowicz_008067-_008068); and allegation para. 71 to Exhibit 1 and allegation para. 75 to Exhibit 1A.

At no time did PRMS, Ms. Krupowicz and Ms. Santana ever advise Mr. Krum that his Additional Living Expense ("ALE") coverage for Extra Living Expenses ("ELE") and/or Fair Rental Value ("FRV") with the BC Property subsequent to September 14, 2011 would omit, change and/or decrease coverage that he had requested in 2010 and 2011 and maintained with Chartis.[17] *See* MKDT at 248:18-23; Defendants' Deposition Exhibit No. 1014 at 10; Plaintiff's Deposition Exhibit 190A (Santana Krupowicz_008067-008068); and allegation para. 72 to Exhibit 1 and allegation para. 76 to Exhibit 1A.

At no time did PRMS ever advise Mr. Krum that it had not placed the same BC Property ALE, ELE and FRV coverages he had requested and previously had in effect with Chartis. *See*

[16] Ms. Santana testified that she knew in August of 2011, when she recommended that Mr. Krum go with Chubb instead of Chartis, he was "no longer getting unlimited ELE". *See* SDT at 170:13-170:19. Ms. Santana goes even further to testify that she does "believe [Mr. Krum and her] had a conversation about this when the policy was placed. Ms. Santana further testified as follows: Question- "When do you believe you came to a conclusion that I [Mr. Krum] only got 60 days of ELE?" Answer– "I mean very, very quickly after the claim, umm, you know, you received the contract language from Tommy Le within two or three days of the claim so it was very clear what the coverage was." *See* SDT at 210:23-211:5, 225:3-4. However, when questioned: "Did you [Ms. Santana] ever orally tell me that I [Mr. Krum] was limited to 60 days?" Answer- "I stated earlier that Dale [Krupowicz] was the lead person on, your relationship . . . . So I did not have a conversation with you [after the claim] about this." *See* SDT at 224:17-225:2. Ironically, Ms. Krupowicz testified that she first learned of the Chubb purported 60 day limit (not in 2011, like Santana, but) "when [she] had a chance to see that you [Mr. Krum] had the vacation home policy and that I [Krupowicz] know that's what the limitation is under the policy. . . . [a] few days [after the Covered Event]. But that wasn't for [her] to give [Mr. Krum] that information." KDT at 326:16-327:16. Mr. Krum's two trusted insurance advisors Santana and Krupowicz never told him about this purported 60 day limit (Question: "But yet you never told me that in all our conversations?" Answer: "I don't recall telling you that.") *See* DKT at 327:17-19.

[17] *See* preceding footnote 16.

MKDT at 248:24-249:2; Defendants' Deposition Exhibit No. 1014 at 11; Plaintiff's Deposition Exhibit 190A (Santana Krupowicz_008067-_008068); and allegation para. 77 to Exhibit 1A.

At no time did PRMS, Ms. Krupowicz and Ms. Santana ever advise Mr. Krum during any of his last nine (9) annual "Personal Insurance Summary" reviews (the "PISR") (last relevant PISR being in September 2019) that his ALE, ELE and/or FRV coverage would be materially different than what Mr. Krum previously had with Chartis and would not provide Mr. Krum's BC Property with maximum ALE, ELE and/or FRV coverage. *See* MKDT at 249:3-12; Defendants' Deposition Exhibit No. 1014 at 11; Plaintiff's Deposition Exhibit 190A (Santana Krupowicz_008067-_008068); and allegation para. 73 to Exhibit 1 and allegation para. 78 to Exhibit 1A.

PRMS, Ms. Krupowicz and Ms. Santana on multiple occasions subsequent to September 14, 2011 expressly told Mr. Krum they had "carefully review[ed]" his "Chubb renewals" and placed the requested and the same maximum ALE, ELE and FRV coverages for the BC Property that existed for Mr. Krum with Chartis (the "PRMS Agreement"). The PRMS Agreement was repeatedly reaffirmed by PRMS at each of Mr. Krum's annual PISRs through 2019. *See* MKDT at 249:13-21; Defendants' Deposition Exhibit No. 1014 at 11; Plaintiff's Deposition Exhibit 190A (Santana Krupowicz_008067-_008068); and allegation para. 74 to Exhibit 1 and allegation para. 79 to Exhibit 1A.

It is Mr. Krum's testimony that he believed and understood that for the BC Property he had ELE and FRV coverage with no maximums and no limits. *See* Defendants' Deposition Exhibit No. 1014 at 11; Plaintiff's Deposition Exhibit 190A (Santana Krupowicz _008067-_008068).

It is Mr. Krum's testimony that at no time did PRMS, Ms. Krupowicz, and Ms. Santana ever offer Mr. Krum the opportunity to purchase and obtain a total of twenty-four months of ALE coverage and give Mr. Krum an explanation of the purpose, terms, and costs of this coverage. *See* Defendants' Deposition Exhibit No. 1014 at 11; Plaintiff's Deposition Exhibit 190A (Santana Krupowicz_008067-_008068); and allegation para. 76 to Exhibit 1 and allegation para. 81 to Exhibit 1A.

It is Mr. Krum's testimony that at no time did PRMS, Ms. Krupowicz and Ms. Santana ever tell Mr. Krum his additional coverage for ELE and/or FRV would be adversely affected because his BC Property will be insured by Chubb as a "Vacation Home." *See* Defendants' Deposition Exhibit No. 1014 at 11; Plaintiff's Deposition Exhibit 190A (Santana Krupowicz_008067-_008068); and allegation para. 77 to Exhibit 1 and allegation para. 82 to Exhibit 1A.

Mr. Krum was willing to pay an additional premium for maximum ELE and/or FRV coverage, but at no time did PRMS, Ms. Krupowicz and/or Ms. Santana ever tell Mr. Krum that his premium(s) must be increased to receive maximum ELE and/or FRV coverage. *See* Defendants' Deposition Exhibit No. 1014 at 11; Plaintiff's Deposition Exhibit 190A (Santana Krupowicz_008067-_008068); and allegation para. 78 to Exhibit 1 and allegation para. 83 to Exhibit 1A.

The record before me establishes that PRMS was compensated to provide Mr. Krum professional services involving specialized training, knowledge and skill while in pursuit of obtaining business for PRMS and insurance for Mr. Krum's BC Property. *See* Defendants' Deposition Exhibit No. 1014 at 12; Plaintiff's Deposition Exhibit 190A (Santana

Krupowicz_008067-_008068); and allegation para. 79 to Exhibit 1 and allegation para. 84 to Exhibit 1A.

### C. Mr. Krum's Intent To Rent The BC Property In 2020.

The BC Property has been rented out (as documented in written contractual agreements) no less than twelve (12) times. It was rented out from December 21, 2010 to January 2, 2011 (13 days/12 nights); from February 4, 2011 to February 8, 2011 (5 days/4 nights); from February 12, 2011 through February 19, 2011 (8 days/7 nights); from March 4, 2011 to March 12, 2011 (9 days/8 nights); March 12, 2011 to March 19, 2011 (8 days/7 nights); December 26, 2012 to January 2, 2013 (8 days/7 nights)[18]; from January 18, 2013 to January 23, 2013 (6 days/5 nights); from March 25, 2013 to April 1, 2013 (8 days/7 nights); from July 1, 2013 to July 6, 2013 (6 days/5 nights); from February 14, 2014 to February 23, 2014 (10 days/9 nights); from February 12, 2105 to February 19, 2015 (8 days/7 nights); from March 14, 2015 to March 21, 2015 (8 days/7 nights); and from December 25, 2015 to January 3, 2016 (10 days/9 nights).[19] *See*

[18] This December 2012 rental was obtained through a October 3, 2012 agreement with a private home rental management company Luxury Home Rentals, LLC ("LHR") that was effective on October 3, 2012 and was provided to Ms. Santana and PRMS on October 3, 2021. *See* Plaintiff's Deposition Exhibit Nos. 200 (copy in PRMS files since 2012), 200A (fully executed); 200B (bc email to Santana); 200C (Santana Krupowicz_001475 to 001494); *see also* KDT at 182:7-194:6 (However, Ms. Krupowicz testified that she does not know why Mr. Krum sent it to PRMS, but agreed it was a business record of PRMS).

The record before me establishes that sometime in late December 2019 through January of 2020 Chubb Adjuster Le "asked [Mr. Krum's] broker, Celia Santana, Dale Krupowicz, PRMS . . . to give [him] anything that they had to support that [Mr. Krum] rented [his BC] property out." Defendants Santana, Krupowicz and PRMS never provided Chubb and Chubb Adjuster Le with the copy of Private Home Rental Agreement between Mr. Krum and Luxury Home Rentals, LLC that was in PRMS' files and possession. *See* LDT at 157:11-162:3; KDT at 181:3—181:13, 182:19-184:15 (Q-"Mr. Le, once again, my question is, you asked my broker, Celia Santana, Dale Krupowicz, PRMS, okay, to give you anything that they had to support that I [Mr. Krum] rented my property out, right? Answer- "I did."); SDT at 10:5 to 10:22, 12:5-12:12, 14:4-15:15, 17:10-18:1, 20:1-21:15, 22:23-23:3, 28:5-29:14 ("neither of these documents to me is significant in that it does not indicate a specific rental" and "I am not certain how this document got into my file"), 30:6-31:11 (". . . So now the document [is] in your file, Exhibit 200. Does that cause you any red flag that you believe as my trusted advisor you now need to make a specific inquiry to me your client as to whether or not I rent the property out?" Answer: "Generally speaking yes"); SDT at 30:16-21.

[19] Prior to the Covered Event Mr. Krum had rented the BC Property out no less than 107 days. 2010-2011 Policy Period 43 rental days; 2011-2012 Policy Period 0 rental days (because the BC Property was under renovation and construction); 2012-2013 Policy Period 26 rental days; 2013-2014 10 rental days; 2014-2015 Policy Period 16 rental

Plaintiff's Deposition Exhibit Nos. 75C (Krum_000800), 206, 207, 208, 209, 210, 211, 242, 243, 244A, 244B, 244C, 244D, 244E, 244F, 245, 246 (Defense Ex. 1015), 246A (Defense Ex. 1018),, 246B (Defense Ex. 1019), 246C (Defense Ex. 1020), 246D, 247, 248, 249, and allegation para. 89 to Exhibit 1 and para. 94 to Exhibit 1A.[20]/[21] *See also* MKDT at 188:15-190:6, 316:3-20; Defendants' Deposition Exhibit No. 1014 at 12.

In October of 2015 the Insured Property was offered for rent for $20,000.00 a day for the entire house and $16,000.00 for the entire house (except the owner's suite). *See* January 7, 2020 Declaration of Andi Ohde (the "January 7 Declaration") at ¶9 marked as Exhibit "B" to Plaintiff's NY Complaint and also identified as Plaintiff's Deposition Exhibit No. 3. *See also* MKDT at 251:1-252:17; Defendants' Deposition Exhibit No. 1014 at 12.

In 2015 and 2016, as well as in 2020 and currently, the fair rental value ("FRV") for the Insured Property during peak ski season (December 25 through January 2 and February 15 through March 31) was and is $20,000.00 a day for the entire BC Property and $16,000.00 a day

---

days; 2015-2016 Policy Period 10 rental days. Four of Mr. Krum's six first policy periods he rented out the BC Property more than the maximum 15 days. The record before me establishes that during four of Mr. Krum's eight first policy periods *prior* to the Covered Event contained rental periods in excess of 15 days; in other words, prior to the Insured Event Mr. Krum rented his BC Property for more than 15 days for all of the policy periods 50% of the time. Moreover, Mr. Krum rented out his BC Property for 26 days as of August 2011when PRMS switched him from Chartis to the Chubb Policy. The record also establishes that the stated purpose of Mr. Krum's 2011-2012 renovations was to build the "World's Greatest Ski House" for rentals.

[20] At her deposition and despite the Chubb Masterpiece Rate Rule Manual ("CMRRM") (Plaintiff's Deposition Exhibits 180 and 180A) and all the discovery information to which she has had access, Defendant Santana continues to assert under oath that Mr. Krum was placed into the "appropriate coverage" with Chubb and Great Northern. *See,* SDT 38:24 to 40:5 (Answer: "I think this shows that you had appropriate coverage"). *See also*, KDT at 17817-18. ("This policy was appropriate for you needs"). The record before me establishes Ms. Santana did not understand Chubb's CMRRM – at one point in her deposition Defendant Santana contends that the CMRRM would require "consecutive" rental days as opposed to simply 15 days, consecutive or not during a policy period. *See* SDT Transcript 46:17 to 49:25, 51:7-22, 53:20-54:18. Another example is when Ms. Santana testified under oath that Mr. Krum would qualify for a vacation home policy (with a 15 day limit on rentals) even if you intended to rent your property out for more than 15 days, because "[y]our intent is not what is actually happening so yes." SDT 55:11 to 56:3.

[21] "[I]t [is] up to the broker [PRMS] to determine what the correct information is in terms of a rental exposure." See David Medford Spetember 14, 2022 Deposition Transcript ("DMDT") at 187:3-5 (Mr. Medford is the Senior Vice President in charge of the associate underwriters at Chubb and designated by Defendant Great Northern as the 30(b)(6) witness for Chubb with regard to underwriting. DMDT at 21:23-22:4).

for the entire BC Property (except what is identified as the owner's suite). *See* Plaintiff's Deposition Exhibit No. 3, the January 7 Declaration at ¶10. *See also* MKDT at 253:3-9; Defendants' Deposition Exhibit No. 1014 at 12.

For the last few years prior to the Covered Event without interruption, with the intent of renting the BC Property at an agreed upon rental rate, Mr. Krum has advertised the BC Property for rent on the internet at the professional website titled "The World's Greatest Ski Lodge" at: MJPropertiesLLC.com. *See* Plaintiff's Deposition Exhibit No. 3, the January 7 Declaration at ¶11.[22] *See also* MKDT at 253:10-15; Defendants' Deposition Exhibit No. 1014 at 13.

On or about November 18, 2019 Mr. Krum contacted a local Vail Valley real estate broker about retaining her professional services and relisting the BC Property for sale *and* rent in 2020. *See* Plaintiff's Deposition Exhibit No. 3, the January 7 Declaration at ¶12. *See also* MKDT at 253:10-19; Defendants' Deposition Exhibit No. 1014 at 13.

On Tuesday afternoon, November 26, 2019 Mr. Krum had a conversation with a real estate broker about relisting the BC Property for sale in the spring of 2020 and about listing and marketing the BC Property in January and February of 2020 for rent during high demand ski season in March of 2020 and also listing the BC Property for rent in the high demand summer months of July and August of 2020. *See* Plaintiff's Deposition Exhibit 3, the January 7 Declaration at ¶13. *See also* Defendants' Deposition Exhibit No. 1014 at 13.

On January 1, 2020 Mr. Krum was contacted by a potential luxury renter from Kansas and Las Vegas who found the BC Property on the internet, had reviewed Mr. Krum's professional rental video and website, and wanted to rent the BC Property for his family during President's weekend in February and/or in March of 2020. *See* Plaintiff's Deposition Exhibit 3,

---

[22] Ms. Santana and Ms. Krupowicz testified that she had never looked at Mr. Krum's website until "after the claim occurred." SDT at 88:16-89:9 and KDT at 142:14-22.

the January 7 Declaration at ¶14 and Plaintiff's Deposition Exhibit No. 14. *See also* MKDT at 254:5-10; Defendants' Deposition Exhibit No. 1014 at 13.

PRMS's sole justification for claiming they did not know about Mr. Krum's BC Property rentals can best be summed up by Ms. Krupowicz' response to Mr. Krum's question: "Why didn't you ask me - - why didn't you just ask me if I was ever renting out my house?" Krupowicz' Answer: "Because the checklist[23] has a certain question and that is to cover all possible occupancies. So rather than specifically saying, we ask if there's been a change to the occupancy that we have."[24]/[25] KDT at 142:2-7.

**The Policy, Plaintiff's Claims And Factual History for ALE, ELE And FRV.**

The Policy states in part:

**Extra Living expenses.** If a covered loss makes your house or other permanent structure uninhabitable during your usual vacation occupancy, we cover the reasonable increase in your normal living expenses that is necessary to maintain your household's usual standard of living, including boarding of domestic animals not primarily owned or kept for business use. We will pay for the boarding of your domestic animals displaced from an other permanent structure even

---

[23] The "checklist" is titled the "Personal Risk Management Solutions Client Checklist" and question three (3) on the checklist states: "Have there been any changes to the occupancy of your home(s)?" *See* Plaintiff's Deposition Exhibit 241A (Santana Krupowicz_000504) (version 2019).

[24] Mr. Krum also asked Ms. Krupowicz: Question: "[D]id you, after you got this E-mail on July 13, 2010 [Plaintiff's Deposition Exhibit 164B] from Ms. Santana, did you ever ask me about renting my Beaver Creek property out?" Answer: "We asked you every year if there had been any changes in the occupancy, what we knew to be your secondary vacation home, and you never told us that it was - - to my recollection, that you were renting it." Question: "My question is so then - - so is your answer to my question, no you - - you never asked me whether I was renting it out?" Answer: "We - - I didn't ask you specifically if you were renting it out, but I asked if there were any changes or updates, and you did not tell me of any." Question: "That's not true. But you're talking about it with regard to rental. You're saying in that - - form that you send out every year, I didn't say, by the way, I'm still renting my - - -my - -Beaver Creek [P]roperty out. That's what you're trying to tell us, right?" Answer: "I was not aware you were renting it and there were no subsequent conversations where you told me you were renting it." Question: "And my question, again, is did you ever ask me once, just once, Mark, are you renting out the BC [P]roperty?" Answer: "We ask that when we do your review if there's been any change to the occupancy, so we've asked that question." *See* KDT at 140:20-141:23. Question: "What about the fact that I've been renting it since day one?" There would be no change, I would just be doing what I started to do from day one." Answer: "You didn't - - I was not informed, to my recollection, that you were renting out the house." *See* KDT at 142:8-13.

[25] Ms. Santana used the same circular response. Question: "You say you 'discuss.' When did you ever discuss it with me?" Answer: "It's on the checklist; has the occupancy of your home changed . . . ." SDT at 32:1-12. Question: "Did you ever ask me to send you rental agreements?" Answer: "I don't know the answer to that. That would have been 10 years ago. I don't know." SDT at 34:9-16; *see also* SDT 35:9-11.

when you have not been displaced by the covered loss. We cover these increases for the reasonable amount of time required to restore your house or other permanent structure to a habitable condition, or if you or members of your household permanently relocate, the shortest amount of time required to settle elsewhere. However, if you are newly constructing your house or other permanent structure or constructing additions, alterations, or renovations to your house or other permanent structure at the time of a covered loss, we only cover the increase in your normal living expenses incurred by you for the reasonable amount of time required to restore the house or other permanent structure to the condition it was in prior to the covered loss. We cover these extra living expenses for up to 60 days, even if the policy period ends during that time.

**Fair rental value.** If a covered loss makes a part of your house or other permanent structure which you usually rent to others uninhabitable, we cover its fair rental value during the period of time it is usually rented for the reasonable amount of time required to restore it to a habitable condition. We cover fair rental value for up to 15 days, even if the policy period ends during that time.

The Policy allows Mr. Krum a maximum amount of $2,069,100.00 in additional coverage for his Additional Living Expenses (*i.e,* Extra Living Expenses and Fair Rental Value Expenses) with no deductible for this coverage. *See* Plaintiff's Deposition Exhibit No. 6 and allegation para. 124 to Plaintiff's Exhibit 1 and allegation para. 125 to Plaintiff's Exhibit 1A.

On January 2, 2020 Chubb Adjuster Le stated to Mr. Krum that the fair rental value (the "FRV") "under the vacation home policy is payable on an incurred cost" and "[i]f [Mr. Krum] intend[ed] to rent the home in March 2020 [he needed to provide a lease agreement]." In response to Chubb Adjuster Le's interpretation of Mr. Krum's insurance contract with Chubb, Mr. Krum asked Chubb Adjuster Le to show him where in the Policy it required "an incurred cost" by the insured. Until the deposition testimony of Mr. Corey Everett, the Great Northern designated corporate representative witness (33+ months later), Mr. Krum was never advised by Great Northern, PRMS, Ms. Krupowicz, Ms. Santana, Chubb Adjuster Mortensen, Chubb Manager Witcher, Chubb Adjuster Magnotta and Chubb Adjuster Le where in the Policy it required "an incurred cost" by the insured. *See* EDT at 92:4-98:25; Plaintiff's Deposition Exhibit

Nos. 230E and 230H-1 and allegation para. 129 to Exhibit 1; *see also* LDT at 92:5-93:13, 321:11-17; Matthew Witcher November 9, 2022 Deposition Transcript ("WDT").

In fact, the Policy does NOT require an "incurred cost" to establish loss of FRV. *See* EDT (Great Northern 30b6 witness) at 94:4 to 94:22; 95:11 to 96:9 and 98:12 to 98:25 (and Chubb Manager Witcher had an obligation to correct Chubb Adjuster Le's false statement); *see also* LDT at 92:5-93:13, WDT at XXX. While Chubb and Great Northern manufactured a Policy term and condition requiring FRV coverage to be an "incurred cost", PRMS, Ms. Santana and Ms. Krupowicz (as Mr. Krum's trusted advisor) failed to protect Mr. Krum and advocate that such policy term and condition was not required, nor did such term and condition even exist in the Policy. In fact just the opposite occurred, PRMS, Ms. Santana and Ms. Krupowicz adopted and supported Great Northern and Chubb's incorrect position. SDT at 120:2-10, KDT at 145:23-146:18, 169:5-169: 11 and PRMSDT at 118:23-119:1, 120:2-10.

Prior to February 2020 Ms. Santana, Ms. Krupowicz and PRMS never once advised Mr. Krum that he was requesting ALE accommodations that were not covered under the Policy and/or were in excess of Policy limits as they understood them. On Friday evening, February 7, 2020, Chubb Adjuster Le informed Mr. Krum *for the first time* that Chubb and Great Northern would only cover ELE for up to sixty (60) days. *See* Plaintiff's Deposition Exhibit Nos. 263 and 76A and allegation para. 162 to Exhibit 1. *See also* MKDT at 254:17-20; Defendants' Deposition Exhibit No. 1014 at 13.

The record before me establishes that from the Covered Event through and including February 6, 2020 (for over six full weeks) PRMS, Ms. Santana and Ms. Krupowicz never once stated in any communication to Mr. Krum that he was only covered for up to sixty (60) days of ELE and that Chubb and Great Northern would not provide coverage for any of the proposed

rentals that Mr. Krum was negotiating. By this time, with the full knowledge of Ms. Santana, Ms. Krupowicz and PRMS thirty (30) days had passed during which Mr. Krum spent numerous hours, days and weeks researching, visiting, and considering properties to rent for a term well in excess of six months. *See* MKDT at 255:5-9; Defendants' Deposition Exhibit No. 1014 at 14.

## III. STANDARD OF CARE.

An insurance producer who agrees to obtain a particular form of coverage for a client has a duty to obtain such coverage or else timely notify the client of the producer's failure or inability to obtain such coverage. In other words, where an insurance agency (like PRMS) undertakes to secure specific coverage or leads a policyholder (like Mr. Krum) to believe certain coverage has been obtained, if the coverage is not included in the policy, it is liable for its negligence.

New York does not immunize insurance brokers and agents from appropriately assigned duties and responsibilities. Those agents who hold themselves out to be exceptional and particularized, may assume or acquire duties in addition to the reasonable care, skill and diligence duties fixed at common law. "[T]he issue of whether such additional responsibilities should be recognized and given legal effect is governed by the particular relationship between the parties and is best determined on a case-by-case basis." *Murphy v. Kuhn, 90 N.Y.2d 266, 272* (1997). *See also, A.J. Contracting Co., Inc. v. Trident Managers, Inc., et al.*, 234 A.D.2d 195, 196 (1st Dep't 1996) (Evidence of the customary practices of other insurance brokers is admissible to establish that standard, and plaintiff was entitled to show that broker's failure to provide plaintiff with ongoing claims monitoring and risk management was a deviation from such standard and accepted practices).

Whether a special relationship has been formed in Colorado turns on whether there is "entrustment," that is, whether the agent or broker assumes additional responsibilities beyond those which attach to an ordinary, reasonable agent possessing normal competencies and skills. *Kaercher v. Stater, et al.,* 155 P.3d 437, 441 (Colo. App. 2006). *See also, Bavly, Martin & Fay, Inc. v. Pete's Satire, Inc.*, 739 P.2d 239, 243 (Colo. 1987) (The Colorado Supreme Court held that an insurance agent who agrees to obtain a particular form of coverage has a legal duty to do so or notify the insured of his or her failure or inability to do so). The Tenth Circuit has also held "that once it was plainly evident that the plaintiff was requesting such insurance, the agent was required to exercise skill and diligence in procuring it. *Butler v. Scott*, 417 F.2d 471, 473 (10th Cir. 1969).

## IV. SYNOPSIS.

From the very outset of their business relationship Celia Santana, Dale Krupowicz, and PRMS were given specific instructions by Mr. Krum to provide him with the maximum FRV and ELE insurance coverage for his BC Property. When Mr. Krum learned that his premium from Chartis would increase from $3,700 to nearly $53,000 due to a 2011 construction and renovation surcharge, Mr. Krum requested Ms. Santana, Ms. Krupowicz, and their firm, PRMS, to find another insurer that would replace Chartis and provide him with the same, maximum coverage for a lesser amount than the nearly 15-fold increase in premium by Chartis. Before agreeing to move his insurance to Chubb, as proposed by PRMS, Mr. Krum wanted to be certain that the coverages provided by Chubb were the same as those provided by Chartis; therefore, he requested that his agents provide him with a coverage and price comparison between Chartis and Chubb for his review. The agents provided him with a Comparison which they prepared, and by the manner in which it was composed, led Mr. Krum to understand that there were *no* material

differences in coverage. The Comparison referred only to "Homeowners" and made no reference to a "Vacation Policy." As presented, there were only two variables to consider; building limit (unlimited replacement cost from Chartis or $9 million from Chubb) and premium ($33,356 difference).

Mr. Krum relied upon the Comparison authored by and submitted to him by Ms. Santana, Ms. Krupowicz and PRMS to make his decision to switch from Chartis to Chubb.

Ms. Santana, Ms. Krupowicz and PRMS failed to disclose during ANY policy period that Mr. Krum's policy coverage with Chubb was materially different from that which he had with Chartis. During the annual Personal Insurance Summary renewals when the brokers could have discussed any policy changes or additional coverage opportunities (flood, earthquake, mold, umbrella, equipment breakdown, *etc.*), the brokers never mentioned any coverage differences or any opportunity to change his policy (or obtain a new insurer) to include unlimited ELE or FRV.

Santana and Krupowicz failed to disclose the very meaningful differences (unlimited ELE and unlimited FRV) between the Chubb and Chartis policies. Further, they did not even place Mr. Krum in the correct and appropriate policy. As early as July 2010 when Mr. Krum was in negotiations to purchase the BC Property, he advised Ms. Santana, telling her about his intent to rent the property. Internal PRMS emails confirm that Mr. Krum advised them that "[t]here's also a chance it [the BC Property] will be rented approximately 30 days per year, but that's TBD"

Despite Mr. Krum's notice that he was renting the BC property (and the acknowledgement of such notice by PRMS and Ms. Santana and Ms. Krupowicz), PRMS procured insurance for the BC Property under the category of Vacation Home House Coverage. Mr. Krum did not ask for a Vacation Home House Policy; he asked for the same policy coverage

that he had with Chartis. Neither Ms. Santana nor Ms. Krupowicz told Mr. Krum that his property insurance was a "Vacation Home House Policy" with different coverage and different coverage limits than the Chartis policy with unlimited ELE and FRV which he previously had; and no one mentioned, let alone explained, to Mr. Krum that under a Vacation Home House Policy, a homeowner is limited to renting their home to no more than 15 days per calendar year. Not only did Mr. Krum advise Ms. Santana, Ms. Krupowicz, and PRMS of his intentions to rent the BC Property, Mr. Krum did, in fact, rent the property – 107 days during peak rental season over the course of the next several years. During four of the first six policy periods Mr. Krum rented out the property for more than 15 days during the calendar years. Before his substantial renovations and construction commenced (for luxury rental improvements and amenities) in August of 2011, Mr. Krum had already rented out the BC Property his first year of ownership 43 rental days.

During her deposition Ms. Krupowicz acknowledged that in the eight plus years that Mr. Krum owned the BC Property and was a client of PRMS, she never looked at Mr. Krum's rental website; she also acknowledged never reading or even seeing the copy of a rental management company contract which had been in the PRMS files since October 2012. Ms. Santana even went so far as to suggest that the rental management contract could have been sent to them post-claim by Chubb. When Chubb Adjuster Tommy Le asked PRMS for any document(s) to support that Mr. Krum rented the property, they failed to produce the rental agency contract which was in their files.

Despite the fact that Chubb's Rate and Rule Manual disallows the placement of a Vacation Home House policy for homes that are rented more than 15 days per calendar year, Ms. Santana stated in her deposition that she had indeed provided Mr. Krum with the "appropriate

coverage"[26] for his BC property. When Mr. Krum produced documents verifying that numerous times during the years when the Chubb Vacation Home coverage was in effect, the property was rented more than 15 days in a calendar year, Ms. Santana dismissed this concern, saying the coverage was "appropriate" and that the rental days were "not consecutive." Ms. Santana testified that in the insurance industry, if it's [the rental period] not a consecutive 25-day period that is very meaningful."[27] PRMS markets itself and its agents as "specialists in personal insurance," as offering "the same reliability as your most trusted lawyer or accountant." However, what has occurred in this case demonstrates a basic lack of understanding of Mr. Krum's loss exposures as well as the coverage terms and conditions of the Chubb policy into which he was placed. Moreover, not once was Ms. Santana or PRMS able to demonstrate during their depositions that they ever explained to Mr. Krum or advised him that under the Vacation Home policy, he would be limited in coverage to renting his property for 15 days or less. Not once were they able to demonstrate that they even asked Mr. Krum in numerous email exchanges or annual renewal reviews if he ever rented his property. Doing so would have alerted Ms. Santana, Ms. Krupowicz, PRMS and Mr. Krum to the fact that he did NOT have the maximum coverage that he believed was in place.

Following the Covered Event, Ms. Santana, Ms. Krupowicz, and PRMS failed to provide even the barest minimum of assistance.[28] They seemed to believe that no assistance was required because they believed Mr. Krum was a "sophisticated client" and Chubb asked PRMS "to step aside." *See* PRMSDT at 159:13-160:8, 287:19-20 By no means did PRMS satisfy and meet the

[26] SDT at 40:5-6; 46:13.
[27] SDT at 47:19-21; *see also* 55:23-56-3.
[28] When asked by Mr. Krum what PRMS did "to help [him]? You said you helped me. Name something you did to help me." PRMS's corporate designee testified that "Dale [Krupowicz] stopped serving dinner Christmas Eve and reported your cliam. . . ." PRMSDT at 160:10-13. Further adding "I don't know how many other brokers would have handled your phone call on Christmas Eve while they were serving dinner. So, I would say that we do do the best that we can to help our clients, and I think that says a lot." PRMSDT at 290:23-291:3.

obligations of the exceptional and particularized standard they held themselves out to provide Mr. Krum.

During her deposition, Mr. Krum asked Ms. Santana specifically why, in the first few days after the Covered Event, (if she honestly believed it to be accurate) she did not simply tell him that his Vacation Home policy which was in effect at the time of the Covered Event only provided 60 days of ELE coverage. Ms. Santana responded that he had been provided the contract language within days and as a "lawyer and sophisticated consumer" he could read the contract. When queried further as to why Ms. Santana did not herself pick up the phone to speak with Mr. Krum directly and point out the 60 day limit, Ms. Santana stated that "[Mr. Krum] was told by getting the contract right away." When pressed further as to why Ms. Santana did not simply tell Mr. Krum about the 60 days, she passed that responsibility to her partner, Ms. Krupowicz, saying that "Dale was the lead person on this … so I did not have a conversation with you about this."[29] In the deposition of Ms. Krupowicz, Ms. Krupowicz said that she became aware of the 60 day limit "a few days" after the claim, "[b]ut that it was not for [her] to give [Mr. Krum] that information."[30] For weeks, Ms. Santana and Ms. Krupowicz elected not to give Mr. Krum (what they believed to be) vital information about his policy limits while Mr. Krum continued to look for homes to rent during the time his house was in remediation and re-construction. Then less than 30 days from the Covered Event, Ms. Krupowicz abruptly sent Mr. Krum a letter telling him that she could no longer advocate on his behalf saying: "there is nothing more I can do to be helpful."[31] Mr. Krum continued to keep Ms. Santana and Krupowicz and PRMS in the loop by directly including them on all emails and email chains, but Ms.

[29] SDT at 222:19-224:24.
[30] KDT at 326:16-327:19.
[31] Plaintiff's Exhibit No. 78.

Santana and Ms. Krupowicz testified that they were "cut off"[32] from communications by Chubb and they were not in a position to assist him as a result.

## V. OPINIONS.

PMRS's negligent acts, errors, and/or omissions in the rendering of or failure to render professional services to Mr. Krum were performed by Ms. Santana and Ms. Krupowicz or a person acting under their direction, control or supervision and for whose acts, errors or omissions Defendant PRMS is responsible.

By the acts, error and/or omissions in the rendering of or failure to render professional services as set forth in this Expert Report, Defendant Santana and Defendant Krupowicz, jointly and individually, breached such duties in that they failed to exercise the requisite degree of knowledge, skill and competence ordinarily exercised by other members of their respective profession and failed to procure appropriate, adequate, and the requested ELE and FRV coverages for Mr. Krum.

As insurance brokers holding themselves out as competent and skilled personal insurance brokers licensed to provide insurance services, Defendants PRMS, Santana and Krupowicz all breached their duty to use reasonable care, diligence and judgment in procuring all the insurance requested by Mr. Krum.

As insurance brokers holding themselves out to the general public as competent and skilled property insurance providers, Defendants PRMS, Santana, Krupowicz all breached their duty to provide insurance services to Mr. Krum with requisite degree of knowledge, skill and competence ordinarily exercised by other specialty insurance brokers of their respective profession.

[32] KDT at 72:14; SDT at 278:12, 281:24-25.

Defendants Santana, Krupowicz and PRMS all failed to protect Mr. Krum and obtain maximum ELE and FRV coverage as requested by Mr. Krum

Defendants Santana, Krupowicz, and PRMS all failed to protect Mr. Krum and obtain maximum ELE and FRV coverage for Mr. Krum.

Defendants Santana, Krupowicz, and PRMS all failed to properly advise and protect Mr. Krum's insurance interests for the BC Property prior to the Insured Event.

Defendants Santana, Krupowicz, and PRMS all failed to properly advise, assist and protect Mr. Krum's insurance interests for the ELE and FRV coverages subsequent to the Insured Event.

A "special relationship" as defined under Colorado law existed between Mr. Krum and Defendants Santana, Krupowicz and PRMS between 2008 through and including 2020.

Defendants Santana, Krupowicz and PRMS failed to exercise basic due diligence to confirm that Mr. Krum "usually rented the BC Property to others".

Based on the record it is my expert opinion that Mr. Krum "usually rented the BC Property to others".

Based on the record it is my expert opinion that Defendants Santana, Krupowicz and PRMS during the insurance periods of September 15, 2011 through and including September 15, 2020 placed Mr. Krum with the wrong insurance coverage, in fact, coverage that was not available by Chubb under its Masterpiece Rate and Rule Manuel, effective March 27, 2018 (*See* Plaintiff's Deposition Exhibits 180 and 180A).

Based on the record it is my expert opinion that PRMS, Ms. Santana and Ms. Krupowicz did *not* fully understand the terms and conditions of the Chubb policy that they recommended to Mr. Krum in August of 2011, which fell below the standard of care and duties for insurance

agents. Furthermore, it's my expert opinion that eight years later they still did not know about a Chubb purported 60-day ELE Limit at the time of the Covered Event.

PRMS, Ms. Santana and Ms. Krupowicz failed to clearly advise Mr. Krum of the material differences in ELE and FRV coverage limits between Chartis and Chubb.

Defendants PRMS, Santana and Krupowicz all continually acted unreasonably and with knowledge of or reckless disregard for the facts that were within their possession which could support and assist Mr. Krum's claims for complete coverage.

As insurance brokers holding themselves out as competent and skilled insurance brokers licensed to provide insurance services, Defendants PRMS, Santana and Krupowicz all had a duty of loyalty to Mr. Krum to fully represent his interests. It is my expert opinion that PRMS, Santana and Krupowicz breached this duty.

## VI. CALCULATION OF DAMAGES.

The determination of damages should be related to the direct harm caused to Mr. Krum by Defendants PRMS, Santana and Krupowicz' alleged negligence and wrongdoing. In other words, the damages which should be recovered by Mr. Krum for breach of an agreement to furnish insurance coverage that was requested (but not placed) is the loss sustained by reason of the breach - - the amount that would have been due under the policy provided it had been obtained.

It is my Expert Opinion that Mr. Krum should received damages for *no less than* two years of unlimited FRV and ELE.[33] Accordingly, as a direct and proximate result of their professional and brokers negligence and their breaches of a fiduciary relationship and duty of

[33] The Chubb Deluxe House Coverage Policy covers ELE and FRV for the reasonable amount of time required to restore the house to the condition it was in prior to the covered loss OR up to two years from the date of loss, or a later date if agreed to by Chubb. The Chartis Policy, however, Mr. Krum was insured under had no yearly limit.

loyalty, Mr. Krum suffered substantial economic injury and damages well in excess of four million dollars.

I reserve the right to amend and/or supplement my Expert Report based upon further information and/or materials which are brought to my attention.

## VII. CONCLUSION

It is my professional opinion within a reasonable degree of professional certainty based on industry standards and my analysis and detailed review of documents and deposition testimony set forth in my Expert Report that Defendants PRMS, Santana and Krupowicz all committed professional negligence and deviated from their required standard of care.

DATED: December 2, 2022
Media, Pennsylvania

Respectfully submitted,

BY: ______________________

William P. Curtis, Jr.
225 State Road
Media, PA 19063
Tel: 610-348-5772

## VII. CONCLUSION

It is my professional opinion within a reasonable degree of professional certainty based on industry standards and my analysis and detailed review of documents and deposition testimony set forth in my Expert Report that Defendants PRMS, Santana and Krupowicz all committed professional negligence and deviated from their required standard of care.

DATED: December 2, 2022
Media, Pennsylvania

Respectfully submitted,

BY: ______________________

William P. Curtis, Jr.
225 State Road
Media, PA 19063
Tel: 610-348-5772